# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND .................................................................................................. 6

    Courthouse "News" Service ........................................................................ 6

    CNS as a First Amendment Plaintiff ......................................................... 8

    CNS in Maryland ........................................................................................ 8

    Maryland's Circuit Circuits ........................................................................ 9

    Maryland Rules of Civil Procedure ........................................................... 9

    Maryland Rule 16-904 ............................................................................. 10

    Historical Press Access to Newly Filed Civil Complaints in Maryland Courts .... 12

    Confidential and Restricted Information ................................................. 12

    Paper Filing in Maryland .......................................................................... 13

    Electronic Filing in Maryland  ................................................................. 14

    MDEC Process for Newly Submitted Civil Complaints ......................... 15

    MDEC Rules ............................................................................................. 16

    Maryland Rule 20-203(a)(2)  ................................................................... 17

    "Press Queue" Request from CNS to Ms. Harris that Costs $108,000 Annually .. 17

    CNS's Current Action .............................................................................. 18

    CNS's *Inaccurate* Allegations ................................................................ 19

    The *Actual* Data ..................................................................................... 20

    New Queue for Newly Submitted Civil Complaints Creates Even Better Results 25

ARGUMENT ................................................................................................................. 26

I.      LEGAL STANDARD. .................................................................................... 26

        A.      Motion to Dismiss. ............................................................................ 26

        B.      Preliminary Injunction .................................................................... 27

II.     THE AMENDED COMPLAINT SHOULD BE DISMISSED. ........................... 28

        A.      This Suit is Barred by Eleventh Amendment Immunity. ............................ 28

        B.      The Court Should Exercise its Broad Discretion under the Declaratory
                Judgment Act and Decline Jurisdiction. ........................................................ 30

        C.      The Court Should Abstain Jurisdiction under these Circumstances .......... 33

                i.      The Court Should Distinguish this Case from Schaefer and Abstain
                        Based on Equity, Federalism, and Comity ....................................... 34

                ii.     The Court Should Abstain Based on the *Burford* Abstention
                        Doctrine ................................................................................. 36

        D.      The Clerk Defendants Should be Dismissed. ............................................... 38

II.     THE REQUEST FOR PRELIMINARY INJUNCTION MUST BE
        DENIED ..................................................................................................... 39

        A.      CNS Has Not Demonstrated that it is Likely to Succeed on the
                Merits. ...................................................................................................... 40

                i.      CNS Does Not Have a Right to Instantaneously Access Newly
                        Submitted Civil Complaints in Maryland MDEC Circuit Courts .... 40

                ii.     CNS Is Unable to Prove a Tradition in Maryland of Instantaneous
                        Access to Newly Submitted Civil Complaints, Because One Does
                        Not Exist ................................................................................ 46

                iii.    CNS has Reasonably Contemporaneous Access to Newly Submitted
                        Civil Complaints in Maryland's Circuit Courts ............................. 49

                iv.     To the Extent There are Minor Delays in Access to Newly Submitted
                        Civil Complaints Caused by Clerical Review and the Docketing
                        Process, they are Justified ........................................................ 51

B. The Balance of Equities Favors Denial of a Preliminary Injunction. ......... 52

C. CNS Has Not Demonstrated that Issuance of a Preliminary Injunction will Prevent Irreparable Harm ..................................................... 53

D. An Injunction is Not in Public Interest......................................................... 54

CONCLUSION ................................................................................................................. 55

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | | |
|---|---|---|
| COURTHOUSE NEWS SERVICE, | * | |
| *Plaintiff*, | * | |
| v. | * | No. 1:22-cv-00548-JRR |
| | * | |
| PAMELA Q. HARRIS, ET AL., | * | |
| *Defendants*. | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**DEFENDANTS' MEMORANDUM IN SUPPORT OF COMBINED MOTION TO DISMISS AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

Defendants submit this memorandum in support of their combined motion to dismiss the amended complaint filed by Plaintiff, Courthouse News Service ("CNS") (ECF No. 8), and opposition to CNS's motion for preliminary injunction (ECF No. 9).

**INTRODUCTION**

On October 1, 2021, Bill Girdner, the editor of CNS, a corporation that profits significantly from lawyers across the country subscribing to the litigation "reports" it creates from newly filed civil complaints and masquerades as the press,[1] sent a letter to the

---

[1] Nothing about this case is about the "news" and the word "News" in CNS's name is a misnomer. CNS receives the bulk of its net profit from the lawyers and law firms who subscribe to its new litigation reports and then use the information from those short blurbs to solicit clients. Exhibit 2, p. 9, Order Denying Motion for A Preliminary Injunction ("The further briefings now shed further light, sometimes not so bright, on what may be driving this lawsuit."). As stated in a memorandum order from the United States District Court for the Central District of California, the vast majority of those who utilize and benefit CNS's "news" services are CNS's law firm customers with a commercial interest in gaining quick access to newly submitted civil complaints. *Id.* CNS's continued strategy (now almost five (5) years after the memorandum order) of stating the opposite is a misrepresentation of CNS's business and true motives in this case.

Maryland State Court Administrator, Pamela Q. Harris ("Ms. Harris").[2]   Mr. Girdner requested that Maryland courts implement what he called a "press queue" to allow CNS to have *instantaneous* electronic access to all newly electronically submitted civil complaints for filing in Maryland, prior to the required processing by clerks and the docketing process.

Mr. Girdner did not raise any specific concerns related to Maryland's docketing procedures, nor any concerns about the timeliness of docketing in Maryland's courts.  *Id.* In fact, at that time CNS had not commenced its supposed (and amateurish) "tracking" of the docketing of newly submitted civil complaints in Maryland.  Mr. Girdner further claimed that the press queue is free.  He is wrong:  it is not.

Although Mr. Girdner made one vague reference to litigation and the First Amendment, he did not mention that CNS previously filed approximately twenty lawsuits nationwide—all related to <u>access</u> to new civil complaints—against state court clerks and administrators.  This included Mr. Girdner failing to mention CNS's recent suit, which only a few months earlier resulted in a Fourth Circuit opinion.  *Courthouse News Serv. v. Schaefer*, 2 F.4th 318 (4th Cir. 2021).  Mr. Girdner was advised that a "press queue" could not be implemented because it would violate the Maryland Rules of Civil Procedure.

Also in October of 2021, a CNS "reporter"[3] in New Jersey, with no alleged statistical or analytical expertise or training, began an amateur, inaccurate, and self-serving "analysis" of the supposed delays between the submission of new civil complaints and their

---

[2] For some reason, the same letter was sent to only one other Defendant.  (ECF No. 9-4.)

[3] While CNS refers to its staff as "reporters," they are not news reporters in any true historical sense of the word.

docketing in Maryland's circuit courts.  During this same time, Maryland's most populated county, Montgomery County, first implemented electronic filing in its courts.[4]

On February 14, 2022, Ms. Harris received a letter from counsel for CNS, Jonathan Ginsberg.  Although the letter was labeled a "follow-up" to Mr. Girdner's letter, this was the first CNS mentioned any concerns specific to actual "delays" in Maryland's docketing of newly submitted civil complaints.  The letter had no information about how or when CNS "tracked" the alleged delays and it contained no information about the length of the alleged delays.  Instead, the letter merely alleged that the delays were "substantial."

Like the previous letter, CNS sought to address only its access to newly electronically submitted civil complaints, in spite of purporting to also "report" on filings, hearings, and rulings.  Unlike the previous letter, CNS first mentioned *Schaefer*.  The letter claimed that the applicable legal standard, *Schaefer*, required that Maryland's clerks' offices make newly submitted civil complaints available upon receipt on the day they are submitted and prior to clerical docketing.  This is an inaccurate recitation of the Fourth Circuit's *Schaefer* standard.  The proper standard requires "reasonably contemporaneous" but not "perfect or instantaneous" access to newly submitted civil complaints for filing.  2 F.4th at 328.  Any contrary contention by CNS is incorrect and simply wishful thinking. Mr. Ginsberg was also sure to warn Ms. Harris that if CNS prevails here then CNS is entitled to attorneys' fees and that in *Schaefer* CNS was awarded over $1.9 million.

---

[4] Electronic court filing expanded to the Circuit Court for Montgomery County on October 25, 2021.  MDEC updates and alerts are available at https://mdcourts.gov/mdec/latestupdatesarchive (last visited May 23, 2022).

As a result of receiving the February 14, 2022, letter, Ms. Harris had Maryland's Administrative Office of the Courts ("AOC") contact Maryland's electronic court filing system provider, Tyler Technologies, Inc. ("Tyler"), to investigate CNS's claims. Contrary to CNS's contention, Tyler advised that the press queue would cost the State and Maryland taxpayers $108,000 annually, so that CNS can increase its profit. Ms. Harris and AOC also gathered statistical data from Tyler confirming that CNS's claims were and are inaccurate and, therefore, that Defendants are complying with *Schaefer*. AOC also investigated and ultimately implemented through Tyler an alternative to CNS's demanded "press queue" that would be less costly to State taxpayers while also complying with the Maryland Rules of Civil Procedure. This new queue prioritizes the review of newly submitted civil complaints at no cost. At approximately the same time, AOC also began posting a daily report on the Maryland Judiciary Case Search Judiciary website identifying every public case created in each Maryland e-filing court in the previous 30 days.

It is undisputable that Defendants are adhering to the *Schaefer* standard. The *actual* data confirms that between October 1, 2021, and May 24, 2022, newly submitted civil complaints were accessible to the press and public, on average, within **3.9** business hours of submittal. The median number of business hours during this time was **1.6**. Statewide, between October 1, 2021, and May 24, 2022, **85.2%** of all newly submitted civil complaints were available to the press and public within 8 business hours and 1 business minute. When the Circuit Court for Montgomery County is omitted, the average drops to **2.7** business hours, and the median drops to **1.2** business hours. Statewide, with the Circuit Court for Montgomery County excluded, the 85.2% rate increases to **91.7%**.

4

During the weeks immediately following the implementation of the new queue, between April 25, 2022, and May 24, 2022 (*i.e.*, 29-days), newly submitted civil complaints were accessible to the press and public, on average, within **1.3** business hours of submittal.  The median was **0.7** business hours.  Most significantly, for the last 29-days of available data from the date of Defendants' instant motion (May 31, 2022), <u>Statewide</u> **<u>98.9%</u>** <u>of all newly filed civil complaints are being made available for public and press</u> <u>review (including CNS) within 8 business hours and 1 business minute of submittal</u>.

Thus, this case is not like *Schaefer* where at the time of the filing of suit the defendant clerks "only made 42.4% of the complaints available on the day of [submittal] and 41.5% of the complaints were not available until two or more court days after [submission]."  2 F.4th at 322.  Instead, here the applicable percent is **98.9%**. Consequently, as to CNS's motion for preliminary injunction, CNS should do <u>exactly as it</u> <u>did in *Schaefer*</u>, <u>which was voluntarily withdrawal its motion for preliminary injunction a</u> <u>mere two (2) months after filing it</u>.  Exhibit 3, CNS's Notice of Withdrawal of Motion for Preliminary Injunction.

CNS has not and cannot demonstrate that it is likely to succeed on the merits, that it is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in its favor, and that an injunction is in the public interest.  CNS's motion for preliminary injunction is nothing more than a litigation strategy to obtain the actual data in this case, which CNS has now obtained and would otherwise have to wait until discovery to do so.  It is further an attempt to alter the status quo.  For these reasons, CNS's motion for preliminary injunction should be denied.

As to dismissal, this Court should abstain from involvement in this case and dismiss this suit based on Eleventh Amendment Immunity, the Court's broad discretion to decline to exercise jurisdiction under the Declaratory Judgment Act, and an application of the facts of this case to the concepts of equity, comity, and federalism.  CNS demands relief well outside the applicable scope of *Schaefer* and CNS seeks to significantly expand *Schaefer*. Specifically, CNS demands instantaneous pre-docketing access to newly submitted civil complaints, which is not the applicable standard.   Rather, the standard is "reasonably contemporaneous" but not "perfect or instantaneous" access to newly submitted civil complaints for filing.  *Schaefer*, 2 F.4th at 328.  The actual data confirms that CNS and the public are being provided this access.   Additionally, the Defendant clerks should be dismissed as improper parties because they are unable to offer CNS the relief it seeks.

## BACKGROUND

**Courthouse "News" Service**

CNS is a stock corporation incorporated in California in 1997.  Exhibit 4, CNS Articles of Incorporation.  Although CNS "publishes a *freely*-available website featuring [what it refers to as] news reports and commentary" (ECF No. 8-1 ¶ 48) (emphasis added), CNS's core "publications" are its for-profit new litigation "reports," which "are sent to [paid] subscribers via e-mail each evening" and summarize in one to three sentences[5] "civil complaints [filed] against business institutions, public entities, and prominent individuals

---

[5] For example, the sample "Baltimore Report" provided by CNS summarizes a case in the Circuit Court for Baltimore County with the case name, case number, plaintiff's counsel, and this description: "Premises liability. The defendant failed to make its grounds safe, causing the plaintiff to fall into an extermination trap and be injured."  (ECF No. 9-8.)

. . ."  (ECF Nos. 9 ¶ 15; 9-8; 9-9.)  The new litigation reports exclusively serve "the lawyers and law firms based across the nation who are [paid] subscribers to these reports."  Exhibit 5, ¶ 3, CNS "The Wayback Machine" (Nov. 14, 2008).

In 2016, CNS had "net income (gross profit) of $4,290,250" and "on a national level law firms and lawyers accounted for $3,959,785," or almost 93% of all but approximately $330,000 of that profit.  Exhibit 6, p. 3, CNS's Response to Order Regarding Additional Briefing.  That is, as of 2016, "over 92% of CNS's subscribers are paying law firms" who "likely then solicit business using the information CNS provides."[6]  Exhibit 2, p. 9.

In order to prepare their new litigation reports, "CNS reporters [] traditionally [and allegedly] visited their assigned courts, so that they [could] review all the complaints . . . ."  (ECF No. 8-1 ¶ 49).  But now, CNS is attempting to cover courts remotely through the advent of "e-filing."  (*See id*.)  Naturally, this creates less overhead cost for CNS.

When court filing information is unavailable electronically, CNS employees allegedly "often visit courts daily, usually at the end of the day, to review the day's filings, but sometimes less frequently, especially in smaller cities, remote areas, and courts with fewer filings."  (ECF No. 9-2 ¶ 18.)  CNS employees also "base their reports on docket information (i.e., party names, case type, and court name) made available online . . . ."  (*Id*.)

---

[6] This data was only provided in response to a court order ordering CNS to provide it.  *See generally* Exhibit 6.  Just as Defendants have provided up-to-date data relevant to CNS's claims in this case, CNS should likewise do the same.  Accordingly, CNS should either voluntarily provide updated data regarding its business to the court in the interest of transparency and candor to the Court, or respectfully Defendants request that the Court order CNS to do so.  For example, at a minimum, CNS could simply answer the five (5) questions from the order referenced in Exhibit 6, but as applied to the present, the Defendants, and this case.

**CNS as a First Amendment Plaintiff**

CNS has been filing this type of litigation for over a decade.  Commencing in 2009, CNS has filed lawsuits against state court clerks across the country seeking federal mandates that will provide CNS with quicker and easier access to newly filed civil complaints to increase CNS's profit.  (ECF No. 9-2 ¶ 57.)  As in this suit, CNS relies on the First Amendment.  *Id*.

In his declaration, Mr. Girdner purports to summarize "Prior CNS Litigation to Address Similar Access Restrictions" (ECF No. 9-2 ¶¶ 57-68).  Interestingly, Mr. Girdner, omits certain cases (*i.e.*, cases not favorable to CNS).  For example, *Courthouse News Service v. Brown* is omitted.  908 F.3d 1063 (7th Cir. 2018).  The Seventh Circuit upheld a dismissal in *Brown*, finding that the federal courts should altogether "avoid a situation in which the federal courts are dictating in the first instance how state court clerks manage their filing procedures and the timing of press access" and that "[i]nitial adjudication of this dispute in the federal court would run contrary to the considerations of equity, comity, and federalism."  *Id.* at 1075.

**CNS in Maryland**

CNS began profiting from newly filed civil complaints in Maryland courts in March 2004.  (ECF No. 9-2 ¶ 46.)  CNS publishes two litigation reports that cover newly filed actions filed in Maryland:  (1) the Baltimore Report, which includes coverage of this Court, the Circuit Court for Baltimore County, and the Circuit Court for Baltimore City, and (2) the Greater Maryland Report, which covers every other Maryland circuit court.  (ECF Nos. 9-2 ¶ 16; 9-8; 9-9.)  Yet, only three of CNS's 240 staff members reside in Maryland.  (ECF

Nos. 9-2 ¶ 17; 9-1, at 9.)  Naturally then, CNS is performing much of its Maryland work electronically as described by CNS in ECF No. 9-2 ¶ 18.  And, because the Circuit Court for Baltimore City is not yet an electronically-filing court, and is not a defendant in this matter, any mention by CNS of it in this lawsuit is irrelevant.

### Maryland's Circuit Courts

The judicial power of the State of Maryland is vested in the Court of Appeals, sitting at the apex of the judicial system, an intermediate appellate court authorized by the General Assembly, circuit courts, orphans courts, and a district court.  Md. Const. Art. IV, § 1.  The circuit courts are "the highest common-law and equity courts of record exercising original jurisdiction within the State."  Md. Code Ann., Cts. & Jud. Proc. § 1-501.  Each circuit court "has full common-law and equity powers and jurisdiction in all civil and criminal cases within its county."  *Id.*

### Maryland Rules of Civil Procedure[7]

Maryland's Court of Appeals has the exclusive constitutional power to oversee Maryland's state judicial system and to create the rules that govern the practice and procedure in and the administration of all Maryland courts.  Md. Const. art. IV, § 18.  The Court of Appeals may appoint a standing committee of lawyers, judges, and other persons to assist the Court in the exercise of its rulemaking power.  Md. Code Ann., Cts. & Jud. Proc. § 13-301.  The standing committee meets regularly to consider proposed amendments

---

[7] Unless otherwise indicated, all reference to a "Rule" or "Rules" are to the Maryland Rules of Civil Procedure rather than the Federal Rules of Civil Procedure.

and additions to the rules and to make recommendations to the Court of Appeals. https://www.mdcourts.gov/rules (last visited May 23, 2022).

"Subject to supervision by the Chief Judge of the Court of Appeals, <u>the State Court Administrator</u> [Defendant, Ms. Harris] <u>shall be responsible for the administration of the MDEC system</u> . . . ."  Md. Rule 20-103(a) (emphasis added).   "The State Court Administrator shall adopt policies and procedures that are necessary or useful for the proper and efficient implementation of the MDEC System and consistent with the [applicable Maryland Rules]."  Md. Rule 20-103(b)(1).

**Maryland Rule 16-904**

Maryland Rule 16-904(b) currently states:

> (b) Protection of Records. To protect judicial records and prevent unnecessary interference with the official business and duties of the custodian and other judicial personnel, <u>a clerk is not required to permit public inspection of a case record filed with the clerk for docketing in a judicial</u> action or a notice record filed for recording and indexing <u>until the document has been docketed or recorded and indexed</u>.

(Emphasis added).  This Rule is derived from former Maryland Rule 16-1002(b)(1),[8] which was adopted in 2004.  It was conceived in 2003, when then-Chief Judge Robert M. Bell, with the concurrence of the Court of Appeals, created a committee to consider and propose new "[r]ules that would govern public access to court records."   Exhibit 7, p. 1, Recommendations Regarding Public Access to Court Records.  This committee consisted

---

[8] Maryland Rule 16-1002(b)(1) was adopted on March 4, 2004, and effective from October 1, 2004, through June 30, 2016, with slight amendments.  Effective July 1, 2016, this rule was codified as Rule 16-902(b)(1).  Effective July 1, 2017, this rule was codified as Rule 16-903(c). Effective August 1, 2020, and through the present, the rule has been codified as Rule 16-904(b).

of then-Chief Judge Bell, as well as Judges Alan M. Wilner and Lynne A. Battaglia of the Court of Appeals. *Id*. The committee recommended—and on March 4, 2004, the Court of Appeals adopted—an entirely new title to the Maryland Rules of Civil Procedure. *Id*.

Pertaining to the current language of Maryland Rule 16-904(b), the committee explained that it "recognizes the common law right . . . of agencies to place reasonable procedural limitations on access to and copying of their records." *Id*., p. 13. These limitations are necessary based, in part, on "the operational efficiency of the agency and the fact that employees have other duties to perform." *Id*. The committee also recognized two competing issues. *Id*. On one hand, there are the issues related to the clerks' offices falling behind in docketing papers, which may result from understaffing or a "temporary deluge in filings." *Id*. The committee recognized a need to protect the "public policy of openness." *Id*. at p. 14.

On the other hand, the committee recognized that "<u>unlimited immediate access to documents prior to their being docketed</u> or, in the case of notice records, prior to their being recorded and indexed, <u>can create some serious operational and security problems</u>." *Id*. (emphasis added). While documents are sitting in stacks and awaiting processing, the "clerks are legitimately concerned about removing them from those stacks for public inspection" "before any official record is made of them." *Id*.

Importantly, the committee pointed out that "[m]ost clerks do not now [2003] permit access to documents until the docketing . . . is complete." The committee further stated that because this "is an important policy issue for the Court," "Section (b) of this Rule adopts the current practice and permits a clerk to deny inspection of a case record until it

11

has been docketed . . . ."  *Id*.  Thus, almost 20 years ago, judges on Maryland's Court of Appeals considered the exact issue(s) raised by CNS when adopting Rule 16-904(b).  And, Maryland's Court of Appeals intentionally and knowingly chose a path with the adoption of Rule 16-904(b) that contradicts CNS's desired outcome here.

### Historical Press Access to Newly Filed Civil Complaints in Maryland Courts

Consistent with the "legislative" history outlined above, and contrary to the assertion by CNS, there is no history in Maryland of permitting press access to newly submitted complaints prior to docketing, nor any history of a "press bin" or "press box" used to allow the press special access to newly submitted but not yet filed and docketed complaints.  *Id*.; Exhibits 8-31, Declarations from all 22 Defendant clerks' offices and Baltimore City and Prince Goerge's County.  The Defendant clerks or their staff confirm that clerks' offices only provided access to newly submitted civil filings, including newly submitted civil complaints, to the public after the requested filing was reviewed by the clerks' offices and docketed.  Exhibits 8-31.  This included any request to review a filing by the press.  *Id*.  And, historically and generally, prior to electronic filing, at best if a member of the press or public physically presented at a clerk's office and requested to see a filing that had not yet been filed/docketed, then as a courtesy the person was asked to wait while the filing was quickly reviewed by the clerk's office, docketed, and completed out of order to satisfy the request.  Exhibits 9-11, 13, 20, 23-28, 30-31 (all at ¶ 5).

### Confidential and Restricted Information

Maryland Rule 16-902(c)(2) explains that "[a]lthough there is a presumption of openness . . . some present special concerns [] require more focused treatment with respect

to sealing or shielding decisions," and that "[c]ase records . . . may contain very sensitive information that needs to remain confidential for overarching privacy, safety, and security purposes and not be subject to public inspection."

Maryland Rule 16-916(a)(1) requires a person filing a new case record to inform the court if any information contained in the case record is confidential and not subject to inspection.  Rule 16-916(b)(2) states, "The clerk shall make a reasonable effort, promptly upon the filing or creation of a case record, to shield any information that is not subject to inspection under the Rules . . . and that has been called to the attention of the custodian by the person filing or authorizing the filing of the case record."  Rule 1-322.1 prohibits the filing of documents containing certain "personal identifier information," including account numbers and social security numbers.  Rule 16-915(f) requires that courts deny inspection of any part of a case record that would reveal a "trade secret, confidential commercial information, confidential financial information, or confidential geological or geophysical information."  Rule 16-914 requires that courts deny inspection of certain information, including but not limited to "medical or psychological information about an individual."  Rule 16-918 requires the courts to "take reasonable steps to prevent access to restricted information" that may be included in electronic judicial records.

### Paper Filing in Maryland

Only two of Maryland's circuit courts—the Circuit Court for Baltimore City and the Circuit Court for Prince George's County—use a "paper filing" system.   Exhibit 32, Harris Decl. at ¶ 11.  These are the only Maryland courts that have not implemented electronic filing.  *Id*.  Their clerks are the only clerks not Defendants in this suit.  *Id*.  In

these two courts new complaints are, and were in all other courts prior to the implementation of electronic filing, submitted either by mail or hand-filing.  *Id.*

**Electronic Filing in Maryland**

On October 10, 2014, Maryland launched its electronic filing program, which is "Odyssey."  *Id.* at ¶ 7; Exhibit 33, Walter Decl. at ¶ 6.  "File and Serve" is Maryland's electronic filing program used by attorneys and other authorized users.  Exhibit 32, Harris Decl. at ¶ 7; Exhibit 33, Walter Decl. at ¶ 6.  It is available at https://maryland.tylerhost.net/OfsWeb/FileAndServeModule (last visited May 23, 2022).  Maryland's Electronic Court ("MDEC") applications include products from Tyler Technologies, Inc. ("Tyler").  *Id.*

MDEC refers collectively and colloquially to a suite of applications, including Tyler's Odyssey and File and Serve.  *Id.*  Twenty-two of Maryland's 24 circuit courts are currently using MDEC, and they are the courts whose clerks are named as Defendants. (ECF No. 8); https://mdcourts.gov/mdec/latestupdatesarchive (last visited May 26, 2022); Exhibit 32, Harris Decl. at ¶ 11.  MDEC is a "judiciary-wide integrated case management system" that enables "courts at all levels to collect, store, process, and access records electronically."  (ECF No. 9-10 at p. 3 ("What is MDEC").)

Maryland's transition to MDEC involved many years of planning.  *See generally* Exhibit 34, "Moving Justice Forward."  The concept of MDEC came about in 2006.  *Id.*, p. 1.  Then-Chief Judge Bell appointed an advisory committee who did years of study and recommended a streamlined electronic system.  *Id.*  The Maryland Judiciary contracted with Tyler on October 28, 2011, and then spent three (3) years creating MDEC.  *Id.*

MDEC has been implemented in Maryland courts on a rolling basis. https://mdcourts.gov/mdec/latestupdatesarchive (last visited May 26, 2022).  The latest circuit court to implement MDEC was in Maryland's most populated county, Montgomery County.  *Id.*; Exhibit 35, Maryland Population.  Perhaps, this is why CNS chose to first contact Ms. Harris seeking a "press queue" in October 2021.  (ECF No. 8-1 ¶ 76.)

### MDEC Process for Newly Submitted Civil Complaints

An MDEC user can initiate a new lawsuit through File and Serve by submitting a complaint for clerk review.  (ECF No. 9-10 at p. 20 ("New Case Initiation")); Exhibit 33, Walter Decl. at ¶¶ 6, 8-12.  After a new complaint is submitted for clerk review, prior to receiving a new case number and being filed/docketed as a new case, a clerk must review it.  Md. Rule 20-203.  Once a clerk has reviewed the submission, it is transmitted and available to the public and press in one of three ways.  Exhibit 33, Walter Decl. at ¶¶ 8.

One method of availability is the Maryland Judiciary Case Search website ("Case Search").  *Id.*  Case Search is a public website that provides access to certain case information, but not actual pleadings, including civil complaints.  *Id.*

A second method of availability are computer terminals or kiosks in any Maryland MDEC courthouse in which all unshielded electronic case records are available to the public to review, including civil complaints.  *Id.*; Md. Rule 20-109.

The third method of availability is the Maryland Judiciary Record Search website, available at https://mdecportal.courts.state.md.us/MDODYSSEYPORTAL/.  Exhibit 33, Walter Decl. at ¶ 8.  This is "a public website that provides access to certain information about case records, but does not provide access to pleadings, including complaints, except

to registered users who are parties to the case or certain government agencies that can view documents." *Id.*

**MDEC Rules**

In anticipation of the forthcoming implementation of MDEC, the rules committee created, and the Court of Appeals adopted on May 1, 2013, an additional title to the Maryland Rules of Civil Procedure:  Title 20 (Electronic Filing and Case Management). Exhibit 36, Notice of Proposed Rules Changes.

When creating this new title, rules committee addressed the topic of restricted information.  *Id.*, p. 10.  The committee explained that unless otherwise necessary, certain personal identifier information should not be included in court records and if it is, it may be subject to shielding.  *Id.*  Thus, the committee created rules that "provide a simple and balanced way of implementing the policy through a combination of exclusion and shielding."  *Id.*  This included redacting certain restricted information from documents and limiting the public to only the redacted version.  *Id.*  These procedures, and certain other requirements for electronic filing are currently addressed by Maryland Rules 20-201 (Requirements for Electronic Filing), 20-201.1 (Restricted Information), and 20-203 (Review by Clerk; Striking of Submission; Deficiency Notice; Correction; Enforcement).

The MDEC manual reiterates these rules and explains to users that if a "submission materially violates a provision of the Rules in Title 20 or an applicable published policy or procedure established by the State Court Administrator, the clerk may issue a Deficiency Notice under Rule 20-203(d)."  (ECF No. 9-10, at 4 ("Compliance with Title 20 is mandatory")).  Similarly, the manual cites Rule 20-203(c) and explains that if a submission

16

"fails to comply with the requirements of Rule 20-107(a)(1) or Rule 20-201(g), the clerk must strike the submission and notify the filer and all other parties of the striking and the reason for it." (*Id*.)   Under such circumstances, the submitted document is not filed/docketed.   And finally, the manual explains that "A submission containing a confidential document will be rejected if the submission fails to comply with Rule 20-201.1." (*Id*.)

### Maryland Rule 20-203(a)(2)

Maryland Rule 20-203(a)(2) states in pertinent part, "Review by Clerk. As soon as practicable, the clerk shall review a submission for compliance with Rule 20-201 (g) and the published policies and procedures for acceptance established by the State Court Administrator."   When creating Maryland Rule 20-203, the rules committee explained that this new rule was comparable to the procedure for paper filings.   Exhibit 36, p. 11.   The committee explained that the rule "requires the clerk to review electronically filed submissions . . . to assure that they are signed, that they contain a certificate of service, that they contain a certificate regarding restricted information, and that any required fee has been paid or waived."   *Id*.   The MDEC manual reiterates this intent, stating, "Rule 20-203(a)(2) requires the clerk to review a submission prior to docketing."   (ECF No. 9-10, at p. 4 ("Compliance with Title 20 is mandatory").)

### "Press Queue" Request from CNS to Ms. Harris that Costs $108,000 Annually

On October 1, 2021, Ms. Harris, received a letter from Bill Girdner, the editor of CNS.   (ECF No. 9-4.)   Mr. Girdner requested that Maryland courts implement a "press queue" that would allow the press to have *immediate* and unfettered access to all newly

submitted (though not yet reviewed and filed/docketed) civil complaints in MDEC jurisdictions. *Id*. Mr. Girdner was concerned only with civil complaints. *Id*. He incorrectly claimed that Tyler would install the press queue "free of charge." *Id*. This is, however, false. It would cost the State and taxpayers at least $108,000 annually. Exhibit 32, Harris Decl. at ¶ 12. On October 26, 2021, the State responded that Maryland Judiciary's Major Projects Committee discussed the request for a "press queue" and "determined that the installation of this configuration would not be in compliance with the Maryland Rules of Procedure," which meant the request had to be denied. (ECF No. 9-5.)

**CNS's Current Action**

Almost five (5) months later, on March 7, 2022, CNS filed this suit for injunctive and declaratory relief against the MDEC circuit court clerks and Ms. Harris, seeking:

(1) a declaratory judgment under 28 U.S.C. § 2201 declaring Defendants' policies and practices for docketing newly submitted civil complaints unconstitutional;

(2) a declaratory judgment under 28 U.S.C. § 2201 declaring Defendants' application of Maryland Rule 16-904(b) unconstitutional;

(3) a preliminary or permanent injunction prohibiting Defendants from "continuing their policies and practices that deny CNS contemporaneous access to newly" submitted civil complaints and requiring Defendants to offer *instant* access to newly submitted civil complaints prior to clerical review and docketing;

(4) a preliminary or permanent injunction prohibiting Defendants from "applying Maryland Rule of Procedure 16-904(b) in a manner that denies CNS access to newly" submitted "civil complaints until after clerical review and docketing" and requiring Defendants to provide instant access to newly filed civil complaints prior to clerical review and docketing; and

(5) attorneys' fees.

(ECF No 1, at 29-31; *see also* ECF No. 8-1, at 30-31.)

On April 18, 2022, CNS filed an almost identical amended complaint, with one major substantive change.  (ECF No. 8-1.)  The amended complaint added allegations related to Rule 20-203(a)(2) and requested that it be declared unconstitutional.  (ECF No. 8-1, at 7, 23, 30-31.)  At the same time, CNS filed a motion for preliminary injunction requesting that Defendants be preliminarily enjoined from "withholding newly e-filed non-confidential civil complaints from press and public view until after clerical review and docketing and [be] direct[ed] to provide CNS with contemporaneous access to all such complaints upon their receipt for filing."  (ECF No. 9-1, at 32.)

### CNS's *Inaccurate* Allegations

CNS claims that prior to suit it tracked Defendants' offices, noting purported delays between "when each complaint was [submitted] with the court and when the court first made each complaint available to the public at the courthouse [when filed]."  (ECF 8-1 ¶ 67.)  Further, CNS alleges that based on its amateur style "tracking," Defendants' offices have significant delays in making complaints accessible to the press and public.  (ECF 8-1 ¶¶ 67-69.)  The amended complaint offers no authority for these factual allegations and no useful information related to how this data was collected.  (ECF Nos. 1 and 8.)  In other words, CNS does not provide its purported "work" so that it may be checked.  But, that is not necessary because, as discussed below, Defendants have the actual data.

In support of its allegations in its request for a preliminary injunction, CNS provided a declaration from Adam Angione, who identified himself as a "reporter" and "journalist," only.  (ECF No. 9-11.)  No mention is made of any alleged analytics or statistics experience.

19

(*Id*.)  He claims personal knowledge of docketing procedures and access in e-filing courts in several states, but significantly, does *not* list Maryland.  (ECF No. 9-11 ¶ 3.)

Mr. Angione supervises 40 CNS "reporter" staff, "including a reporter in New Jersey named Chris Fry who currently works with [Mr. Angione] to track [alleged] delays in" Maryland's MDEC courts."  (ECF No. 9-11 ¶ 6.)  Like Mr. Angione, Mr. Fry does not have any asserted professional background in analytics or statistics.  (ECF No. 9-11.)

CNS's amateur "tracking" method is not done by visiting Maryland courts, where the kiosks are available for viewing court records.  (ECF No. 9-11 ¶ 8.)  Rather, Mr. Angione has allegedly "supervised" Mr. Fry working from his personal computer using electronic "wildcard" searches (presumably on Case Search) to manually and unprofessionally compile information and create unprofessional charts purporting to give information about the timeliness of accessibility to newly submitted civil complaints.  (ECF No. 9-11 ¶¶ 8-16.)  Significantly, CNS attempts to use these charts to mislead this Court by measuring alleged accessibility only in days.  (*Id*.; ECF No. 9-12.)  There is no information provided as to the reliability of these charts because they are inherently unreliable.  They should be disregarded by this Court because the actual data is provided.

**The *Actual* Data**

MDEC courts in Maryland use Tyler to provide a computer software platform for electronic filing.  Exhibit 33, Walter Decl. at ¶ 7; Exhibit 32, Harris, Decl. at ¶ 8.  Unlike CNS's method for obtaining its supposed "data" in support of its court filings to date in this case, AOC and Tyler can and did monitor and track, with precision, the actual data at

issue in this case by obtaining all the data directly from Tyler. *Id.* There is no disputing this electronically obtained data. *See id.*; Exhibit 33, Walter Decl. at ¶¶ 13-16.

Between October 1, 2021, and May 24, 2022,[9] the data confirms that Maryland's MDEC courts made newly submitted civil complaints accessible to the press and public, on average, within **3.9** business hours of submittal.[10] Exhibit 33, Walter Decl. at ¶ 17. The median number of business hours during this time was **1.6**. *Id.* Statewide, between October 1, 2021, and May 24, 2022, **85.2%** of all newly submitted civil complaints were filed within 8 business hours and 1 business minute.[11] *Id.* Thus, Statewide since October 1,

---

[9] This motion is filed May 31, 2022. Thus, this data is as current as possible. If the Court requests, Defendants will provide the Court with more current data.

[10] The "timeliness" measure used is the time between when new civil complaints were electronically submitted/uploaded into MDEC through File and Serve and when they were reviewed and accepted by the courts' clerk's offices and then instantaneously transmitted/filed/docketed and, therefore, immediately available to the public and press on: (1) Case Search; (2) the Maryland Judiciary Record Search website; and (3) computer terminals or kiosks in any Maryland MDEC courthouse. Exhibit 33, Walter Decl. at ¶ 8.

"Submitted" and "uploaded" are synonymous. *Id.* at ¶ 9. They both refer to the point at which an attorney or other authorized user electronically "submits" or "uploads" a document to MDEC for clerk review prior to the time the document is transmitted/filed/docketed in the case and available for public review. *Id.* "This is analogous to mailing a document to a court for filing in non-MDEC jurisdictions and to mailing a document to a court for filing in MDEC jurisdictions prior to the implementation of MDEC." *Id.*

"[T]ransmitted," "filed," and "docketed" are synonymous. *Id.* at ¶ 10. "They refer to the point at which a "submitted" or "uploaded" electronic document in MDEC is reviewed and accepted for filing and docketing by a respective court's clerk's office and is transmitted into Odyssey, therefore making it available to the public." *Id.* "This is analogous to courts filing/docketing recently received by mail and newly filed civil complaints in legacy systems in non-MDEC jurisdictions and in MDEC jurisdictions prior to the implementation of MDEC." *Id.* A "transmitted" complaint is immediately available to the press and public for electronic review. *Id.* at ¶ 11.

[11] "For purposes of AOC's data collection and tracking, "business hours" are defined as 8:30 a.m. to 4:30 p.m. because that is when Maryland circuit courts and their respective clerk's offices are open." Exhibit 33, Walter Decl. at ¶ 15; *see* Md. Rule 16-403(a). For purposes of the actual data, only the time during which the clerks' offices are open were used. Exhibit 33, Walter

2021, 85.2% of all newly filed civil complaints were available to the public within 8 business hours and 1 business minute of submittal.  *Id.*

"When the Circuit Court for Montgomery County is omitted from these calculations because it only just implemented MDEC on October 25, 2021,[12] the average during this time drops to **2.7** business hours, and the median drops to **1.2** business hours."  *Id.* (emphasis added).  "Statewide, between October 1, 2021, and May 24, 2022, with the Circuit Court for Montgomery County excluded, **91.7%** of all newly submitted civil complaints were filed within 8 business hours and 1 business minute."  *Id.* (emphasis added).  Thus, Statewide since October 1, 2021, 91.7% of all newly filed civil complaints have been made available for public review within 8 business hours and 1 business minute of submittal.  *Id.*

Two line graphs detailing the time (average and median hours) between newly submitted civil complaints in MDEC courts and their availability for public and press review during the period October 1, 2021 through May 24, 2022, are below:

---

Decl. at ¶ 16.  This is because, as was the case prior to the implementation of MDEC, "civil complaints are available for public view at circuit court courthouses during business hours, only."  *Id.*  As such, "whenever a newly submitted civil complaint is submitted in MDEC outside of business hours—whether before courts open, after they close, or on a holiday, weekend, or other day a court is closed—that complaint is considered submitted at 8:30 a.m. the next business day the court in which the complaint was submitted is open.  A newly submitted civil complaint that is later transmitted outside of business hours—regardless of when submitted—is considered as transmitted at 8:31 a.m. the next business day the court in which the complaint was submitted is open."  *Id.*

[12]  "There is a clear learning curve for clerks and staff in implementing and using MDEC" and, therefore, including the data from the Circuit Court for Montgomery County early on when MDEC went "live" in Montgomery County "distorts the data Statewide and is not an accurate representation of current Statewide statistical data regarding timeliness measures."  Exhibit 33, Walter Decl. at ¶ 19.  Rather, the current data is the most accurate.  *Id.* at ¶ 19.



*Id.* at ¶ 21.  The same data and information illustrated in the two line graphs above are included below, merely in a different form:



*Id.* at ¶ 22.

Similarly, two line graphs detailing the percentage of newly submitted civil complaints filed within eight (8) business hours and one (1) business minute of submission are below:



*Id.* at ¶ 23.   The same data and information illustrated in the two line graphs above are included below, merely in a different illustrative and demonstrative form:



*Id.* at ¶ 24.

These numbers continue to improve with the use of a new queue that was implemented by AOC and Tyler within mere weeks of the filing of this motion.[13]

**New Queue for Newly Submitted Civil Complaints Creates Even Better Results**

The State and Tyler were able to work together to create a new queue that effectively electronically separates new complaints and allows the clerks' offices to prioritize for docketing all newly submitted complaints. Exhibit 32, Harris Decl. at ¶ 15. The new queue was implemented in certain courts on or about April 25, 2021, and in other circuit courts on or about May 3, 2022.[14] *Id.*

During the weeks immediately following the implementation of the new queue, between April 25, 2022, and May 24, 2022 (*i.e.*, 29-days), MDEC circuit courts made newly submitted civil complaints accessible to the press and public, on average, within **1.3** business hours of submittal. Exhibit 33, Walter Decl. at ¶¶ 18, 20. Substantially, this is a 2.6-hour improvement, or 66%, from the October 1, 2021 – May 24, 2022, timeframe calculations. The median number of hours during this time was **0.7** business hours. *Id.* Substantially, this is a 0.9-hour improvement, or 56%, from the October 1, 2021 – May 24, 2022, timeframe calculations. Most significantly, <u>for the last 29-days, Statewide **98.9%**</u>

---

[13] CNS filed its motion for preliminary injunction despite having advance notice of the new queue. At a minimum, CNS should have determined the affect of the new queue on however CNS chooses to accumulate/calculate its data. Perhaps, this is also why CNS amended its complaint.

[14] Shortly before this new queue was implemented, another unrelated though relevant action was taken that addresses CNS's concerns. Exhibit 32, Harris Decl. at ¶ 16. Beginning in mid-February, 2022, Case Search now includes a daily report containing a list of every new public case created in each MDEC court in the previous thirty days. https://mdcourts.gov/mdec/publiccases (last visited May 23, 2022. This alone should satisfy CNS.

of all newly filed civil complaints are being made available for public and press review (including CNS) within 8 business hours and 1 business minute of submittal. *Id.*

This actual data is based on statistics calculated from all newly submitted and transmitted civil complaints, not merely a self-serving and unreliable sample of cases like what CNS has done. *Id.* at ¶ 25. The underlying computer-generated data from which the actual data and calculations were obtained was provided directly from Tyler and, therefore, this actual data is undeniably the best evidence of the issue in this case. *Id.*

## ARGUMENT

## I.   LEGAL STANDARD.

### A.   Motion to Dismiss.

Federal Rule of Civil Procedure 12(b)(6) authorizes the dismissal of a complaint if it fails to state a claim upon which relief can be granted. While a complaint need not include "detailed factual allegations," it must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). A plaintiff cannot rely on bald accusations or mere speculation. *Id.* at 555. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Twombly*, 550 U.S. at 570. This "plausibility" standard demands "more than a sheer possibility that a defendant has acted unlawfully." *Twombly*, 550 U.S. at 556. The Court is "not bound to accept as true a legal conclusion couched as a factual allegation," and "[t]hreadbare recitals of the elements of a cause of action,

supported by mere conclusory statements, do not suffice" and "are not entitled to the assumption of truth." *Ashcroft*, 556 U.S. at 678-79 (2009).

In reviewing a Rule 12(b)(6) motion, a court "'must accept as true all of the factual allegations contained in the complaint'" and must "'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted). However, a court is not required to accept legal conclusions drawn from those facts. *Iqbal*, 556 U.S. at 678. "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

### B.      Preliminary Injunction.

A preliminary injunction is an "extraordinary remed[y] involving the exercise of very far-reaching power [that is] to be granted *only sparingly* and in limited circumstances." *MicroStrategy, Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (citation omitted) (emphasis added); *see also Profiles, Inc. v. Bank of America*, 453 F. Supp. 3d 742, 747 (D. Md. 2020) (denying preliminary injunctive relief). Further, given that the purpose of preliminary injunctions is to preserve the status quo during the pendency of litigation, injunctions that "alter rather that preserve the status quo," such as the one sought by CNS here, are particularly disfavored. *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 n. 8 (4th Cir. 2019). Courts should grant such

"mandatory" preliminary injunctions only when "the applicant's right to relief [is] indisputably clear." *Id.*

A plaintiff seeking a preliminary injunction must demonstrate "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 720 (2008)). Because a preliminary injunction is an extraordinary remedy, all four elements must be satisfied prior to the issuance of a preliminary injunction. *Id.* As set forth below, CNS has not satisfied any of the required elements.

## II. THE AMENDED COMPLAINT SHOULD BE DISMISSED.

The Court should dismiss this suit based on Eleventh Amendment Immunity, the Court's broad discretion to decline to exercise jurisdiction under the Declaratory Judgment Act, and an application of the facts of this particular case to the concepts of equity, comity, and federalism. Additionally, the suit against the Defendant clerks should be dismissed as improper parties because they are unable to offer CNS the relief it seeks.

### A. This Suit is Barred by Eleventh Amendment Immunity.

This suit should be dismissed based on Eleventh Amendment immunity. The Eleventh Amendment bars suit in federal court against States, state agencies, and state officials acting in an official capacity, unless Congress abrogates the immunity, or the State waives it. *Puerto Rico Aqueduct & Sewer Auth. v. Metcalfe & Easy, Inc.*, 506 U.S. 139, 144-45 (1993). This immunity "encompasses not only actions in which a State is actually

28

named as the defendant, but also certain actions against state agents and state instrumentalities." *Regents of the Univ. of California v. Doe*, 519 U.S. 425, 429 (1997).

In *Ex Parte Young*, the Supreme Court created a narrow exception to Eleventh Amendment immunity, which allows for certain claims that seek prospective injunctive relief.  209 U.S. 123 (1998).  To determine whether the narrow exception created by *Ex Parte Young* applies, "a court need only conduct a 'straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md. v. Public Serv. Comm'n of Md.*, 535 U.S. 635 (2002) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 269 (1997)).

Related to its request for injunctive relief, CNS alleges that Defendants' practice of withholding access to newly submitted civil complaints for filing until after clerical review violates federal law.  (ECF No. 8-1 ¶¶ 78-80.)  CNS specifically alleges that the denial of access to newly submitted civil complaints for filing and docketing is a violation of "the right of access to judicial records secured by the First Amendment to the United States Constitution."  (ECF No. 8 ¶ 83).  In other words, CNS alleges that there is a federal law that mandates instantaneous access to newly submitted civil complaints for filing and docketing as soon as they are submitted.  There is no such federal law.

There is no allegation of a violation of a federal law here because there is no federal law mandating instantaneous access to newly submitted complaints *upon submittal* for filing and *before* clerical review and docketing, as CNS alleges.  While *Schaefer* is distinguishable in certain ways, it provides the current and controlling "federal law" to this

Court on the issue of how to qualify the First Amendment right to access newly submitted complaints for filing.  2 F.4th 318 (4th Cir. 2021).

*Schaefer* states that "the press and public thus have an important interest in *reasonably contemporaneous* access to civil complaints."  *Id*. at 328 (emphasis added). The Fourth Circuit wrote that "contemporaneous" means "the same day on which the complaint is filed [*i.e.*, submitted], *insofar as is practicable*; and when not practicable, *on the next court date*—excepting inconsequential deviations and extraordinary circumstances *which may, without violating the constitution, delay access*."  *Id*. (citations omitted) (emphasis added).  The Fourth Circuit also explained, "This *flexible standard does not require perfect or instantaneous access*."  *Id*. (emphasis added).  Rather, the standard requires "courts to make newly filed [*i.e.*, submitted] civil complaints available *as expeditiously as possible*."  *Id*. at 329 (emphasis added).  Thus, the actual legal authority here sets forth a "flexible standard" that does not require instantaneous access to newly submitted complaints.  *Id*. at 328-29.

There is no federal law mandating instantaneous access to newly submitted complaints, yet that is exactly what CNS seeks.  Being the plaintiff in *Schaefer,* however, CNS knows this.  As such, there is no alleged ongoing violation of an actual federal law here, and this suit should be dismissed based on Eleventh Amendment immunity.

### B.     The Court Should Exercise its Broad Discretion under the Declaratory Judgment Act and Decline Jurisdiction.

To the extent that CNS requests a declaratory judgment, this Court has broad discretion to decline to exercise jurisdiction and should do so.  "Since its inception, the

Declaratory Judgment Act has been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286-87 (1995).   "We have repeatedly characterized the Declaratory Judgment Act as 'an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant.'"   *Id.* (quoting *Public Serv. Comm'n of Utah v. Wycoff Co.,* 344 U.S. 237, 241 (1952)) (other citations omitted).

"A declaratory judgment, like other forms of equitable relief, should be granted only as a matter of judicial discretion, exercised in the public interest." *Eccles v. Peoples Bank of Lakewood Vill., Cal*., 333 U.S. 426, 431 (1948) (citations omitted).   "It is always the duty of a court of equity to strike a proper balance between the needs of the plaintiff and the consequences of giving the desired relief." *Id.* "Especially where governmental action is involved, courts should not intervene unless the need for equitable relief is clear, not remote or speculative." *Id.* "The actuality of the plaintiff's need for a declaration of his rights is therefore of decisive importance." *Id.* "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy any reality to warrant the issuance of a declaratory judgment." *Golden v. Zwickler*, 394 U.S. 103, 108 (1969) (citations omitted).

This Court should decline to entertain a declaratory action here because reasonable inference suggests that CNS's actual "need" for its desired relief is based on its "need" to maximize its commercial profits, rather than any real concern for the First Amendment. CNS receives the bulk of its net profit from the lawyers and law firms who subscribe to its

new litigation reports and then use the information from those short blurbs to solicit clients. Exhibit 2, p. 9.  As Judge Andrew J. Guilford of the United States District Court Judge for the Central District of California put it, "It seems that if CNS had its way, the vast majority of those who would benefit [from its lawsuits] would be those with a commercial interest in gaining quick access to newly [submitted] complaints."  *Id*.

When certain facts are considered together, it becomes apparent that CNS's actual "need" is a need to make as much money as possible.  This is because new civil complaints are the only court filings CNS "needs" to compile its new litigation reports.  CNS continually purports to defend the First Amendment and constantly references its other "news publications" and the importance of making sure the "news" they report is not "stale" as CNS likes to claim, yet that is objectively and obviously not the case here.

There are other indications that CNS's actual "need" for immediate access to complaints does not directly correlate with this suit.  For example, in reviewing the sample litigation reports provided, only a small percentage of the cases about which CNS "reports" are cases that are within Defendants' jurisdictions.  (ECF Nos. 9-8 and 9-9.)  CNS states that it provides to its paying subscriber law firms two "New Litigation Reports": one for the Baltimore area, and one for every other circuit court.  (ECF No. 1 ¶ 46); *supra* at 8-9. CNS's April 11, 2022, "Baltimore Report," (ECF No. 9-8) lists 32 cases:  six (6) federal, six (6) from the Circuit Court for Baltimore County, and the remaining 20 are from the Circuit Court for Baltimore City.  In other words, even in the example provided by CNS itself, <u>less than 20% of the cases on which CNS "reports" were filed in courts named as Defendants in this case</u> (*i.e.* this Court and the Circuit Court for Baltimore City).

As another example, CNS alleges a "need" for *instantaneous* access to complaints in several counties in which they admit their "reporters" only ever visit "once or twice a week to once or twice a month." (ECF No. 9-7 ¶ 11.) CNS states that "[i]n most large and mid-size cities, CNS reporters visit the courthouse daily to review newly filed actions, but that "[i]n smaller cities and more rural areas, CNS reporters visit the courthouse less frequently, with visits ranging from once or twice a week to once or twice a month." (ECF No. 9-7 ¶ 11.)

According to 2020 census data, ten (10) Maryland counties have populations of less than 100,000 people:  Allegany, Calvert, Caroline, Dorchester, Garrett, Kent, Queen Anne's, Somerset, Talbot, and Worchester.   Exhibit 35.  All ten of these counties' circuit court clerks are named as Defendants.  It seems impossible for CNS to have a "need" to instantaneously access civil complaints in these counties when CNS has historically only ever visited these counties to review new complaints <u>once or twice a week or month</u>. Clearly, CNS does not have a genuine "need" for declaratory relief here.

**C.    This Court Should Abstain Jurisdiction under these Circumstances.**

Under the circumstances of this case the Court should abstain from involving itself in the administrative operations of the individualized 22 Defendant Maryland state courts' clerks' offices.  This matter is distinguishable from *Schaefer* on the issue of abstention. The facts here support abstention under the concepts of equity, federalism, and comity. Additionally, an application of the facts here to the *Burford* abstention doctrine (not raised in *Schaefer*) supports abstention.

i.    **The Court Should Distinguish this Case from *Schaefer* and Abstain Based on Equity, Federalism, and Comity.**

Although the United States District Court for the Eastern District of Virginia decided not to abstain from involvement in *Courthouse News Serv. v. Schaefer*, 440 F. Supp. 3d 532 (E.D. Va. 2020) and the Fourth Circuit upheld that decision, *Schaefer*, 2 F.4th 318*, Schaefer* is distinguishable and should not control this Court's decision on abstention here.  In *Schaefer*, there was no state law specifically implicated or attacked.

This Court should apply the concepts of equity, comity, and federalism and abstain in this case.  CNS is requesting that this Court dictate to the Maryland State courts that the State's specific administrative procedures pertaining to how it operates its state circuit courts are flawed.  Although the Fourth Circuit briefly mentioned federalism and comity in a footnote in *Schaefer*, the Court did not analyze those concepts in depth and, because this case directly implicates state law and administrative procedures, those issues should be analyzed.  When those concepts are applied, they support abstention.

The Supreme Court "repeatedly has recognized that the States have important interests in administering certain aspects of their judicial systems." *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 12-13 (1987).  "[A]bstention's importance in our system of dual sovereignty cannot be underestimated.'"  *Washington Gas Light Co. v. Prince George's County Council*, 711 F.3d 412, 418 (4th Cir. 2013) (quoting *New Orleans Pub. Serv. Inc. v. Council of New Orleans*, 491 U.S. 350, 359, (1989) ("*NOPSI*")).  "Thus, federal courts must 'exercise their discretionary power with proper regard for the rightful independence

of state governments in carrying out their domestic policy.'"  *Id.* (quoting *Burford*, 319 U.S. at 318).

Unlike in *Schaefer*, CNS is challenging state rules.  Maryland's Constitution makes it clear that "the People of this State have the sole and exclusive right of regulating the internal government . . . thereof, as a free, sovereign and independent State."  Md. Const. Decl. of Rts. art. 4.  Specific to the creation of court rules, the Court of Appeals, has the exclusive constitutional power to oversee Maryland's state judicial system and to create the rules that govern the operation of the courts within the State.  Md. Const. art. IV, § 18. The Court of Appeals of Maryland has the exclusive responsibility of adopting rules and regulations concerning the practice and procedure in and the administration of all Maryland courts.  *Id.*  As such, this suit presents a question of state law and this Court's review would disrupt a coherent policy of public concern.

CNS directly challenges Maryland Rule 16-904(b), which Maryland's highest court created in order "[t]o protect judicial records and prevent unnecessary interference with the official business and duties of the custodian and other judicial personnel."  In accordance with this goal, under Maryland Rule 16-904(b), "a clerk is not required to permit public inspection of a case record filed with the clerk for docketing in a judicial action or a notice record filed for recording and indexing until the document has been docketed or recorded and indexed."

CNS also directly challenges Maryland Rule 20-203(a)(2).  CNS claims that although "the MDEC Policies and Procedures established by the State Court Administrator state that 'Rule 20-203(a)(2) requires the clerk to review a submission prior to docketing,'

nothing in [the Rule] requires court staff to do so . . . ."  (ECF No. 8 at ¶ 63.)  But, CNS ignores the plain language of the rule, which states that "the clerk shall review a submission for compliance with . . . the published policies and procedures for acceptance established by the State Court Administrator."

Although the Fourth Circuit declined to undertake any kind of balancing test based on the facts in *Schaefer*, this Court should do so.  As discussed above, CNS's motives are disingenuous, while Maryland's courts and Ms. Harris have thoroughly considered competing policies and thoughtfully implemented the rules implicated by CNS's request.

### ii.    The Court Should Abstain Based on the *Burford* Abstention Doctrine.

In *Schaefer,* the Courts were not given the opportunity to analyze the full breadth of abstention doctrines because the defendants raised only the abstention doctrine delineated in *Younger v. Harris*, 401 U.S. 37 (1971), and its progeny, *O'Shea v. Littleton*, 414 U.S. 488 (1974) and *Rizzo v. Goode*, 423 U.S. 362 (1976).  As such, the Fourth Circuit only addressed the facts of that case within the confines of those doctrines.  Using an abuse of discretion standard, the Fourth Circuit agreed with the district court that without any "ongoing state proceeding with which this case would interfere," reliance on the *Younger* abstention doctrine was misplaced.  *Schaefer*, 2 F.4th at 324.

The *Schaefer* defendants did not raise the abstention doctrine articulated in *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943), which supports abstention here.  The *Burford* doctrine considers whether federal adjudication "threaten[s] to frustrate the purpose of a state's

complex administrative system." *Martin v. Stewart*, 499 F.3d 360, 364 (4th Cir. 2007) (citing *Burford*, 319 U.S. at 331-32).

Under the *Burford* doctrine, "Courts must balance the state and federal interests to determine whether . . . the state interest in uniform regulation outweighs the federal interest in adjudicating the case at bar." *Martin*, 499 F.3d at 364. Specifically, the *Burford* doctrine "permits abstention when federal adjudication would 'unduly intrude' upon 'complex state administrative processes' because either: (1) 'there are difficult questions of state law . . . whose importance transcends the result in the case then at bar'; or (2) federal review would disrupt 'state efforts to establish a coherent policy with respect to a matter of substantial public concern.'" *Id.* (quoting *NOPSI*, 491 U.S. at 361-63).

CNS requests that this Court unduly intrude in Maryland's independence and its right to create and implement its domestic policies pertaining to its state courts. And CNS is doing so based on a disingenuous request for relief—instantaneous pre-docketing access to newly submitted civil complaints—to which it is not even entitled under the applicable First Amendment standard. *See Schaefer* at 328. (articulating a "flexible standard [that] does not require perfect or instantaneous access."); *see also Planet III* ("The First Amendment does not require courts, public entities with limited resources, to set aside their judicial operational needs to satisfy the immediate demands of the press.").

"The preparation necessary to implement a project as large as MDEC [was] complex and require[d] the coordination of multiple activities and parties within and external to the Judiciary." Exhibit 34, p. 2. "Thousands of hours of programming [were spent] to replicate how each individual court and office processes its business." *Id.* Clearly, the State's

highest court, its rules committee, and its State Court Administrator, among may others, spent years carefully establishing the administrative procedures that govern MDEC.  As such, interference here would undoubtedly disrupt "state efforts to establish a coherent policy with respect to a matter of substantial public concern." *NOPSI*, 491 U.S. at 361-63.

### D.     The Clerk Defendants Should Be Dismissed.

At a minimum, the 22 Defendant clerks (*i.e.*, all Defendants but Ms. Harris) should be dismissed.  They have certain mandatory duties prescribed by statute, Md. Code Ann., Cts. & Jud. Proc. § 2-201, and other mandatory duties under the Rules, including Rules 16-904 and 20-203.  These duties were created by the Court of Appeals and the State Court Administrator.  *Id*.  The clerks have limited discretion to take actions not specifically delegated to them. *Blundon v. Taylor*, 364 Md. 1, n. 9 (2001).  "In regard to receiving and filing papers, as in the making of docket entries, a clerk 'acts only as a ministerial officer of the Court.'" *Dir. of Fin. of Baltimore City v. Harris*, 90 Md. App. 506, 513 (1992).

The clerks are also not permitted to "procure any service or property except in accordance with procedures established by the State Court Administrator."  Md. Rule 16-402.  "The State Court Administrator shall develop policies, procedures, and standards for all judicial and non-judicial operations of the clerks' offices, including case processing, records management, forms control, accounting, budgeting, inventory, and data processing."  *Id*.  This includes the State Court Administrator's exclusive authority to "adopt policies and procedures that are necessary or useful for the proper and efficient implementation of the MDEC System."  Md. Rule 20-103(b).

As such, the Clerk Defendants have no control over MDEC procedures and, therefore, no ability to effectuate any of the changes CNS desires in this case.  Exhibit 32, Harris Decl. at ¶ 9.  "Instead, the authority and control over MDEC policies and procedures rests mainly with [Ms. Harris] as the State Court Administrator."  *Id.*; Md. Rule 20-103(a) (under the supervision of the Chief Judge of the Court of Appeals, the administration of MDEC shall be the responsibility of the State Court Administrator, Ms. Harris). Accordingly, the 22 clerk Defendants are not proper parties to this action and should be dismissed.

## III.   THE REQUEST FOR PRELIMINARY INJUNCTION MUST BE DENIED.

Assuming, *arguendo*, that the federal courts have the right under the circumstances presented here to dictate to Maryland state court clerks and the State Court Administrator how they operate, CNS's request for a preliminary injunction must be denied because CNS has not demonstrated that it is likely to succeed on the merits, has not demonstrated that it is likely to suffer irreparable harm in the absence of preliminary relief, has not demonstrated that the balance of equities tips in its favor, and has not demonstrated that an injunction is in the public interest.

CNS accomplished its goal with its motion for preliminary injunction:  Defendants have provided the *actual* data prior to the initiation of formal discovery.  CNS only filed its motion for preliminary injunction as a strategic means to obtain information it is otherwise not entitled to yet because discovery has not initiated.  Now, CNS has what it wants and should, therefore, voluntarily withdrawal its motion for preliminary injunction, just as CNS did in *Schaefer*.  Exhibit 3.

**A.      CNS Has Not Demonstrated that it is Likely to Succeed on the Merits.**

CNS has not demonstrated that it is likely to succeed on the merits because it requests preliminary injunctive relief to which it is not entitled, because there is no tradition in Maryland circuit courts of instantaneous access to newly submitted civil complaints, and because (as the actual data demonstrates) Maryland MDEC circuit courts are not violating the First Amendment.

**i.      CNS Does Not Have a Right to Instantaneously Access Newly Submitted Civil Complaints in Maryland MDEC Circuit Courts.**

CNS requests injunctive relief beyond the scope of its entitlement.  CNS seeks to have this Court "preliminarily enjoin Defendants from [alleged] continued violation of the First Amendment" (ECF No. 9, at 1), by a preliminary or permanent injunction prohibiting Defendants from "continuing their policies and practices of withholding newly [submitted] non-confidential civil complaints from press and public view until after clerical review and docketing."  (ECF No. 9-1, at 32.)  CNS seeks an order from this Court "direct[ing] Defendants to provide CNS with contemporaneous access to all such complaints upon their [submission on MDEC] for filing."  (*Id.*)  But the press and public do not have a right to *instantaneously* access civil complaints immediately upon their submission in MDEC, as CNS misrepresents and requests.

Although CNS uses the word "contemporaneous" in its request, the use of this word is a misnomer.  If the actual particulars of CNS's request are examined, CNS is seeking to have this Court:  (1) enjoin the clerks from "reviewing and docketing" newly submitted complaints at all before making them available to the public (ECF No. 9-1, at 32), and (2)

order that all complaints be made available immediately "upon their [e-submission] for filing." (*Id.*)  As such, the preliminary injunctive relief CNS seeks is not accurately described as *contemporaneous* access to newly filed complaints, but rather *instantaneous* access to newly submitted complaints intended for filing and docketing.

To place CNS's extraordinary demand in perspective, this is the same as CNS demanding access to all mailed new civil complaints sitting unopened in the mail bin in Maryland's two non-MDEC circuit courts and in Maryland's 22-MDEC circuit courts prior to MDEC, before even being opened by clerical staff.  CNS wants access to potential pleadings (that may be rejected) prior to circuit court clerical staff even accessing the documents.  CNS will not succeed in its quest of obtaining access to newly submitted civil complaints "upon their receipt for filing" (ECF No. 9-1, at 32) and before "clerical review and docketing" (*id.*) because the controlling legal authority does not provide for this kind of instantaneous access.  *Schaefer*, 2 F.4th at 328.  Any argument to the contrary is a misrepresentation of the controlling legal precedent.

In *Schaefer*, the Fourth Circuit found a right to "reasonably contemporaneous" access to civil complaints, which <u>does not require "perfect or instantaneous access."</u>  *Id*. (emphasis added).  Contemporaneous is further defined as the day of submission when practicable and the next day when not practicable, "excepting inconsequential deviations and extraordinary circumstances which may, without violating the constitution, delay access."  *Id*.  This imperfect standard requires courts to make newly submitted for filing civil complaints available "as expeditiously as possible."  *Id*. at 329.  Thus, the controlling

41

legal authority sets forth a "flexible standard" that does not require instantaneous access to newly submitted for filing civil complaints, as CNS contends. *Id*. at 328-29.

CNS misrepresents the controlling legal standard applicable on the timing of availability of access to civil complaints. Rather than focusing on the controlling precedent, CNS peppers in where convenient pieces of certain opinions from other federal appellate circuits. The federal appellate courts have not applied a consistent standard to these cases (selectively and strategically brought by CNS against state court clerks across the country), and the Supreme Court has denied *certiorari* when sought. *See Courthouse News Serv. v. Brown*, 140 S. Ct. 384 (2019) (denying the petition filed by CNS).

Further, even if the opinions of other appellate circuits were examined to provide some non-binding guidance, CNS glosses over their actual applicable holdings. For example, even in the Ninth Circuit where CNS at least had *some* success, the court did not establish a bright line right to immediate access. *Courthouse News Serv. v. Planet*, 947 F.3d 581, 594 (9th Cir. 2020) ("*Planet III*"). To the contrary, the Ninth Circuit clearly stated that although the right *attaches* when the complaint is filed, "we do *not* view [our] conclusion as demanding *immediate, pre-processing access* to newly filed complaints." *Id*. (emphasis added). Thus, just because the right *attaches* when a civil complaint is filed, that does not mean that *access* must be provided immediately to the press and public upon submission for filing. *Id*.

The Ninth Circuit clearly stated, "The First Amendment does not require courts, public entities with limited resources, to set aside their judicial operational needs to satisfy the immediate demands of the press." *Id*. at 596. The Ninth Circuit also explained that

42

"[e]ven in this era of electronic filing systems, instantaneous public access to court filings, especially complaints, could impair the orderly filing and processing of cases with which clerk's offices are charged." *Id*.   Because litigants are not simply "uploading their complaints to the internet" and instead "they are filing them with a court," those filings are "subject to judicial administration." *Id*.   The Ninth Circuit further applied the two-pronged test from *Press-Enter. Co. v. Superior Ct. of California for Riverside County*, 478 U.S. 1 (1986), and found that certain of the defendant court's procedures were constitutionally acceptable and certain others were not. *Id*. at 596-600.   *Planet III* does not provide support for CNS's demand here for pre-docketing instantaneous access.

Similarly, CNS is misguided in its reliance on other Fourth Circuit cases to support its argument that access to complaints should be immediate.   Specifically, CNS inaccurately claims that "[o]ther cases in the Fourth Circuit . . . have similarly found that delays in access to court documents are effectively access denials that implicate the First Amendment and thus 'contemporaneous' and '*immediate*' access is required."  (ECF No. 9-1, at 17) (emphasis added).

*Doe v. Public Citizen* does not provide support for CNS's argument that access to court documents should be immediate.   749 F.3d 246 (4th Cir. 2014).   In *Doe*, a manufacturing company unsuccessfully brought an action to enjoin the Consumer Product Safety Commission from publishing an online report attributing an infant's death to one its products. *Id*.   In that case, which has no factual relevance to the instant case, the Fourth Circuit stated that "the public and press generally have a *contemporaneous* right of access to court documents and proceedings when the right applies."  749 F.3d 246, 272 (4th Cir.

2014) (emphasis added).  Even if the circumstances in *Doe* had any correlation to the current circumstances, *Doe* does not use the word "instantaneous."  *Id*.  *Doe* uses the word "contemporaneous," which the Fourth Circuit clearly defined in relation to access to newly filed civil complaints in *Schaefer*, as outlined above.

*In re Charlotte Observer (Div. of Knight Pub. Co.)* also does not provide support for CNS's argument that access to civil complaints should be immediate.  882 F.2d 850 (4th Cir. 1989).  That case is decidedly distinguishable because it was a criminal matter involving multiple counts of fraud by a religious organization in which the trial court closed certain proceedings from the public.  *Id*.  The Fourth Circuit addressed the issue of "immediate access to ongoing *proceedings*" when the trial court closed a hearing.  *Id.* at 856. (emphasis added).  The court assessed only "the public's right of access to *criminal proceedings*."  *Id.* at 852 (emphasis added).  This provides a limited holding in a criminal case in which a proceeding was closed, and press and public were blocked from access.  *Id*. The current purported "access" issue bears no comparison to *Charlotte Observer*; thus, that case provides no legal support for CNS' immediate access argument here.

And finally, to the extent that CNS attempts to offer support from other district courts to support their immediate access argument (ECF No. 9-1, at 18), those cases likewise do not support CNS' argument.  Like *Planet III*, the district courts have distinguished between the time at which the right attaches from the time at which access is required.  This is extremely significant in this case in which that time for the last 29-days has a median of only **0.7** business hours.

The United States District Court for the District of New Mexico "denie[d] the underlined injunctive relief that Courthouse News [sought], which would direct New Mexico to implement immediate, pre-processing access to newly filed civil complaints . . . ." *Courthouse News Serv. v. New Mexico Admin. Off. of the Cts.*, WL 4710644, at *43 (D. N.M. Oct. 8, 2021) (emphasis added).  Rather than mandating immediate access, the Court created and quantified its own definition of "timely access" as five (5) business hours between the time of submission of a new civil complaint and its filing.  *Id*.  Again, here the current median for such time during the last 29-days is **0.7** business hours, and 98.9% of all newly filed civil complaints in Maryland MDEC courts are being made available for public and press review within 8 business hours and 1 business minute of submittal.  And, these numbers are only improving with the recent implementation of the new queue.

Similarly, the United States District Court for the District of Oregon stated, "To be clear, this court cannot mandate that [the Oregon State Court Administrator] provide [CNS] with 'immediate, pre-processing access to newly filed complaints.'"  *Courthouse News Serv. v. Cozine*, 2022 WL 593603, at *8 (D. Or. Feb. 14, 2022), report and recommendation adopted, 2022 WL 1000775 (D. Or. Apr. 4, 2022) (quoting *Planet III*, 947 F.3d at 594) (emphasis added).  Again, rather than finding a requirement of immediate access, the district court found a right to "timely access."  *Id*.  Thus, mere months ago, a district court presented with the same issue as in this case held that CNS does not have a First Amendment right to instantaneous access to newly submitted civil complaints for filing.

On the issue of timing of access to newly submitted complaints, this Court is required to follow the precedent set forth in *Schaefer*, wherein the Fourth Circuit found

that the First Amendment does not require instantaneous access.  2 F.4th at 328.  And, even if this Court were to examine other non-binding opinions, they do not support a right to instantaneous access to new civil complaints "upon their receipt for filing" (ECF No. 9-1, at 32) and before "clerical review and docketing" (*id.*).  CNS cannot succeed on the merits wherein it requests relief that is unavailable under the law.

> ### ii.     CNS Is Unable to Prove a Tradition in Maryland of Instantaneous Access to Newly Submitted Civil Complaints, Because One Does Not Exist.

CNS is unable to prove that there is a First Amendment right to instantaneously access all newly submitted civil complaints filed in Maryland's MDEC circuit courts, prior to the clerks taking any action related to reviewing and then filing/docketing the complaints.  This is not the tradition in Maryland.  Exhibits 8-31; Exhibit 32, Harris Decl. at ¶¶ 6-7; Exhibit 7, p. 14.

In *Schaefer*, the Fourth Circuit relied on the "experience and logic" test outlined in *Press-Enter. Co. v. Superior Ct. of California for Riverside County*, 478 U.S. 1, 8-10 (1986) to determine whether "a qualified First Amendment right of public access attaches" to certain court proceedings.  2 F.4th at 326.  Under that test, this Court must consider: (1) "whether the place and process have historically been open to the press and general public," and (2) "whether public access plays a significant positive role in the functioning of the particular process in question."  *Press-Enter Co.*, 478 U.S. at 8-10.

During the *Schaefer* trial, "Mr. Schaefer, the Norfolk Clerk, testified that it had always been his unwritten policy and that of his predecessor to make new civil filings available 'behind the counter' and there was evidence that the Prince William Clerk did

the same . . . ." *Courthouse News Serv. v. Schaefer*, 440 F. Supp. 3d 532, 557 (E.D. Va. 2020), *aff'd*, 2 F.4th 318 (4th Cir. 2021).   As such, the Fourth Circuit found that "nothing in the record" <u>in that case</u>[15] evidenced a tradition in *those* courts of access to new complaints being conditioned on judicial action.  *Schaefer*, 2 F.4th at 327.

Unlike in *Schaefer*, in Maryland there is undeniably a clear tradition of the access to newly submitted complaints being conditioned on court review and docketing.  The tradition in Maryland's circuit court clerks' offices has been one of clerks reviewing and docketing newly submitted civil complaints for filing/docketing before they are accessible to the press and public.  *Supra* at 12.  Likewise, Maryland clerks' offices never utilized the supposed "press bin" or "press box" that CNS claims.  *Id.*

The true tradition in Maryland's circuit courts is also evident in the legislative history of the rule that preceded Maryland 16-904(b).  Exhibit 7, p. 14.  In creating the rule in 2004, the rules committee clearly acknowledged and considered the importance of providing timely access to court documents but counterbalanced it with other concerns. *Id*.  Significantly, the rules committee identified this is "an important policy issue" and

---

[15] CNS states, "In *Schaefer*, the Fourth Circuit made clear that 'the experience prong supports a First Amendment right of access to civil complaints, *even before any judicial action in the case*.'"  (ECF No. 9-1, at 22) (emphasis in original).  To the extent CNS is purporting that this is a *holding* that applies to all cases and all circumstances, it is not.  This quote is a portion of the Fourth Circuit's analysis in applying the two-prong *Press-Enter Co.* test to the facts in the *Schaefer* case, only.  The Fourth Circuit made it clear that "nothing in the record before [them]" supported the clerks' arguments about the experience prong of the test, *as applied in that case*.  2 F.4th at 327.  In addition, this analysis is intertwined with the Virginia court clerks' suggested application of an entirely different standard, under which a particular document must be directly tied to an actual proceeding to be covered under the First Amendment.  *Id.* at 326-27.

clearly pointed out that "[m]ost clerks <u>do not now permit access to documents until the docketing . . . is complete</u>." *Id.* (emphasis added).

Throughout his 22-page declaration purporting to share "personal knowledge" of court docketing procedures, both before and after electronic filing generally in other states, Mr. Girdner makes no allegation that he has ever been to Maryland nor inside a Maryland courthouse, despite listing several other specific state courts he has personally visited. (ECF No. 9-2.)   Instead, Mr. Girdner declares an alleged and unsubstantiated "long-standing tradition in courts across the country for the press to review new civil complaints . . . before docketing."  (ECF No. 9-2 ¶ 25.)  Mr. Girdner broadly declares that "[s]ince time beyond memory, in courts across the country the press has reviewed new civil complaints right after they crossed the intake counter – on the day of filing and prior to docketing."  (ECF No. 9-2 ¶ 5.)  Clearly, Mr. Girdner has no actual personal knowledge of court procedures in the State of Maryland.  And, more importantly, he is wrong.  *Supra* at 10-12.

In the declaration provided by Ryan Abott, who identifies himself as CNS's mid-Atlantic and southeast regional bureau chief, Mr. Abott states, "In my experience as a ["]journalist"] covering courts in the Mid-Atlantic and Southeastern parts of the country, civil complaints filed in paper form were traditionally available on receipt right after intake by a counter clerk and prior to the completion of clerical docketing."  (ECF No. 9-7 ¶ 13.) When he purports to actually "testify" about Maryland courts, his "testimony" is extremely limited.  (ECF 9-7 ¶¶ 14-21.)   And interestingly, the overwhelming majority of his declaration related to Maryland's courts relates to the clerks' offices for the Circuit Court

for Baltimore City and the Circuit Court for Prince George's County, whose clerks are not named as defendants in this suit and are the only two non-MDEC Maryland circuit courts, thus making them irrelevant to this case. (ECF 9-7 ¶¶ 16-21.)

As is evident by the declarations of individuals with actual personal knowledge of Maryland courts and Maryland's "legislative" history, there is no tradition in Maryland of the press and public having instantaneous access to all newly submitted civil complaints. As such, CNS will be unable to demonstrate that it is entitled to an *instantaneous* right to access all newly submitted civil complaints in Maryland's circuit courts "upon their receipt" and before "clerical review and docketing," as CNS demands. (ECF No. 9-1).

### iii.    CNS has Reasonably Contemporaneous Access to Newly Submitted Civil Complaints in Maryland's Circuit Courts.

CNS is unable to demonstrate that Defendants are violating CNS's actual, qualified First Amendment right at issue here.  As discussed in detail above, the right at issue is a right to "reasonably contemporaneous" access to newly submitted civil complaints and Defendants are fulfilling their obligation to make newly submitted civil complaints available to the press and public as "expeditiously as possible."  *See Schaefer*, 2 F.4th at 329.

Between October 1, 2021, and May 24, 2022, the MDEC clerks' offices made newly submitted complaints accessible to the press and public, on average, within 3.9 business hours of submittal.  *Supra* at 21.  The median number of hours during this time is 1.6 business hours.  *Id*.  If the Circuit Court for Montgomery County is omitted from the

calculations due to just implementing MDEC at the end of October 2021, the average during this time is 2.7 business hours, and the median is 1.2 business hours. *Supra* at 22.

Less than 90-days since filing its complaint, CNS has achieved its profit-driven goal (whether legally entitled to or not) of faster access to newly submitted civil complaints, absent the need for an expensive "press queue" charged to the State and Maryland taxpayers at an annual price tag of at least $108,000. *Supra* at 18, 20-26. And, after the implementation of the new queue that the State voluntarily implemented as an alternative to the "press queue" requested by CNS, the numbers have improved even more. *Supra* at 20-26.

Between April 25 and May 24, 2022, MDEC clerks' offices made newly submitted civil complaints accessible to the public, on average, within 1.3 business hours of filing (an improvement of 2.6 hours, or 66%, from the October 1, 2021 – May 24, 2022, calculations). *Supra* at 25. The median number of hours during this time was 0.7 business hours (an improvement of 0.9 hours, or 56%, from the October 1, 2021 – May 24, 2022, calculations). *Id*. Significantly, currently statewide, <u>98.9% of electronically filed civil complaints are accessible to the public (including CNS) within 8 business hours and 1 minute of submittal</u>. *Id*. at 25-26. Whereas CNS and its staff are maintaining non-statistical, unreliable, amateur, self-serving, and limited numbers to support their position, Defendants' numbers are based entirely on electronic data from Tyler. *Id.* Defendants' data is irrefutable. *Id.*

iv.   **To the Extent There are Minor Delays in Access to Newly Submitted Civil Complaints Caused by Clerical Review and the Docketing Process, they are Justified.**

Any minor delays that may be caused by the clerks docketing newly submitted civil complaints have been carefully considered by the State in creating the Rules, and they are properly justified.   As the Fourth Circuit explained in *Schaefer*, in applying relaxed scrutiny, any delays must be "content-neutral, narrowly tailored and necessary to preserve the court's important interest in the fair and orderly administration of justice."   2 F.4th at 328 (citations omitted).

As outlined above, the State closely analyzed the issues related to pre-docketing access to court filings when it created the predecessor to Maryland Rule 16-904(b) in 2004. *Supra* at 10-12.   And in the years preceding the State's transition to MDEC, the rules committee meticulously created new rules, including Maryland Rules 20-201 (outlining the requirements for electronic filing), 20-201.1 (requiring the clerk to review and reject certain submissions containing restricted information), and 20-203 (outlining the procedures for clerks in reviewing and docketing filings).

The State spent years creating rules that are necessary to preserve its interest in the fair and orderly administration of justice, and in a way that has made the rules narrowly tailored and content-neutral.   Maryland Rule 20-203(a)(2), which "requires the clerk to review a submission prior to docketing" (ECF No. 9-10, at 4), was created to ensure that certain threshold requirements are met before docketing.   Exhibit 36 at pp. 11-12. Specifically, Rule 20-203(a)(2) "requires the clerk to review electronically filed

submissions . . . to assure that they are signed, . . . and that any required fee has been paid or waived." *Id*. at 11.

Additionally, under Maryland Rule 16-916, clerks are required to shield any information that is not subject to inspection when a new case record is created, and under Maryland Rule 16-919, courts are also required to prevent access to restricted information.

The State has created narrowly tailored rules that balance the importance of public access with the courts' need for orderly administration. Therefore, any alleged minor delays in access by CNS to newly submitted civil complaints between submission and filing caused by clerical review and the docketing process are justified.

## B.     The Balance of Equities Favors Denial of a Preliminary Injunction.

The balance of equities favors the denial of a preliminary injunction. "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 24 (2008) (citation omitted).

Maryland is sovereign state with the exclusive right to control and organize its government and the administration of its state court system. Within its exclusive authority to administer its court processes, the State decided that there was strong public interest in ensuring that complaints are processed and docketed correctly and created its state court procedures accordingly. And the State has been able to balance these interests with providing access to newly submitted complaints after clerk review and filing/docketing in a reasonably contemporaneous manner, as required by *Schaefer* and the First Amendment. CNS's only true goal is a "press queue," which would require the State to substantively

change the procedures the State determined were necessary to efficiently operate its courts in a manner that is in the best interest of its citizens and would cost $108,000 annually.

The public consequences to the State are outbalanced by CNS's disingenuous concern about a very short period between submission and transmission/filing of new civil complaints (a median of 0.7 business hours, Statewide).  CNS profits significantly from the lawyers and law firms across the country who subscribe to its "new litigation reports." Despite CNS's allegations about the First Amendment, it is reasonable to infer that CNS's true motivation for filing this suit is a desire to maximize profit.  Likely, CNS has not filed this suit and requested a preliminary injunction because it has legitimate concerns about the "timeliness" of "news," or even concerns about the "timeliness" of access to newly submitted civil complaints for filing.

CNS seeks only instantaneous, pre-docketing, electronic access to newly submitted civil complaints.  If CNS was concerned about the First Amendment, then it would acknowledge the proper First Amendment standard set forth in *Schaefer* ("reasonably contemporaneous" but not "perfect or instantaneous" access to newly submitted civil complaints for filing), rather than continually requesting instant, pre-docketing access.  A balance of the true equities here supports denial.

### C.   CNS Has Not Demonstrated that Issuance of a Preliminary Injunction will Prevent Irreparable Harm.

"To establish irreparable harm, the movant must make a 'clear showing' that it will suffer harm that is 'neither remote nor speculative, but actual and imminent.'"  *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d

197, 216 (4th Cir. 2019) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991)).  In addition, to be considered irreparable, the harm "cannot be fully rectified by the final judgment after trial." *Id*.  (citation omitted).

CNS has not demonstrated that it will suffer actual and imminent irreparable harm here.  In fact, CNS makes no allegations related to how the brief time in docketing newly submitted complaints (median of 0.7 business hours) specifically affects their "reports" or subscriptions in Maryland.  (ECF No. 9-1, at 29-30.)  To the contrary, CNS makes only broad theoretical and conclusory claims of a constitutional violation that does not exist. *Id*. This is likely because there will be no "First Amendment" harm without an injunction, but rather just a "harm" to CNS's ability to decrease its overhead and increase its profit.

As discussed above, CNS's inconsistencies support this.  For example, although CNS sues all of Maryland's smaller clerks' offices, CNS does not even regularly (if even ever) send staff to them.  (*See* ECF No. 9-7 ¶ 11.)  It is inconsistent and disingenuous to claim a need for the drastic remedy of immediate, injunctive relief granting CNS immediate access to newly submitted complaints when traditionally CNS has only sent "reporters" to the majority of Defendants' courts once or twice a week or month, if ever.

CNS fails to demonstrate a real harm, much less an irreparable one.  Additionally, there is nothing CNS alleges as harm that could not be rectified by a final judgment.

### D.    An Injunction is Not in Public Interest.

CNS claims that it is attempting to protect the First Amendment and thus protecting the public interest.  However, in CNS's initial *letter* to Maryland's Court Administrator, CNS only vaguely mentioned the First Amendment in the very last sentence, and CNS had

no complaints.   In fact, CNS had not yet even begun "tracking" the timeliness of Maryland's docketing procedures related to newly submitted civil complaints.

CNS is solely focused on obtaining instantaneous and electronic access to newly submitted civil complaints because it will allow CNS to more efficiently create the "new litigation reports" that make-up the bulk of CNS's profits and purported "news."  CNS is not truly concerned with the public interest.  Instead, this suit relates only to one type of court paper CNS desires *immediate* access to so that CNS may make the most money.  On the other hand, however, Maryland's highest court has thoughtfully and diligently created court rules that balance the courts' goals of openness with certain important goals, in the public interest.

## CONCLUSION

For the above reasons, Defendants respectfully request that the motion for preliminary injunction be denied and that the amended complaint be dismissed.

Respectfully submitted,

BRIAN E. FROSH
Attorney General of Maryland

/s/  Kevin M. Cox

_____
KEVIN M. COX (29012)
KATHRYN HUMMEL (21991)
Assistant Attorneys General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland  21202
kcox@oag.state.md.us
khummel@oag.state.md.us
(410) 576-6388
Attorneys for Defendants

May 31, 2022

**United States District Court for the District of Maryland**
Civil Case No. 1:22-cv-00548-JRR

**EXHIBIT LIST**

**Exhibit**    **Description**

1         (omitted to conform to ECF numbering)

2         *Courthouse News Service v. Yamasaki*, Case No. 8:17-cv-00126-JVS-KES - Order Denying Motion for A Preliminary Injunction, Dated 08/07/17

3         *Courthouse News Service v. Schaefer*, Case No. 2:18-cv-00391-HCM-LRL – Plaintiff Courthouse News Service's Notice of Withdrawal of Motion for Preliminary Injunction, Dated 09/12/18

4         Courthouse News Service, Articles of Incorporation, Dated 08/25/1997

5         Courthouse News Service, "About Us"  Section of Website, Dated 11/14/08, from "The Wayback Machine" Web Archive – available at: https://web.archive.org/web/20140625105759/ http://www.courthousenews.com/aboutus.html

6         *Courthouse News Service v. Yamasaki*, Case No. 8:17-cv-00126-JVS-KES - Response of Plaintiff Courthouse News Service to March 22, 2017 Order Regarding Additional Briefing, Dated 03/31/17

7         Recommendations to the Court of Appeals Court Committee Designated to Develop Rules Regarding Public Access to Court Records, Dated 11/17/03, available at: https://mdcourts.gov/rules/ruleschangesarchive

8         Declaration of Dawne D. Lindsey, Clerk of the Circuit Court for Allegany County

9         Declaration of Kimberle Early, Civil Department Manager for the Clerk of the Circuit Court for Anne Arundel County

10        Declaration of Marilyn F. Bentley, Clerk of the Circuit Court for Baltimore City

11        Declaration of Julie Ensor, Clerk of the Circuit Court for Baltimore County

12        Declaration of Kathy P. Smith, Clerk of the Circuit Court for Calvert County

13        Declaration of Terry Lord, Clerk of the Circuit Court for Caroline County

14        Declaration of Paula "Missy" Green, Chief Deputy of the Clerk for the Circuit Court for Carroll County

15        Declaration of Brandy L. Douglas, Chief Deputy Clerk II for the Clerk of the Circuit Court for Cecil County

16        Declaration of Sharon L. Hancock, Clerk of the Circuit Court for Charles County

17        Declaration of Amy J. Craig, Clerk of the Circuit Court for Dorchester County

18        Declaration of Sandra K. Dalton, Clerk of the Circuit Court for Frederick County

19        Declaration of Kerry Gibson, Clerk of the Circuit Court for Garrett County

20        Declaration of James Reilly, Clerk of the Circuit Court for Harford County

21        Declaration of Wayne A. Robey, Clerk of the Circuit Court for Howard County

22        Declaration of Sherise L. Kennard, Clerk of the Circuit Court for Kent County

23        Declaration of Karen A. Bushell, Clerk of the Circuit Court for Montgomery County

24        Declaration of Mahasin El Amin, Clerk of the Circuit Court for Prince George's County

25        Declaration of Katherine B. Hager, Clerk of the Circuit Court for Queen Anne's County

26        Declaration of Debra J. Burch, Clerk of the Circuit Court for St. Mary's County

27        Declaration of Charles Horner, Clerk of the Circuit Court for Somerset County

28        Declaration of Kathy Dulin Duvall, Clerk of the Circuit Court for Talbot County

29        Declaration of Kevin Tucker, Clerk of the Circuit Court for Washington County

30        Declaration of James B. McAllister, Clerk of the Circuit Court for Wicomico County

31        Declaration of Susan Braniecki, Clerk of the Circuit Court for Worcester County

32       Declaration of Pamela Q. Harris, State Court Administrator for Maryland's
         Administrative Office of the Courts

33       Declaration of Jamie Walter, PhD., Program Director of Research and Analysis for
         Maryland's Administrative Office of the Courts

34       "Moving Justice Forward" – Maryland Judiciary, MDEC Newsletter, Issue 1,
         Winter, 2013, available at:
         https://mdcourts.gov/sites/default/files/import/mdec/pdfs/movingjusticeforward1.pdf

35       Maryland population, available at:
         https://msa.maryland.gov/msa/mdmanual/01glance/html/pop.html

36       Maryland Court of Appeals' Standing Committee on Rules or Practice and
         Procedure, Notice of Proposed Rules Changes, Dated 02/07/2013, available at:
         https://mdcourts.gov/rules/ruleschangesarchive