IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND


COURTHOUSE NEWS SERVICE,                    *

                *Plaintiff*,                      *

        v.                              *        No. 1:22-cv-00548-ELH

                        *

PAMELA Q. HARRIS, ET AL.,                    *

            *Defendants*.                    *


*    *    *    *    *    *    *    *    *    *    *    *

**DEFENDANTS' REPLY MEMORANDUM**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

ARGUMENT............................................................................................................... 3

I.    *Ex Parte Young* Does Not Apply ......................................................... 3

II.   CNS's Need for the Requested Relief is Unclear .......................................... 5

III.  This Court Should Abstain Based On the Circumstances of This Case.... 8

IV.   Maryland Has Thoughtfully Created Constitutionally Justified Court Rules ........................................................................................... 9

V.    The New Queue Assures *Schaefer* Compliance and Moots This Case ...... 16

VI.   A Full Picture of CNS's Litigation................................................................. 19

CONCLUSION ........................................................................................................ 20

Currently, CNS may access civil complaints newly submitted for filing in MDEC courts in under 90 business minutes on average, with a median of less than 45 minutes, and with 85% and 98.9% accessible, respectively, within 3 and 8 court business hours. Yet, CNS argues this is not "as expeditiously as possible" and violates the First Amendment.

If these success rates do not meet the Fourth Circuit's flexible as "expeditiously as possible" standard, then nothing short of instantaneous access will. Therein lies CNS's strategy. CNS seeks to expand the federal law in *Schaefer* to create a First Amendment right to pre-docketing instantaneous access to complaints.

At the core of this lawsuit is CNS's desire to gain easier access to civil complaints that provide the substance for CNS's primary business of selling aggregated snippets of case information to law firms. When the Maryland Court Administrator did not agree to implement a "press queue" that would allow CNS to accomplish that goal, CNS requested that this Court dictate to Maryland courts how to operate their clerks' offices and electronic case management system to underwrite CNS's information-brokering business. This is an extraordinary request. It is only possible if CNS wears the First Amendment as a cloak.

For a decade, CNS has been filing identical lawsuits (at least 24) across the country. Sometimes, CNS has successfully draped itself in the First Amendment by painting with broad-brush strokes. And although it may appear that CNS was successful in the Fourth Circuit, it was not successful in obtaining what it *actually* wants: *instantaneous* remote

access to all newly submitted civil complaints.[1]  Instead, the Fourth Circuit gave CNS a reasonable/fluid standard, which CNS seeks expand to meet its business "needs."

If this Court fails to dismiss or abstain from exercising jurisdiction and entertains this lawsuit, state court sovereignty will be eroded.  Failing to dismiss or abstain will set a precedent that allows the federal courts to broadly intervene and monitor state court operations and management.  And, while perhaps there may exist distinct situations in which the federal courts must defend the First Amendment and undertake the extraordinary task of controlling and supervising state court operations, *this* case is not one of them.

Initially, CNS does not allege violation of an *actual* federal law, but rather seeks to change the law to meet its "needs."  Absent such allegation, *Ex parte Young* does not apply.

Additionally, the discretion afforded under the Declaratory Judgment Act requires a close look at the alleged controversy here and the actual "*need*" for relief requested.  The First Amendment is a powerful shield, and this Court should be mindful of CNS's true motives underlying its use.  CNS's only "*need*" is really a *want*.  It is a want to optimize its business model, which is why CNS focuses only on the one specific type of court document it needs to sell its aggregated snippets to law firms:  civil complaints.

Further, this Court must undertake its own abstention analysis under the facts in *this* suit and should determine that abstention is proper.  State governments have a right to

---

[1] Exhibit 37 (numbered to consecutively follow Defendants' opening memorandum (ECF No. 23-1)), confirms CNS's desire for such remote electronic access.  *See Courthouse News Serv. v. Hade*, No. 3:21-CV-460-HEH, 2022 WL 4485177 at *1, *13 (E.D. Va. Sept. 27, 2022) (confirming CNS's true motive in its nationwide decades-long litigation crusade for remote access to all non-confidential court records, and the *Schaefer* District Court denying same in a case filed immediately after the *Schaefer* opinion was published).

independently carry out their domestic policies and to develop the mechanisms to do so, including overseeing their court systems.  This Court should abstain from controlling the state courts, especially because Maryland courts have proven adherence to *Schaefer*.

And finally, and relatedly, this case is moot because Defendants are adhering to *Schaefer*, and they have implemented new mechanisms to ensure continued compliance. As this Court indicated, of course civil complaints must be reviewed prior to docketing, if only to ensure the Maryland Judiciary does not publish confidential information.

## ARGUMENT

### I.   *EX PARTE YOUNG* DOES NOT APPLY.

CNS's continued attempts to mislabel its allegations and its requested relief cannot disguise the critical point that CNS is not alleging an ongoing violation of an *actual* federal law here.  Rather, CNS is seeking to have this Court change the federal law to meet its business desires.  This is prohibited by the protection afforded by the Eleventh Amendment and does not qualify for the limited exception under *Ex parte Young*.

The *Ex parte Young* exception is narrow.  *Puerto Rico Aqueduct & Sewer Auth.*, 506 U.S. at 146.  It is not meant to permit "a federal court action to proceed in every case where prospective declaratory and injunctive relief is sought."  *Idaho*, 521 U.S. at 270. Among the requirements necessary to apply the exception, a complaint must allege "an ongoing violation of federal law . . . ."  *Verizon Md.*, 535 U.S. at 636 (citations omitted). The amended complaint does not allege an ongoing violation of an *actual* federal law.

CNS's *actual* requested relief seeks to have this Court declare as unconstitutional, and enjoin the State from adhering to, the Maryland Rules that operate to preclude access

3

to civil complaints "*until after clerical review and docketing*."[2]  (ECF No. 8-1, at 30-31.)  That is, CNS wants this Court to *create* a constitutional right to access all civil complaints "prior to clerical review and docketing" and in doing so abolish the applicable, thoughtfully created State policies and procedures and broadly expand the *Schaefer* standard.  (*See id.*)

In its latest filing, CNS claims to seek "contemporaneous" access, which it torturously and incorrectly characterizes as access "upon the court's receipt 'as expeditiously as possible' and prior to docketing." (ECF No. 47, at 32.)  To be clear, while CNS generally refuses to admit it seeks instantaneous access, it admits it once.  (ECF No. 47, at 4-6; *id.* at 6 ("there is no reason why immediate access should not be provided.").)

Although CNS—the plaintiff in *Schaefer*—knowingly misuses the label "contemporaneous" access, the Fourth Circuit was clear that "contemporaneous" means "the same day on which the complaint is filed [*i.e.*, submitted], insofar as is practicable; and when not practicable, on the next court date—excepting inconsequential deviations and extraordinary circumstances which may, without violating the constitution, delay access." 2 F.4th at 328-29 (citations omitted).  The court further explained, "This flexible standard does not require perfect or instantaneous access," but rather that courts "make newly filed [*i.e.*, submitted] civil complaints available as expeditiously as possible." *Id.*

If CNS seeks access to civil complaints prior to clerical review and upon the court's receipt, then CNS is attempting to assert a right to *instantaneous* access.  And if CNS is

---

[2] CNS wants to be the authority on the Maryland Rules, not Maryland.  CNS argues that Defendants misinterpret Maryland's Rules to support CNS's theory that clerical review may occur after docketing.  This Court may certify the question to Maryland's Court of Appeals.

alleging a right to instantaneous access, then CNS is not alleging a violation of an actual federal law.  Defendants are not presenting this as a merits-based argument, as CNS argues. (ECF No. 47, at 25.)  The Court need not analyze the merits of the allegations to refuse to apply *Ex parte Young*.  Much more simply, the Court need only recognize that CNS has not alleged an ongoing violation of an actual federal law.

CNS should not be permitted to dodge the Eleventh Amendment and masquerade an attempt to change the federal law by mislabeling its core assertions and requested relief. *See Idaho*, 521 U.S. at 270 ("The real interests served by the Eleventh Amendment are not to be sacrificed to elementary mechanics of captions and pleading.").

## II.    CNS'S NEED FOR THE REQUESTED RELIEF IS UNCLEAR.

As a matter of judicial discretion, this Court should decline to entertain a declaratory judgment because CNS's need for equitable relief is unclear.  *See Eccles.*, 333 U.S. at 431 ("Especially where governmental action is involved, courts should not intervene unless the need for equitable relief is clear, not remote or speculative.").  In addition to an unclear need, CNS's claims lack the sufficient immediacy required.  (ECF No. 23-1, at 30-33 (citing *Eccles*, 333 U.S. at 431, and *Golden*, 394 U.S. at 108).)

It is vital to closely consider CNS's true "need" for the relief requested here.  *See Eccles*, 333 U.S. at 431 ("The actuality of the plaintiff's need for a declaration of his rights is . . . of decisive importance.").  When questioned about its "need" for the requested relief, CNS repeatedly relies only on Mr. Girdner's unverified self-serving declarations claiming an altruistic concern for the First Amendment rights of citizens.  (ECF No. 47, at 27; ECF 47-1.)  In reality, CNS and Mr. Girdner use the First Amendment as a red herring

and a shield to pursue a lawsuit that serves their business needs.[3]  If CNS's true need for the relief requested here is indeed a philanthropic compulsion to protect First Amendment rights, as it claims, there are many unanswered questions.  Thus, CNS's need is unclear.

CNS's need is unclear when considering its first communication to Maryland.  (*See* ECF No. 9-4.)  Why did CNS first request *only* a press queue that would provide instantaneous access to the press, and *not* the public?  (*Id.*)  Why did CNS request a press queue before it even began tracking *any* "data" relating to this case?  (*Id.*)

CNS's need is also unclear when considering its requested relief.  Why does the requested relief concern only access to civil complaints, and not to any other type of document(s) in any other type of case, such as highly newsworthy criminal cases or court orders?  (ECF No. 8-1, at 30-31.)  If CNS's "subscriber" law firms truly rely on "news" from CNS about all court happenings, including "rulings" as they contend (ECF No. 47, at 28, n. 17), then why does CNS only request access to newly submitted civil complaints?

Further, CNS's need is unclear when considering its litigation choices.  Why did CNS *not* include as defendants the two circuit courts—Baltimore City and Prince George's County—that had not launched MDEC by the date of CNS's filing, especially in light of Maryland's largest city, Baltimore City, producing many newsworthy happenings, and in

---

[3] CNS has not provided any information to dispute that its true business model is profit-driven and sustained by the subscribing law firms to CNS's litigation reports.  (*See* ECF No. 23-1, 7 (confirming as of 2016 virtually all of CNS's income is from paying law firms and not "news" subscribers); *id.* at 7, n. 6; *see* ECF No. 36, at 16.)  While seeking expedited discovery from Defendants (ECF Nos. 27 and 38), CNS is deafeningly silent in producing its own business and financial information.  CNS should provide this information, as was ordered in a related case, ECF No. 23-6 (confirming relevant CNS financial and business data as of Mar. 2017), to allow this Court to understand CNS's true nature as a for-profit corporation and its true needs and motivation.

light of CNS publishing a "Baltimore Report"?  (ECF Nos. 9-8 and 9-9.)  Why does CNS claim a need for a declaratory judgment allowing it to get *pre-docketing* access to civil complaints in several counties in which its "reporters" have admittedly historically only ever visited once or twice a week to once or twice a month?  (ECF No. 9-7 ¶ 11.)

And finally, CNS's need is unclear when considering whether it truly reports on the *daily news* in Maryland's courts.  When convenient, CNS describes itself as a news organization and attempts to tie its need for quick access to newly submitted civil complaints to its "news" reporting.  (ECF No. 47, at 28, n. 17).  CNS claims its "subscribers and non-subscribers alike, rely[] on CNS for prompt information about court filings, arguments, and rulings,"  and often points out that it has a website with news articles (ECF No. 47, at 28, n. 17); yet there is no reliable, independent, and objective evidence of this.[4]

An examination of the sample of litigation reports CNS provided reveals questions about why CNS purports a "need" for pre-docketing access, or even *daily* access, to newly submitted complaints.  For example, in the sample *Baltimore Report* dated *April 11*, 2022, CNS "reports" on two *federal* cases that were filed on *April 8*.  (ECF No. 9-8.)  That is, in a jurisdiction in which court filings are *immediately* accessible on the PACER system, <u>CNS waited three days</u> to "report" on the cases.  (*Id*.)  CNS's own evidence directly contradicts its claims about its "needs."  (ECF No. 8-1 ¶ 80 (attempting to analogize newly submitted civil complaints to stale bread).)  CNS has failed to demonstrate any connection between

---

[4] CNS provides no empirical evidence for this assertion.  And, if CNS is as altruistic and concerned about the "news" as it claims, it would make its subscription-based litigation reports publicly available.

its "need" for instantaneous access to newly submitted complaints and its actual work product. Instead, it blurs concepts by providing overly broad soundbites about "stale" news (ECF No. 8-1 ¶¶ 2, 80; ECF 47, at 30), and provides evidence that directly contradicts its own "needs"-based assertions. (*Compare* ECF No. 9-8 and ECF No. 8-1 ¶ 80.)

Relatedly, if one is to examine CNS's website, courthousenews.com, and do some simple searches, it is unclear why CNS purports to "report" on the *daily* news in Maryland's circuit courts. For example, when using the search term "Maryland," of the 20 most recent articles in that result, only *one* relates *at all* to civil cases filed in Maryland's circuit courts. Exhibit 38, search dated October 21, 2022. Rather, the majority of the articles relate to federal cases and/or *criminal* cases. *Id.* And interestingly, the article about one of the most newsworthy criminal cases to have come from Maryland's circuit courts in recent weeks, the Adnan Syed case made popular by the NPR Serial Podcast, is merely a link to an associated press article. *Id.* That is, the most "newsworthy" legal case coming out of Maryland's circuit courts in recent months was not even "reported" on by CNS itself.

CNS uses the First Amendment as a cloak when convenient, wrapping itself in its power and purporting to defend its constitutional rights as a "press" organization. But when not distracted by CNS's cloak and CNS's masterful ability to paint with broad-brush strokes—a craft that has been honed over the last 13 years—it is unclear how CNS's purported "need" for instantaneous access to newly submitted civil complaints is genuine.

## III. THIS COURT SHOULD ABSTAIN BASED ON THE CIRCUMSTANCES OF THIS CASE.

CNS would like this Court to rely solely on a brief footnote in *Schaefer*, 2 F.4th at 325, a case that is distinguishable on the issue of abstention, to reject all abstention

principles.  (ECF No. 47, at 29).  Based on the facts of *this* case and issues raised by *these* Defendants, however, this Court should abstain. (ECF No. 23-1, at 33-37.)

As the plaintiff in this suit and its others, CNS has thus far easily avoided *Younger* abstention.  That is, there is no active, competing state case here because CNS is the moving party and controls the forum.  But CNS's litigation strategies should not undermine the important legal principles underlying abstention.  That is, the Maryland state government has a right to independently carry out its domestic policies and to develop the mechanisms to do so.  *See Burford*, 319 U.S. at 318, 331-32 (the rightful independence of state governments in carrying out their domestic policies ) (citation omitted).

## IV.   MARYLAND HAS THOUGHTFULLY CREATED CONSTITUTIONALLY JUSTIFIED COURT RULES.

The State of Maryland has created rules and laws (*see* ECF No. 21-3, at 9-17, 38-39, 40-41) that appropriately meet constitutional scrutiny[5] and balance the public interests of openness, efficiency, privacy, and security.  As detailed previously, the Court of Appeals has carefully drafted the rules at issue here.  In fact, Maryland Rule, 20-203, titled "Review by Clerk" has as the first sentence "*As soon as practicable*, the clerk shall review a submission for compliance with . . . the published policies and procedures for acceptance

---

[5] CNS baldly claims Defendants "concede" that a First Amendment right of instantaneous access attaches to new complaints submitted for filing and that *Press-Enterprise II* provides the framework for this case.  (ECF 47, at 3-4; *id*. at 1.)  Of course, CNS knows this is not Defendants' position, ECF No. 41-42 (cited by CNS, ECF No. 47 at 3), and is yet another example of CNS stating what it wishes the circumstances to be, rather than what they are.  CNS's *Hade* case— decided by the *Schaefer* District Court just one month ago—is instructive.  2022 WL 4485177. Both cases confirm that a fact-based analysis is required to determine when the First Amendment right attaches.  *Hade*, 2022 WL 4485177 at *6-13; *Schaefer*, 2 F.4th at 326-28.

established by the State Court Administrator." (Emphasis added). Thus, compliance with *Schaefer* is already required by the Maryland Rules.

In discussing amendment to the applicable rules, Maryland's Standing Committee on Rules of Practice and Procedure (the "Rules Committee") considered the effect of the shift from paper to electronic records, as well as the need to balance court openness with privacy and security, and stated:

> Pursuant to its Constitutional authority in Article IV, Section 18 of the Maryland Constitution to adopt Rules for practice and procedure in, and the administration of, the Maryland courts, the Court therefore chose to regulate access to judicial records by Rule, hewing closely nonetheless to the <u>overarching premise that the traditional openness of judicial records should be maintained</u> and that <u>judicial records should be presumed to be open to public inspection, subject only to the legitimate security and privacy rights of those who are the subject of those records</u>. The revision proposed in this Report maintains that premise.

Exhibit 39 (Notice of Proposed Rule Changes at 4, dated Feb. 21, 2020) (emphasis added). The Rules Committee further explained why some clerical review is necessary to address concerns with operational efficiency, privacy, security, and openness. *Id.* at 12-15. The interplay between filer error and these concerns were directly analyzed. *Id.*

Interestingly, the Rules Committee explained why clerical review serves to *preserve* the openness of court filings. *Id.* at 13. It explained that where filers have inappropriately chosen the confidential drop-down box in an effort to improperly shield documents from public view records that are *not* confidential, clerical review is necessary to protect "the transparency required by the Rules." *Id.* at 13. The Rules Committee explained that this was an issue in a high-profile Maryland case (*i.e.*, Capital Gazette shooter Jarrod Ramos,

https://www.capitalgazette.com/news/ac-cn-documents-hearing-20200107-

l47zzpg5jzdefenppthfjg7eja-story.html (last visited Oct. 24, 2022). *Id.*

Clerical review also protects the courts from publicizing confidential and restricted

information, such as social security numbers, financial information, and other personal

identifying information.[6]  Any filer can accidentally click on an incorrect MDEC drop-

down box and mistakenly label a document as a civil complaint that in fact pertains to

unrelated matters (perhaps, juvenile, criminal, or domestic violence) and/or contains

confidential information.  *Actual* examples from File & Serve demonstrate this, as the

following list represents the "rejection reasons" given in response to certain documents that

were submitted as new civil complaints:

- There are SSN digits visible on the document.
- It cannot be determined if these documents are for a new civil case or for an existing criminal case.
- Your filing is rejected for the following reason: Filed in wrong Court.
- Rejected per Phone call with Attorney. It will be submitted with a different Case Type and a Case Information Report.
- Please file a properly formatted complaint for case to be processed, exhibit cannot be filed on its own to start a case.  Additionally please file all pleadings into single envelope in order to avoid additional charges and duplicate case numbers being created.[7]
- Financial statement needs Notice of Restricted Information.
- Wrong complaint uploaded.
- Complaint contains restricted information (account information).

---

[6] Exhibit 40, titled "Notice Regarding Restricted Information Pursuant to Rule 20-201.1" is a form document issued by AOC that identifies such confidential and restricted information.

[7] If CNS has its way and newly submitted civil complaints skip the clerical review process, then in instances like this additional work would be created by Defendants' clerical staff to ensure only one case is created.  The Maryland Judiciary must be able to control the orderly administration of case records and the courts.

- Could not perform payment processing because the account has been declined.[8]
- REJECTED - Restricted Information is still visible through redaction.
- Not a valid pleading.
- Rejected Submission: Confidential Exhibits filed/scanned in with Complaint.
- Please re-submit your envelope/pleadings with the correct Case Type: Name Change (Not Independent Proceedings - Birth Certificate Amendment) and correct Case Category: Family (Not Civil).
- Petition for Protection must be filed in person before a judicial officer, it cannot be e-filed.

Exhibit 41, Walter Decl. at ¶ 20.   Clerical review corrects the filer errors that could disseminate this information to the public.   Similarly, MDEC users may cancel/rescind inadvertent and mistaken submissions, including civil complaints.   *Id.* at ¶¶ 21-22.

The Supreme Court has recognized an obligation on the part of government agencies to protect sensitive information.   *Fla. Star v. B.J.F.,* 491 U.S. 524, 534-35 (1989) (within the context of a First Amendment case, finding a governmental power to "forestall or mitigate the injury caused" by the release of sensitive information by "classify[ing] certain information, establish[ing] and enforce[ing] procedures ensuring its redacted release, and extend[ing] a damages remedy against the government or its officials where the government's mishandling of sensitive information leads to its dissemination").   In *Fla. Star*, a rape victim's identity was inadvertently disseminated by government officials to the press, who published it.   *Id.*   When the victim sought to hold the press accountable for invasion of her privacy, the Court placed the onus on the government.   *Id.*   As is

---

[8] If filing fees are never paid, then newly submitted civil complaints for filing will never become actual civil cases and what CNS considers "news" would not, in fact, ever become "news."

demonstrated by the above example in which a domestic violence "petition for protection" was inadvertently filed as civil complaint, there are any number of documents containing sensitive information that could be publicly disseminated without clerical review.

Likewise, the Fourth Circuit has recognized a government obligation to protect certain information, including specifically emphasizing the importance of protecting Social Security numbers. *See Ostergren v. Cuccinelli*, 615 F.3d 263, 280 (4th Cir. 2010) (within the context of a First Amendment case, recognizing "the serious privacy concerns and potential harm stemming from [Social Security Number] dissemination" and "a broad consensus that [Social Security Numbers'] public disclosure should be strictly curtailed"); *Greidinger v. Davis*, 988 F.2d 1344, 1354 (4th Cir. 1993) (recognizing compelling concerns over the confidentiality and misuse of Social Security Numbers and explaining how inadvertent disclosure creates the potential for "a serious invasion of privacy" because "an unscrupulous individual" could "obtain a person's welfare benefits or Social Security benefits, order new checks at a new address on that person's checking account, obtain credit cards, or even obtain the person's paycheck").

And finally, the Maryland General Assembly enacted the "Protection of Information by Government Agencies" statute, which obligates the protection of "personal information [including Social Security numbers] from unauthorized access, use, modification, or disclosure" by "implement[ing] and maintain[ing] reasonable security procedures and practices." Md. Code Ann., State Gov't §§ 10-1304, 10-1301. Maryland Rules 16-904, 20-201(h), and 20-203 recognize the courts' obligation to protect sensitive information.

Clerical review also ensures operational efficiency.  Clerks ensure that complaints are signed and match the proper venue chosen in MDEC, and that filing fees are paid.  (ECF No. 23-36, at 11.)  And, the Court of Appeals has implemented a system that provides for efficiency.  At case initiation,[9] regardless of the boxes checked by filers, clerks must identify confidential and inaccessible documents.  Regardless of when they are corrected, filer mistakes must be corrected.  Under the current system, errors are mitigated by maintaining two separate programs:  (1) the pre-acceptance File and Serve program used by filers, and (2) the post-acceptance Odyssey program used by the courts.  Under CNS's desired outcome, clerk staff would wait until invalid and defective documents are automatically transferred from File and Serve into Odyssey to identify parties and correct mistakes.  This would force the courts to enable an auto-accept process that allows documents to flow into Odyssey prior to review.  As a result, court staff would be required to navigate two different work-flow programs (one in File and Serve used by litigant filers and the other in Odyssey used by the courts) and use a multi-step process to meet state law requirements, safeguard confidential information, and prevent corruption of MDEC.

---

[9] One need only skim the instructions in any of the Odyssey File and Serve User Guides (available at https://mdcourts.gov/sites/default/files/import/mdec/pdfs/manualh5.pdf and https://odysseyfileandserve.zendesk.com/hc/en-us/article_attachments/360069320532/2019.1Individual_Filer_User_Guide.pdf) (last visited Oct. 17, 2022) to get a sense of the complexity involved in the e-filing system.  Notably, at case initiation, filers must choose a Court Location, General Category, a Case Type, a Sub-case type, a Filing type, and a Document code.  Additionally, filers are expected to understand the rules related to nonpublic information, omit or redact confidential information, and then select the correct confidentiality designation.  Mistakes by MDEC users are imminent and anticipated.

Defendants and their clerical staff provide an essential function relating to the mandatory review of all court filings, including newly submitted civil complaints. Their need for review more than justifies the current average of less than 90 business minutes between the time of submission of a new civil complaint, to filing.[10] And Maryland's right to control its own state courts is especially important to consider in contrast to the true "needs" of CNS, as discussed above.

Further, the Maryland Judiciary has been able to simultaneously exercise its right to control its own courts with its duty to uphold the First Amendment rights alleged to have been violated in this suit. Defendants have done so by implementing and successfully

---

[10] CNS attempts to present *Courthouse News Serv. v. Gabel*, 2021 WL 5416650 (D. Vt. Nov. 19, 2021), as authority for its flawed position that electronic filing courts cannot possibly justify pre-docketing clerical review; and CNS criticizes Defendants for failing to address this specific case. (*See, e.g.,* ECF No. 47, at 8 (calling Defendants' purported silence "deafening").) *Gabel*, however, is but one of CNS's <u>many</u> cases in <u>other</u> jurisdictions, is <u>pending appeal</u>, and the *Gabel* defendants presented different facts and defenses.

Because CNS brings up *Gabel,* it is relevant that in *Courthouse News Service v. Gabel*, No. 21-3098 (2nd Cir.), the Conference of Chief Justices ("CCJ") submitted an amicus brief supporting abstention. This Court may find CCJ's amicus curiae briefs in *Gabel* and a similar case *Courthouse News Service v. Quinlan* (formerly *Glessner*), 32 F.4th 15 (1st Cir. 2022)—filed respectively on February 4, 2022, and May 9, 2022—instructive on abstention. https://www.pierceatwood.com/practice-areas/appellate-amici under "Areas of Expertise" and "Amici Curiae" (last visited Oct. 14, 2022). Exhibits 42 and 43 (for convenience). CCJ also filed an amicus curiae brief on September 6, 2022, in *Courthouse News Serv. v. Cozine*. Exhibit 44 (for convenience).

CCJ is an organization that provides an opportunity for the highest judicial officers of each State and U.S. Territory "to meet and discuss matters of importance in improving the administration of justice, rules and methods of procedure, and the organization and operation of state courts and judicial systems, and to make recommendations and bring about improvements on such matters." https://ccj.ncsc.org/ (last visited Oct. 14, 2022). Maryland's former Chief Judge, Robert M. Bell, is a former president and vice-president of CCJ as well as a former vice-chair of the committee on access to and fairness in the courts. https://msa.maryland.gov/msa/mdmanual/29ap/former/html/msa11654.html (last visited Oct. 14, 2022). He was also instrumental in laying the groundwork for MDEC. (ECF No. 23-1 at 10-11, 14.)

utilizing a new queue that prioritizes newly filed civil complaints.  (ECF 23-1, at 4-5, 25-26.)  And *unlike* the press queue suggested by CNS, this solution to the "problem" alleged here:  (1) does not violate the Maryland Rules; and (2) is of no ongoing cost[11] to Maryland taxpayers.  As outlined below, Defendants have found an excellent solution on their own.

## V.   THE NEW QUEUE ASSURES *SCHAEFER* COMPLIANCE AND MOOTS THIS CASE.

As the Fourth Circuit noted, "A case becomes moot when 'the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.'"  *Schaefer,* 2 F.4th at 323 (citations omitted).  "A defendant asserting mootness" "'bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.'"  *Id.*  (citation omitted).  Defendants meet this burden here through implementation of the new queue.[12]

As explained previously, in response to CNS's first[13] expression of concern that Maryland courts may have some issues related to the docketing of civil complaints, the

---

[11] CNS continues to allege that the "press queue" they so desperately seek is free.  CNS is aware this is false.  (ECF No. 23-32 ¶ 12.)  Even Tyler confirms this.  Exhibit 45.  CNS is also attempting to mislead state courts into believing that Tyler is "pushing" the "press queue."  Tyler has been forced to threaten legal action against CNS if CNS's actions continue.  Exhibit 46.

[12] While the *Schaefer* defendants' increased productivity was insufficient to meet their burden because they merely processed newly submitted civil complaints faster, the circumstances here are distinguishable because in Maryland a new electronic queue was implemented to increase and maintain the Clerk Defendants' level of productivity.  Further, CNS misleads this Court by claiming "*Schaefer* required 85-90% *same-day access*," ECF No. 47 at 7 (emphasis in original), which CNS knows is untrue.  *Scheafer* required no such thing.  Again, CNS attempts to expand *Schaefer*.

[13] The first letter that the State received from CNS, in October 2021, requested only a specific kind of "press queue" and did not mention anything about Maryland courts allegedly having any "issues" with purported docketing delays.  (ECF Nos. 23-1, at 3-4; 23-32 ¶¶ 13-15.)  Such an allegation was first made on February 14, 2022.  The new queue followed in April and May.

State and Tyler created a new queue that effectively electronically separates new complaints and allows newly submitted civil complaints to be prioritized for docketing. (ECF 23-1, at 25; ECF 23-32, at ¶ 15.)  The first full month of implementation of the new queue was June 2022.  (*See* ECF 23-1, at 25; ECF 23-32, at ¶ 15.)

The most recent data from Tyler as a result of the new queue confirms that between June 1, 2022,[14] and September 30, 2022—the last four months prior to the hearing on the Parties' respective motions—newly submitted civil complaints were filed and thus, made accessible to the press and public (especially CNS) Statewide, on average, within **1.5** court business hours of submittal.[15]  Exhibit 41, Walter Decl. at ¶ 6.  The median number of business hours during this time was **0.8**.  *Id.* Between June 1, 2022, and September 30, 2022, **98.4%** of all newly submitted civil complaints were available to the press and public within 8 business hours and 1 business minute.  *Id.*  And, for the most recent month of data, September 2022, newly submitted complaints for filing were on average accessible to the press and public in **under 90 business minutes**, with a median number being available in **less than 45 business minutes**.  *Id.* at ¶ 11.  Likewise, for September, **98.9%** of all newly

---

[14] In the previous filing, Defendants used data for the period ending on May 24, 2022.  For this filing, Defendants have run a new set of data for the period beginning on June 1, 2022.  Using a starting date of June 1, 2022 (rather than May 25, 2022) for this new set was done solely so that the data set begins on the first of the month.  The data between May 25 and May 31, 2022, was accounted for by factoring it into the previous data set and updating that set as such.

[15] Defendants' opening memorandum (ECF No. 23-1) was filed May 31, 2022.  Over five months will have passed between then and the motions hearing.  Updated data is, therefore, necessary for the Court to have an accurate understanding/picture of the existing status.  While Defendants' combined motion included data from October 1, 2021, through May 24, 2022, updated charts detailing the data during the period October 1, 2021, through September 30, 2022, are included in Ms. Walter's updated declaration, which is attached as Exhibit 41.  The Court now has one full year of data.  The "raw data" is also being provided to CNS.  (*See* ECF No. 42.)

submitted civil complaints were available to the press and public within 8 business hours and 1 business minute. *Id.* at ¶ 13.

Finally, the data confirms that the following "benchmarks" have been achieved Statewide since the implementation of the new queue: (1) **85%** of newly submitted civil complaints are available within **3 business hours** of submission; (2) **90%** within **3.8 business hours**; (3) **95%** within **5.5 business hours**; and (4) nearly **99%** within approximately **8 business hours**. *Id.* at ¶¶ 14-15. This data from Tyler is indisputable, as CNS recognizes.

These numbers surely meet the *Schafer* standard.[16] By using the language "the *same day* on which the complaint is *filed*, insofar as is *practicable*;' and when not practicable, on the next *court date*," it is undeniable that the Fourth Circuit counted time by *court/business hours* and *court days*, rather than *clock hours* and *calendar days*. 2 F.4th at at 328 (emphasis added); *see Courthouse News Serv. v. New Mexico Admin. Off. of the Cts.*, 2021 WL 4710644, at *35 (D. N.M. Oct. 8, 2021) (unambiguously using court "business hours" to count time) (appeal pending). Yet, unhappy with the *Schaefer* standard (a case CNS was a party to), CNS advocates for a flawed extension of it by taking issue with Defendants' unequivocable compliance with the standard by attempting to twist it into a clock hours and days standard rather than the plain and unambiguous *court/business hours* standard provided just 9 months prior to this suit. (ECF No. 47, at 21.)

---

[16] CNS incorrectly states that "Defendants do not dispute" its allegations and conclusions related to timeliness. (ECF No. 47, at 20.) This is patently false. It is abundantly clear that, based on the data, Defendants unequivocally dispute CNS's allegations and conclusions.

Under CNS' strained interpretation of *Schaefer* if, for example, a newly submitted civil complaint is electronically submitted on the Wednesday before Thanksgiving at 11:00 p.m., because courts are not open until Monday at 8:30 a.m. and the complaint is, therefore, not transmitted for filing until, for example, Monday at 8:45 a.m., then *somehow* Defendants caused "significant delay" because it somehow took "six-days" for the submittal to be filed and docketed, even though it truly only took 15 court/business minutes. (*See id.*)  But clearly, under such circumstances, the *Schaefer* standard would be complied with.

## VI.    A FULL PICTURE OF CNS'S LITIGATION.

CNS cherry-picks selective language from its 13-year nationwide litigation it wishes to utilize.  As to this case, CNS began preparing over one year ago, and by the motions hearing it will be 8 months since the filing of this lawsuit.  As to CNS's nationwide litigation, sometimes it achieves its goals, and sometimes it has not.  And, as in the *Schaefer* case, when CNS does not quite obtain what it desires, it appeals and/or files suit in another state within the same appellate circuit.  This is how we got here.

For the convenience of the Court, a brief review of the CNS litigation is provided. *See* Exhibit 47 (CNS Litigation Map) and Exhibit 48 (CNS Litigation Timeline).  As of July 2022, CNS has filed 24 lawsuits involving state court systems in 10 of the 12 federal circuits (all except the 3rd and Federal Circuits).  Appellate decisions have been rendered or are pending in 8 circuits (all except the 3rd, 5th, 6th, and Federal Circuits).

CNS desires federal courts to dictate to state courts how they must manage access to court records.  And even in the face of incomplete records, including no fact-based

tangible, empirical, and reliable evidence of a historical, nationwide tradition of contemporaneous access to newly filed civil complaints,[17] CNS desires this Court to warp the First Amendment to accommodate CNS's commercial interests.  The outcomes in the cases simply have nothing to do with giving ordinary citizens or the press the ability to monitor the operations of the state court systems.

## CONCLUSION

For the above reasons, Defendants respectfully request that the amended complaint be dismissed and that the motion for preliminary injunction be denied.

Respectfully submitted,

BRIAN E. FROSH
Attorney General of Maryland

/s/  Kevin M. Cox

_____
KEVIN M. COX (29012)
KATHRYN HUMMEL (21991)
Assistant Attorneys General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland  21202
kcox@oag.state.md.us
khummel@oag.state.md.us
(410) 576-6388
October 24, 2022                                          Attorneys for Defendants

---

[17] Defendants prove, and CNS concedes, no such history in Maryland.  (ECF No. 23-1 at 12 (citing Exhibits 8-31); ECF No. 47, at 18-19.)  And the only "evidence" of an alleged nationwide tradition are the self-serving statements of CNS, ECF No. 47, at 18-19, which Defendants dispute.  Regardless, *Schaefer* requires proof of such a history in the courts at issue, 2 F. 4th at 326-27, which Defendants have proven has never existed.

**United States District Court for the District of Maryland**
Civil Case No. 1:22-cv-00548

**REPLY EXHIBIT LIST**

| Exhibit | Description |
|---------|-------------|
| 37 | Email from Eric Ericon, Jr. (CNS Baltimore) to Bradley Tanner (Maryland Judiciary), dated April 22, 2022 |
| 38 | Website www.courthousenews.com, Search for "Maryland," Dated October 21, 2022 |
| 39 | Maryland Rules Committee, Notice of Proposed Rule Changes, Dated Feb. 21, 2020 |
| 40 | Maryland Judiciary Form, Notice Regarding Restricted Information Pursuant to Rule 20-201.1 |
| 41 | Reply Declaration of Jamie Walter, PhD., Program Director of Research and Analysis for Maryland's Administrative Office of the Courts |
| 42 | Brief of *Amicus Curiae* of Conference of Chief Justices, Dated May 9, 2022, *CNS v. Gabel*, U.S. Court of Appeals for the Second Circuit, Case No. 21-3098 |
| 43 | Brief of *Amicus Curiae* of Conference of Chief Justices, Dated Feb. 4, 2022, *CNS v. Quinlan* (formerly *Glessner*), 32 F.4th 15 (1st Cir. 2022) |
| 44 | Brief of *Amicus Curiae* of Conference of Chief Justices, Dated Sept. 26, 2022, USDC District of Oregon, Portland Division, Case No. 3:21-cv-00680 |
| 45 | Email from Les Butler (Tyler Technologies) to Pamela Harris, Explaining Cost Associated with Press Queue, Dated March 23, 2022 |
| 46 | Letter to Bill Girdner (CNS) from Abigail Diaz, Chief Legal Officer for Tyler Technologies, Cease and Desist, Dated Spetmber 30, 2022 |
| 47 | CNS Litigation Map |
| 48 | CNS Litigation Timeline |

i