IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

COURTHOUSE NEWS SERVICE,

    *Plaintiff,*

    v.

PAMELA Q. HARRIS, in her official
capacity as the State Court Administrator
of the Administrative Office of the Courts
of Maryland, et al.,

    *Defendants.*

Civil Action No. ELH-22-0548

## MEMORANDUM OPINION

This case involves the intersection of the digital age and the First Amendment.  Because many courts now permit electronic submission of lawsuits, twenty-four hours a day, 365 days a year, the question arises as to what the First Amendment requires in terms of public access to those lawsuits.

Plaintiff Courthouse News Service ("CNS") has filed suit against Pamela Q. Harris, the State Court Administrator of Maryland's Administrative Office of the Courts, and the Clerk of almost every circuit court in the State of Maryland,[1]  in their official capacities (the "Clerks"), complaining that defendants fail to provide the public and the press with contemporaneous access to non-confidential civil lawsuits that are electronically submitted.  *See* ECF 1 (Complaint); ECF 11 (First Amended Complaint).  According to CNS, the right of public access attaches when a suit is electronically submitted to a Clerk's office.  ECF 9-1 at 24.  And, they claim that defendants unlawfully engage in a policy and practice of delaying access to such complaints until after

---

[1] The Circuit Court for Baltimore City and the Circuit Court for Prince George's County do not yet use electronic filing.  ECF 23-32, ¶ 11.  As a result, the clerks of those courts were not named as defendants.

completion of clerical review and docketing. ECF 11 at 30-31.  The First Amended Complaint, lodged pursuant to 42 U.S.C. § 1983, and founded on both the First and Fourteenth Amendments to the Constitution, seeks injunctive and declaratory relief, *id.* ¶ 41, as well as reasonable attorneys' fees and costs.  *Id.* at 31, ¶ (e).

Plaintiff has also moved for a preliminary injunction (ECF 9), supported by a memorandum of law (ECF 9-1) (collectively, the "PI Motion") and several exhibits.  CNS seeks to enjoin defendants from "withholding newly e-filed non-confidential civil complaints from press and public view until after clerical review and docketing" and to obtain "contemporaneous access to all such complaints upon their receipt for filing." ECF 9-1 at 32.

Defendants filed a combined motion to dismiss the Amended Complaint and opposition to the PI Motion (ECF 23), supported by a memorandum of law (ECF 23-1) (collectively, the "Motion") and several exhibits. They maintain that electronically filed civil complaints are accessible to the press and the public within a "reasonably contemporaneous" time of submission. They seek dismissal of the suit under the Eleventh Amendment and, alternatively, they urge the Court to abstain.  Moreover, defendants ask the Court to dismiss the suit as to the twenty-two defendant Clerks, claiming that they are merely ministerial officers. ECF 23-1 at 41.  In addition, defendants assert that the case is moot due to the implementation of a new queue that expedites public access and resolves any allegedly unconstitutional delays.  ECF 50 at 18.

CNS filed a combined  opposition to the Motion and reply to defendant's opposition to the PI Motion.  ECF 47.  It is supported by several exhibits.  The defendants filed a reply as to their Motion (ECF 50), supported by several exhibits, including three amicus curiae briefs filed by the Conference of [State] Chief Justices in regard to cases in the Second Circuit, the First Circuit, and the District of Oregon, urging abstention based on principles of comity and federalism.  *See* ECF

50-6; ECF 50-7; ECF 50-8. With permission of the Court (ECF 54), plaintiff filed a surreply (ECF 55), with exhibits.

In addition, CNS moved for expedited, limited discovery.  ECF 27.  By Memorandum (ECF 41) and Order (ECF 42) of August 18, 2022, the Court granted that motion.

The pending motions were heard on November 28, 2022. The transcript for the hearing is docketed at ECF 59. At the hearing, the parties relied on the exhibits they provided with their submissions.  In addition, defendants submitted a letter from United States Senator Ron Wyden (D. Oregon) to Chief Justice John Roberts, Jr., dated August 4, 2017, expressing concerns about privacy violations in public filings in federal court.[2]

After the hearing, plaintiff filed correspondence (ECF 61) to bring a recent decision to the Court's attention with respect to the issue of abstention: *Courthouse News Service v. O'Shaughnessy*, 22-cv-201471-SDM-CMV, 2022 WL 17476835, at *1 (S.D. Ohio Dec. 6, 2022). In response, defendants filed correspondence (ECF 62) to clarify their position regarding abstention.

Thereafter, on December 19, 2022, the Court held a telephone hearing with counsel.[3]  At that hearing, the parties confirmed that in Maryland the judiciary does not permit the public or the press to obtain remote access to any complaints.  *See also* ECF 59 at 95. Instead, the public and the press may only access complaints during business hours at a courthouse.  Usually, they are

---

[2]  According to Senator Wyden, "federal courts are failing in their legal obligations to protect Americans' private information, putting Americans at needless risk of identity theft, stalking and other harms."  Defense Hearing Ex. 1.

[3] Although a court reporter participated, the Court does not have a transcript of the telephone hearing.  Therefore, I have relied on my notes and my recollection.

reviewed at computer terminals.  And, CNS has acknowledged that it is not seeking remote access. ECF 59 at 18.

For the reasons that follow, I shall deny both the Motion and the PI Motion.

## I.      Factual Background[4]

CNS is a news service that reports on civil litigation in state and federal courthouses across the country. ECF 11, ¶ 16.[5] Its publications include its "New Litigation Reports," which contain summaries of new civil complaints that are regarded as significant. *Id.* ¶ 44. To compile the summaries, CNS reporters have traditionally visited their assigned courthouses to review complaints and "to determine which ones are newsworthy." *Id.* ¶ 49.

However, the federal courts, and an increasing number of state courts, now make at least some court records available electronically. *Id.* ¶ 48.  Therefore, "CNS also covers courts remotely

---

[4] For the purpose of the Motion, I must assume the truth of the factual allegations in the Amended Complaint. *See Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). For the PI Motion, the facts are derived from both the Amended Complaint (ECF 11) and the parties' exhibits.

In general, I cite to the electronic pagination for each submission.  The electronic pagination does not always correspond to the page number imprinted on a particular document.

[5] The defense asserts that CNS "masquerades as the press" (ECF 23-1 at 4) and misrepresents its business.  ECF 23-1 at 4 n.1.  Defendants state:  "Nothing about this case is about the 'News' and the word 'News' in CNS's name is a misnomer."  ECF 23-1 at 4 n.1.  According to defendants, plaintiff's "primary business" is that of "selling aggregated snippets of case information to law firms."  ECF 50 at 3; *id.* at 8 n.3.

In today's world, news takes many forms; there are countless niche news organizations, particularly in the digital milieu.  In any event, the Fourth Circuit and other courts have characterized CNS as a news service.  *See*, *e.g.*, *Courthouse News Service v. New Mexico Administrative Office of the Courts*, 53 F.4th 1245, 1245 (10th Cir. Nov. 23, 2022); *Courthouse News Service v. Schaefer*, 2 F.4th 318, 322 (4th Cir. 2021); *Courthouse News Service v. Hade*, ___ F. Supp. 3d ___, 2022, WL 4485177, at *1 (E.D. Va. Sept. 27, 2022); *Courthouse News Service v. Gabel*, Case 2:21-000132, 2021 WL 5416650, at *2 (D. Vt. Nov. 19, 2021).  Therefore, I shall do the same.

through the Internet." *Id.* According to CNS, new, non-confidential civil complaints in those courts generally "flow automatically onto public access terminals and remotely online upon receipt, where they can be viewed by the public and press on the day of filing, prior to clerk review, docketing, and acceptance." ECF 11, ¶ 72.[6]

The defendants are employees of the Maryland judiciary.[7]  The judicial power of the State of Maryland is vested in the Supreme Court of Maryland, which is Maryland's highest court; the Appellate Court of Maryland, the State's intermediate appellate court; and the circuit courts, orphans' courts, and district courts.  MD. CONST. ART. IV, § 1.  I pause to note that, until December 14, 2022, Maryland's high court was known as the Court of Appeals and the intermediate appellate court was called the Court of Special Appeals.[8]  However, the change is "in name only," and "[t]he precedents, Rules, and all other practices of the Court are unaffected by the change and will continue in force as the precedents, Rules, and practices of the Supreme Court of Maryland." *Welcome to the Supreme Court of Maryland*, MARYLAND COURTS, https://www.mdcourts.gov/coappeals (last accessed Dec. 21, 2022). For convenience, and because the name change just went into effect, I shall generally use the names by which the courts were known since their inception, and when this case began.

Each county in Maryland, as well as Baltimore City, has a circuit court.  MD. CONST. ART. IV, § 20.  The circuit courts are "the highest common-law and equity courts of record [in

---

[6] As noted, in Maryland the public and the press do not have remote access to court records. ECF 59 at 98.  Rather, complaints may be viewed only at a courthouse.

[7] In their suit, CNS named each Clerk individually.  But, it is not necessary for me to do so.  I note that, since suit was filed, three of the Clerks have left their positions, and new Clerks have been substituted as parties.  *See* ECF 63, ECF 64, ECF 65.

[8] In November 2022, the voters of Maryland approved a constitutional amendment, changing the names of the courts.

Maryland] exercising original jurisdiction within the State."  Md. Code, § 1-501 of the Cts. & Jud. Proc. Art. ("C.J.").  Each circuit court "has full common-law and equity powers and jurisdiction in all civil and criminal cases within its county."  C.J. § 1-501.

Trials are conducted in the State's district courts and circuit courts.  But, the circuit courts are the only courts in Maryland that conduct jury trials. *Id.* § 6-404.

The Maryland Court of Appeals (now the Supreme Court of Maryland) oversees Maryland's state judicial system, and establishes the rules that govern the practice and procedure in Maryland courts.  MD. CONST. ART. IV, § 18.  A standing committee (the "Rules Committee") of lawyers and judges, appointed by the Maryland Court of Appeals, assists that court in the exercise of its rulemaking power.  C.J. § 13-301.  The Rules Committee meets regularly to consider proposed amendments and additions to the Maryland Rules that govern practice and procedure (the "Rules" or "Maryland Rules").[9]

Harris is the State Court Administrator for Maryland's Administrative Office of the Courts ("AOC").  ECF 23-32 (Harris Decl.), ¶ 2.  "Subject to supervision by the Chief Judge of the Court of Appeals, the State Court Administrator shall be responsible for the administration" of the Maryland Electronic Courts system.  Md. Rule 20-103(a).  "MDEC" is the acronym for "Maryland Electronic Courts."  Md. Rule 20-101(k) (Committee Note).

Maryland Rule 20-101(k) defines "MDEC" or "MDEC system" as the system of electronic filing and case management established by the Maryland Court of Appeals.  MDEC enables Maryland courts at all levels to "collect, store, process, and access records electronically."  ECF 9-10 ("MDEC Policies & Procedures") at 3.  Harris's many duties include the "adopt[ion of]

---

[9] Presumably, all references in the Maryland Rules to the Court of Appeals have been or will soon be revised to reflect the change in the name of the court.  But, I shall rely on the text of the rules as they have appeared during the pendency of this litigation.

policies and procedures that are necessary or useful for the proper and efficient implementation" of MDEC, consistent with the applicable Rules.  Md. Rule 20-103(b)(1).

According to the defendants, "Maryland's transition to MDEC involved many years of planning," beginning in 2006.  ECF 23-1 at 17.  At that time, Robert M. Bell, who was then the Chief Judge of the Maryland Court of Appeals, appointed an advisory committee that conducted years of studies and eventually recommended an electronic filing system. *Id.* The Maryland Judiciary contracted with Tyler Technologies, Inc. ("Tyler") on October 28, 2011, to create an electronic filing system for case management.  *Id.*  The Maryland judiciary began the transition to the MDEC system in October 2014. ECF 23-33 (Walter Decl.), ¶ 6; ECF 11, ¶ 56.  Since then, MDEC has been implemented on a "rolling basis."  ECF 23-1 at 18.  To date, twenty-two of Maryland's twenty-four circuit courts utilize the MDEC system. ECF 11, ¶ 7; ECF 23-32, ¶ 11.

In particular, "Tyler is used in MDEC courts to provide a computer software platform for electronic filing of court papers/records."  ECF 23-32, ¶ 8. The electronic filing program is known as "File and Serve."  *Id.* ¶ 7.  Defendants explain: "An MDEC user can initiate a new lawsuit through File and Serve by submitting a complaint for clerk review. After a new complaint is submitted for clerk review, prior to receiving a new case number and being filed/docketed as a new case, a clerk must review it. Once a clerk has reviewed the submission, it is transmitted and available to the public and press in one of three ways." ECF 23-1 at 18 (citations omitted).  One way is through Maryland Judiciary Case Search ("CaseSearch"); the second method is via computer terminals or kiosks located in the courthouses; and the third method is the Maryland Judiciary Record Search website.  *Id.*; *see also* Rule 20-109.

Case Search is a public website.  ECF 23-33, ¶ 8.  Notably, "CaseSearch does not provide access to a complete record but only [to] selected elements or information in a case record."  Md. Rule 16-903(2) (committee note). A complaint cannot be accessed via CaseSearch.

The Maryland Judiciary Record Search website is also "a public website . . . ."  *Id.*  It "provides access to certain information about case records, but does not provide access to pleadings, including complaints, except to registered users who are parties to the case or certain government agencies that can view documents."  *Id.*

As indicated, the public and the press do not have remote access to court filings. ECF 59 at 95. Although the Maryland Judiciary Case Search reveals the existence of a suit, members of the press and the public must go to a courthouse to view the complaint itself, generally by use of a computer terminal at a kiosk.  ECF 59 at 99.  But, attorneys of record have electronic access to the documents in their own cases, via MDEC.

As noted, CNS complains that the Clerks of the circuit courts who use MDEC do not provide contemporaneous access to newly filed, non-confidential civil complaints.  ECF 11, ¶ 69. According to CNS, they improperly withhold access until after the complaints have been reviewed, accepted by court staff, and docketed. *Id.*  CNS claims that defendants rely on their interpretation of the Maryland Rules, such as Rules 16-904(b) and 20-203(a)(2), to justify their process. *Id.* ¶¶ 60, 83. In CNS's view, "the manner in which these [two] Rules are applied by Defendants and their staff . . . violates CNS' First Amendment right of access."  *Id.* ¶ 83. And, CNS contends that defendants' policies and practice of withholding access to non-confidential electronically filed civil complaints until after clerical review and docketing has resulted in unconstitutional delays with regard to public access, in violation of the First Amendment. *Id.* ¶ 5.

During the telephone hearing, CNS clarified its stance.  It asserted that, if a complaint is electronically submitted while the courthouse is closed, the public and the press have the right to inspect the complaint at the courthouse as soon as the courthouse opens for business, without any delay due to clerical review.

CNS's Chief Executive Officer, William Girdner, avers that he has been a journalist for more than 30 years, and he maintains that "timely access to civil complaints is essential to robust and accurate news reporting . . . ."  ECF 9-2 (Girdner Decl.), ¶¶ 3, 4.  He states, *id.* ¶ 25: "Before the advent of electronic filing, it had been a long-standing tradition in courts across the country for the press to review new civil complaints on the day of filing soon after they crossed the intake counter and went through initial intake – where the clerk recorded the filer's check, often noted the parties' names, sometimes assigned a case number, and then handed the filer a receipt – but before docketing. This practice ensures that interested members of the public learn about new cases in a contemporaneous manner, while the news is still fresh."

According to Girder, the advent of e-filing in the Maryland circuit courts has prompted delays in access to complaints. *Id.* ¶ 30.  Girdner asserts that defendants "withhold access to non-confidential civil complaints after filing, while they sit in electronic queues waiting to be reviewed, docketed, and 'accepted' by court staff before being made public." *Id.* ¶ 48.

On February 14, 2022, CNS's counsel sent a letter to Harris complaining about "ongoing delays" in Maryland's docketing of newly submitted civil complaints.  ECF 1-4 at 1.  The letter asserted: "Less than half of new filing are available on the day of filing, and in some circuit courts, delays have been much greater, often taking two or more days until complaints are available." *Id.* Further, the letter stated: "In light of the foregoing, I hope that you and your colleagues will consider this matter and provide assurances that will ensure contemporaneous access to new filings

upon receipt, as required by the First Amendment, and obviate the need for litigation." ECF 1-4 at 2.

Harris avers that, upon receipt of the letter from CNS, she instructed AOC personnel to investigate the implementation of a new press queue. ECF 23-32, ¶ 15. However, Harris, who is responsible for Budget and Finance as the State Court Administrator, was concerned about the cost of a press queue. *Id.* ¶ 3. She states: "Tyler confirmed that CNS's requested 'press queue' would cost the Maryland Judiciary, and, therefore, the State and Maryland taxpayers, at least $108,000 per year, so that CNS may have the instantaneous access it desires for its business purposes to newly submitted civil complaints." *Id.* ¶ 12.

Instead, Harris implemented an alternative queue, without cost. She states, *id.*:

> In response to CNS's counsel's February 14, 2022, letter to me, I also instructed others at and within AOC to investigate the possibility of implementing an alternative to CNS's desired "press queue" that would be less costly (or perhaps even free) to State taxpayers and the Judiciary, as well as in compliance with the Maryland Rules of Civil Procedure. Tyler reported that it could create and implement a new "queue" that essentially isolates newly submitted civil complaints to be reviewed by clerks' offices for filing and docketing. This new "queue" was free of cost to the State. I authorized the implementation of the new "queue," which was effective on or about April 25, 2022, in some MDEC circuit courts. It was later implemented in the remaining MDEC circuit courts on or about May 3, 2022. This new queue has already had significant results in terms of minimizing the time between newly submitted complaints and their filing/docketing.

The queue went into effect in some circuit courts as early as April 2022. And, by June 2022, it was operative in all MDEC courts. ECF 50 at 19.

At the hearing, defendants' counsel described the queue as akin to an inbox that separates newly submitted civil complaints from all other filings, so that the clerks can prioritize the complaints for review. ECF 59 at 57. Further, counsel explained that by keeping newly submitted civil complaints in their own "bin," the clerical staff can more efficiently identify and then review the new complaints. *Id.*

The parties have provided the Court with data that purports to measure the time between electronic submission of complaints and public access to them. Of relevance, CNS measures the delay in access to complaints in terms of calendar days, because "complaints can be [electronically] filed 24 hours per day every day of the week." ECF 9-1 at 13. In other words, CNS measures the delay beginning with the time of electronic submission, which can occur at any time of day or night, even when the courts are closed. In contrast, defendants measure delay in terms of court/business hours and court/business days. ECF 50 at 20. Thus, they calculate delay based only on hours when the courts are open for business, which excludes nights, weekends, and holidays.

Plaintiff claims that, prior to commencing this action, it tracked and compiled data concerning civil complaints electronically filed at each of the twenty-two Maryland circuit courts that use the MDEC system, noting delays between when each complaint was filed with the court and "when the court first made each complaint available to the public at the courthouse." ECF 11, ¶ 67. CNS asserts: "[F]or complaints filed between October 11, 2021 and April 8, 2022, Defendants cumulatively have made on average 46.9% of newly filed complaints available to the press and public on the day of filing, with 28.3% withheld until the next day and 24.8% delayed for two days or more." *Id.*

Amita Kancherla, Senior Director with Alvarez & Marsal Disputes and Investigation, LLC, submitted declarations in support of CNS's claims. ECF 47-6 (Kancherla Decl.); ECF 55-1 (Kancherla Supplemental Decl.). Kancherla is a "Chartered Financial Analyst and a member of the CFA Society Washington, DC," with twenty years of experience in forensic accounting investigations and litigation consulting. ECF 47-6, ¶ 1. She asserts that for the period of October 2, 2021 to September 30, 2022, 55.85% of new civil complaints were accessible on the same day,

27.43% were accessible one day after filing, 4.84% were accessible two days after filing, and 11.88% were accessible three or more days after filing.  ECF 55-1, ¶ 8.

The graph below illustrates CNS's data for the period of October 1, 2021, to September 30, 2022, *id.* at 6:



Additionally, CNS asserts: "Among the 22 Maryland Circuit Courts, the percentage of new civil complaints made available on the same day they were filed, on average, ranged from a low of 32.72 percent to a high of 86.47 percent." ECF 55-1 at 3. As to each of the twenty-two circuit courts that use electronic filings, the graph that follows illustrates CNS's data for the period of October 1, 2021, to September 30, 2022, *id.*:

**Availability for Each of the 22 Maryland Circuit Courts from Oct 1, 2021 - Sept 30, 2022**

| Location | Same Day Availability | Next Day Availability | 2 Day Availability | 3+ Day Availability | Total New Complaints |
|---|---|---|---|---|---|
| Allegany | 86.47% | 10.59% | 0.00% | 2.94% | 170 |
| Anne Arundel | 32.72% | 39.51% | 7.58% | 20.19% | 1,253 |
| Baltimore | 59.61% | 31.65% | 1.56% | 7.18% | 2,436 |
| Calvert | 72.16% | 18.18% | 2.27% | 7.39% | 176 |
| Caroline | 81.25% | 18.75% | 0.00% | 0.00% | 64 |
| Carroll | 47.56% | 33.78% | 4.89% | 13.78% | 225 |
| Cecil | 71.14% | 15.85% | 6.50% | 6.50% | 246 |
| Charles | 61.36% | 19.96% | 5.10% | 13.59% | 471 |
| Dorchester | 81.94% | 15.28% | 1.39% | 1.39% | 72 |
| Frederick | 70.19% | 23.32% | 0.72% | 5.77% | 416 |
| Garrett | 52.05% | 35.62% | 1.37% | 10.96% | 73 |
| Harford | 71.97% | 22.42% | 0.67% | 4.93% | 446 |
| Howard | 55.76% | 33.95% | 1.69% | 8.60% | 651 |
| Kent | 40.23% | 33.33% | 10.34% | 16.09% | 87 |
| Montgomery | 52.40% | 21.49% | 9.24% | 16.88% | 2,880 |
| Queen Anne's | 67.06% | 24.71% | 1.18% | 7.06% | 85 |
| Saint Mary's | 64.88% | 16.94% | 3.72% | 14.46% | 242 |
| Somerset | 54.32% | 38.27% | 2.47% | 4.94% | 81 |
| Talbot | 51.58% | 34.74% | 6.32% | 7.37% | 95 |
| Washington | 46.15% | 32.97% | 5.49% | 15.38% | 273 |
| Wicomico | 60.00% | 30.70% | 1.40% | 7.91% | 215 |
| Worcester | 63.30% | 28.19% | 3.72% | 4.79% | 188 |
| **Grand Total** | **55.85%** | **27.43%** | **4.84%** | **11.88%** | **10,845** |

**Figure 1**

Further, for the period from June 1, 2022, to September 30, 2022, CNS asserts: "Among the 22 Maryland Circuit Courts, the percentage of new civil complaints made available on the same day they were filed, on average, ranged from a low of 39.47 percent to a high of 94.34 percent." *Id.* at 4. The graph that follows illustrates CNS's data for the period from June 1, 2022, when the new queue implemented by Harris became fully operational, to September 30, 2022, *id.*:

**Availability for Each of the 22 Maryland Circuit Courts from June 1, 2022 - Sept 30, 2022**

| Location | Same Day Availability | Next Day Availability | 2 Day Availability | 3+ Day Availability | Total New Complaints |
|---|---|---|---|---|---|
| Allegany | 94.34% | 3.77% | 0.00% | 1.89% | 53 |
| Anne Arundel | 39.47% | 40.53% | 4.74% | 15.26% | 380 |
| Baltimore | 61.39% | 31.64% | 1.00% | 5.97% | 904 |
| Calvert | 79.37% | 15.87% | 1.59% | 3.17% | 63 |
| Caroline | 83.33% | 16.67% | 0.00% | 0.00% | 24 |
| Carroll | 62.82% | 25.64% | 1.28% | 10.26% | 78 |
| Cecil | 82.47% | 12.37% | 0.00% | 5.15% | 97 |
| Charles | 74.83% | 18.88% | 0.00% | 6.29% | 143 |
| Dorchester | 88.00% | 12.00% | 0.00% | 0.00% | 25 |
| Frederick | 79.17% | 15.28% | 0.69% | 4.86% | 144 |
| Garrett | 54.55% | 31.82% | 0.00% | 13.64% | 22 |
| Harford | 72.55% | 22.88% | 0.00% | 4.58% | 153 |
| Howard | 62.50% | 29.81% | 0.48% | 7.21% | 208 |
| Kent | 80.00% | 13.33% | 0.00% | 6.67% | 15 |
| Montgomery | 75.05% | 16.67% | 2.02% | 6.26% | 1,038 |
| Queen Anne's | 85.71% | 10.71% | 0.00% | 3.57% | 28 |
| Saint Mary's | 73.77% | 14.75% | 0.00% | 11.48% | 61 |
| Somerset | 54.84% | 41.94% | 0.00% | 3.23% | 31 |
| Talbot | 61.29% | 29.03% | 3.23% | 6.45% | 31 |
| Washington | 67.07% | 28.05% | 2.44% | 2.44% | 82 |
| Wicomico | 61.11% | 30.56% | 1.39% | 6.94% | 72 |
| Worcester | 79.31% | 17.24% | 3.45% | 0.00% | 58 |
| **Grand Total** | **67.14%** | **24.47%** | **1.56%** | **6.82%** | **3,710** |

Figure 2

Defendants dispute CNS's data.  As mentioned, they disagree with plaintiff's calculation of delays based on calendar days, without regard to whether the courts were open to the public. Moreover, Harris notes that "AOC obtained all relevant data directly from Tyler." ECF 23-32, ¶ 8. And, she asserts, *id*.:  "Unlike how CNS obtained and calculated data in this case, AOC and Tyler were capable of and did effectively monitor and track, with precision, the actual data at issue in this case."

Jamie Walter, Ph.D. is the Program Director of Research and Analysis for the AOC. ECF 23-33 (Walter Decl.) at 1; ECF 50-5 (Second Walter Decl.).  She is experienced in research design, data collection and statistical analysis, report preparation and dissemination, and management of research staff. ECF 23-33, ¶ 4.  Walter states that, beginning on or about February 15, 2022, the AOC tracked the time between the submission of new civil complaints in MDEC courts and their

availability to the press and public.  ECF 23-33, ¶ 8; *see also* ECF 23-32, ¶ 16.  The AOC calculated the time "using business hours during which the clerks' offices are open . . . ."  ECF 23-33, ¶ 16. Walter explains: "This is because as was the case prior to the implementation of MDEC, civil complaints are available for public view at circuit court courthouses during business hours, only." *Id.*  Therefore, a complaint that is submitted outside of normal business hours is considered submitted at 8:30 a.m. on the next business day when the court reopens.  *Id.*

Walter also notes that there are many "types of categories of potential filings" via MDEC. *Id.* ¶ 13. Moreover, the Clerks handle a wide variety of records.  *See* Rule 16-902(c). In other words, the clerical staff in the Clerks' offices do far more than attend to the filing of civil complaints.  To the contrary, they have other duties.  Further, Walter states, *id.* ¶ 12: "Once a newly submitted civil complaint is transmitted, it is immediately available to the press and public for electronic review . . . ."[10]  But, transmission does not occur until after the submission is "reviewed and accepted" by the particular Clerk's office.  ECF 23-33, ¶ 8; *see also id*. ¶¶ 9, 10. And, there is no set amount of time for that process.

According to Walter, between October 1, 2021, and May 24, 2022, Maryland's MDEC courts made newly submitted civil complaints accessible to the press and public, on average, within 3.9 business hours of submission.  ECF 23-33, ¶ 17.  Statewide, 85.2% of all newly submitted civil complaints were available to the press and public within eight business hours and one business minute.  *Id.*[11]

---

[10] In the teleconference on December 19, 2022, defendants clarified that electronic review does not mean remote access. Rather, electronic review refers to the ability to view complaints in person, electronically, via the computer terminals that are available at the courthouses.

[11] A typical business day is eight hours long. At oral argument, defense counsel asserted that 8 business hours and 1 business minute refers to one business day, and that a complaint made publicly accessible within 8 hours and 1 minute constitutes same-day access. ECF 59 at 101.

Walter maintains that there is "a clear learning curve" to use MDEC.  ECF 23-33, ¶ 19.
And, she states, *id.* ¶ 17: "When the Circuit Court for Montgomery County is omitted from these
calculations because it only just implemented MDEC on October 25, 2021, the average during this
time drops to 2.7 business hours, and the median drops to 1.2 business hours. Statewide, between
October 1, 2021, and May 24, 2022, with the exclusion of the Circuit Court for Montgomery
County, 91.7% of all newly submitted civil complaints were filed within 8 business hours and 1
business minute." *Id.*

Further, Walter asserts, *id.* ¶ 18: "Between April 25, 2022, and May 24, 2022, the data
confirms that Maryland's MDEC courts made newly submitted civil complaints accessible to the
press and public, on average, within 1.3 business hours of submission.  The median number of
business hours during this time is 0.7.  Statewide, between April 25, 2022, and May 24, 2022,
98.9% of all newly submitted civil complaints were filed within 8 business hours and 1 business
minute of submittal."   Thus, defendants argue that any delays in access are constitutionally
permissible.  ECF 23-1 at 52.

Defendants presented graphs pertaining to the period of October 1, 2021, through May 24,
2022, depicting the length of time between submission of civil complaints in MDEC courts and
their availability to the public and the press.  The graphs illustrate the data with and without
Montgomery County.  *Id.*  ¶¶ 21, 22:



The defense also provided graphs detailing the percentage of newly submitted civil complaints filed within eight business hours and one business minute of submission. The graphs below illustrate the data, with and without Montgomery County. *Id.* ¶¶ 23, 24.



In addition, defendants have provided more recent information, through September 30, 2022, as to the average and median number of business hours it takes for the MDEC courts to make complaints publicly accessible.  ECF 50-5 at 5.

From October 1, 2021, to September 30, 2022, there were 2,436 complaints filed in Baltimore County.  *Id.* The average and median number of business hours to make the complaints publicly accessible was 1.7 and 1.0 hours, respectively, and 98.2% of the complaints were accessible within 8 business hours and 1 business minute. *Id.* Anne Arundel County had 1,253 complaints filed within this time period. *Id.*  The average and median number of business hours to make those complaints publicly accessible were 4.0 hours and 2.1 hours, respectively, and 82.9% of complaints were publicly accessible within 8 business hours and 1 business minute.  *Id.*

Defendants submitted the chart that follows, which depicts data for each MDEC circuit court from October 1, 2021, to September 30, 2022.  *See* ECF 50-5 at 5.

| Initial Civil Complaints - Number of and Business Hours to Transmit (MDEC Circuit Courts Only) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Jurisdiction | From 10/01/2021 to 09/30/2022 | | | | | From 06/01/2022 to 09/30/2022 | | | | |
| | N | Average Hours | Median Hours | ≤8:01 Bus. Hrs. | %age ≤8:01 | N | Average Hours | Median Hours | ≤8:01 Bus. Hrs. | %age ≤8:01 |
| Allegany | 170 | 0.6 | 0.4 | 170 | 100.0% | 53 | 0.3 | 0.3 | 53 | 100.0% |
| Anne Arundel | 1,253 | 4.0 | 2.1 | 1,039 | 82.9% | 380 | 2.6 | 1.3 | 347 | 91.3% |
| Baltimore County | 2,436 | 1.7 | 1.0 | 2,391 | 98.2% | 904 | 1.4 | 0.8 | 894 | 98.9% |
| Calvert | 176 | 0.8 | 0.5 | 176 | 100.0% | 63 | 0.6 | 0.4 | 63 | 100.0% |
| Caroline | 64 | 0.3 | 0.2 | 64 | 100.0% | 24 | 0.3 | 0.2 | 24 | 100.0% |
| Carroll | 225 | 3.1 | 1.5 | 198 | 88.0% | 78 | 1.2 | 0.6 | 78 | 100.0% |
| Cecil | 246 | 1.7 | 0.7 | 235 | 95.5% | 97 | 0.5 | 0.3 | 97 | 100.0% |
| Charles | 471 | 3.2 | 1.0 | 410 | 87.0% | 143 | 0.8 | 0.5 | 143 | 100.0% |
| Dorchester | 72 | 1.7 | 1.2 | 72 | 100.0% | 25 | 1.3 | 1.0 | 25 | 100.0% |
| Frederick | 416 | 0.8 | 0.3 | 414 | 99.5% | 144 | 0.4 | 0.2 | 144 | 100.0% |
| Garrett | 73 | 1.2 | 0.7 | 72 | 98.6% | 22 | 1.3 | 0.7 | 21 | 95.5% |
| Harford | 446 | 0.9 | 0.5 | 446 | 100.0% | 153 | 1.1 | 0.6 | 153 | 100.0% |
| Howard | 651 | 2.2 | 1.3 | 632 | 97.1% | 208 | 1.6 | 1.1 | 205 | 98.6% |
| Kent | 87 | 5.7 | 5.0 | 60 | 69.0% | 15 | 1.5 | 1.3 | 15 | 100.0% |
| Montgomery | 2,880 | 5.2 | 2.4 | 2,273 | 78.9% | 1038 | 1.7 | 0.9 | 1,035 | 99.7% |
| Queen Anne's | 85 | 1.1 | 0.4 | 83 | 97.6% | 28 | 0.5 | 0.2 | 28 | 100.0% |
| Saint Mary's | 242 | 3.1 | 1.6 | 219 | 90.5% | 61 | 1.9 | 1.0 | 57 | 93.4% |
| Somerset | 81 | 1.1 | 0.6 | 79 | 97.5% | 31 | 0.5 | 0.5 | 31 | 100.0% |
| Talbot | 95 | 2.6 | 1.3 | 89 | 93.7% | 31 | 2.1 | 1.2 | 30 | 96.8% |
| Washington | 273 | 4.3 | 1.7 | 230 | 84.2% | 82 | 2.0 | 1.1 | 80 | 97.6% |
| Wicomico | 215 | 2.0 | 1.3 | 209 | 97.2% | 72 | 1.8 | 1.2 | 71 | 98.6% |
| Worcester | 188 | 1.7 | 1.2 | 186 | 98.9% | 58 | 0.9 | 0.8 | 58 | 100.0% |
| Maryland Statewide | 10,845 | 3.0 | 1.2 | 9,747 | 89.9% | 3,710 | 1.5 | 0.8 | 3,652 | 98.4% |
| Statewide Montgomery Omitted | 7,965 | 2.2 | 1.0 | 7,474 | 93.8% | | | | | |

Further, the chart depicts data for the period from June 1, 2022, to September 30, 2022, coinciding with the implementation of the new queues. ECF 50-5, ¶ 15 at 10. According to Walter, during this period, 90% of newly submitted civil complaints in MDEC courts were available to the public and press "within 3.8 business hours of submission." *Id.* Moreover, 95% of newly submitted civil complaints in MDEC courts were publicly available within approximately 5.5 business hours of submission. *Id.* And, for the period June 1, 2022, to September 30, 2022, 98.4% of complaints filed statewide in circuit courts using MDEC were publicly accessible within 8

business hours and 1 business minute. *Id.* ¶ 6 at 5. The statewide average and median number of business hours was 1.5 and 0.8, respectively. *Id.*

Defendants acknowledge that, on occasion, civil complaints get "'caught'" in the MDEC electronic system "for an unknown technological reason." *Id.* They also assert that some filings require "additional court review, particularly from *pro se* individuals and sovereign citizens." *Id.* at 10-11. Moreover, they contend that their conduct in reviewing and processing complaints is in accordance with various Maryland Rules. ECF 23-1 at 54.

The parties refer to several Maryland Rules. Specifically, CNS references Maryland Rules 16-902, 16-916, 16-918, 20-109, 20-201.1, 20-202, and 20-203. *See, e.g.,* ECF 9-1 at 7-10, 25-26. The defendants cite Maryland Rules 16-902, 16-904, 16-914, 16-915, 16-916, 16-918, and 20-203. ECF 23-1 at 12-16. Nevertheless, their arguments rest primarily on two Rules: Maryland Rule 16-904(b) and Rule 20-203(a), discussed *infra*.

As the review below indicates, it is clear that the Standing Committee and the Maryland Court of Appeals have thoughtfully crafted numerous Rules that are pertinent to clerical duties and electronic filing. The Rules reflect the efforts of the judiciary to administer the courts, mindful of the wide variety of court records and proceedings handled by the courts, and the need to safeguard the First Amendment while also protecting individual privacy interests.

On May 1, 2013, the Maryland Court of Appeals added a new title to the Maryland Rules: Title 20, "Electronic Filing and Case Management." Maryland Rule 20-109, titled "Access to Electronic Records in MDEC Actions," states that "access to judicial records in an MDEC action is governed by the Rules in Title 16, Chapter 900."

Title 16 of the Maryland Rules is named "Court Administration."  Chapter 900 of Title 16 is called "Access To Judicial Records."  Maryland Rule 16-902, titled "Preamble," states, in pertinent part (italics added):

(a) **Constitutional Authority.** — Article IV, § 18(a) of the Md. Constitution authorizes the Court of Appeals to adopt Rules concerning the practice and procedure in and the administration of the courts of this State that have the force of law.  Control over access to judicial records in the custody of judicial agencies, special judicial units, or judicial personnel is an integral part of the practice and procedure in and administration of the courts.

\* \* \*

(b) **General Intent.** — The intent of this Chapter is to (1) adopt comprehensive principles and *procedures that will maintain the traditional openness of judicial records, subject only to such shielding or sealing that is necessary to protect, supervening rights of privacy, safety, and security,* and (2) provide an efficient, credible, and exclusive system for resolving disputes over inspection decisions by custodians of judicial records.

(c) **Categories of Judicial Records.** —

(1) **Generally.** — Judicial records fall into five categories:

(A) Notice Records - those, such as land records, that are filed with circuit court clerks for the sole purpose of recording, preserving, and providing public and constructive notice of them;

(B) Administrative Records - those that relate to personnel, budgetary, or operational administration; information technology; the safety and security of judicial personnel, facilities, equipment, or programs; the development and management of electronic data; or that constitute judicial or other professional work product;

(C) License Records - those that relate to the issuance of licenses by Circuit Court clerks pursuant to statutes;

(D) Case Records - those that were filed with the clerk of a court in connection with litigation that was filed in or transferred to the court; and

(E) Special Judicial Unit Records - those maintained by four special judicial units that are subject to special rules of confidentiality.

(2) **Treatment.** —

-21-

(A) *Although there is a presumption of openness applicable to all five categories of judicial records, some present special concerns that require more focused treatment with respect to sealing or shielding decisions.*

(B) Because the principal function of notice records is to give public notice of them, very few exceptions to public access are warranted. *Case records and certain kinds of administrative records may contain very sensitive information that needs to remain confidential for overarching privacy, safety, and security purposes and not be subject to public inspection.*

(C) License records are similar to public records maintained by Executive Branch licensing agencies, and public inspection of them is generally consistent with what is allowed under the PIA or other statutes.

In Rule 16-903(a)(1), "Access" is defined as the right to inspect and copy a judicial record. The terms "access" and "inspect" or "inspection" are used interchangeably. *Id.*

"Remote Access" is defined in Rule 16-903(a)(2)(A) as the ability to inspect or copy a judicial record by electronic means from "a device not under the control of the Maryland Judiciary." Moreover, Rule 16-903(a)(2)(B) indicates that access to "electronic case records through a terminal or kiosk" in a courthouse "and made available by the court for public access does not constitute remote access."

As noted, the parties specifically identify Rule 16-904 as pertinent, with defendants claiming it justifies their clerical review and CNS arguing to the contrary. Maryland Rule 16-904, titled "General Policy," states, in pertinent part (italics added):

(a) **Presumption of Openness. —** *Judicial records are presumed to be open to the public for inspection.* Except as otherwise provided by the Rules in this Chapter or by other applicable law, the custodian of a judicial record shall permit a person to inspect a judicial record in accordance with Rules 16-922 through 16-924. Subject to the Rules in this Chapter, inspection of case records through the MDEC program is governed by Title 20 of the Maryland Rules.

(b) **Protection of Records. —** To protect judicial records and prevent unnecessary interference with the official business and duties of the custodian and other judicial personnel, *a clerk is not required to permit public inspection of a case record filed with the clerk for docketing in a judicial action or a notice record filed*

-22-

*for recording and indexing until the document has been docketed or recorded and indexed*.

Maryland Rule 16-903(g) defines "Custodian" with respect to a "judicial record" to include "the clerk of the court in which the record was filed" or "an employee of the clerk's office authorized to act for the clerk in determining administratively whether inspection of the record . . . may be denied[.]"  And, under Rule 16-914, except as provided by law, court order, or the Rules, a custodian "shall deny inspection" of various kinds of cases, such as those pertaining to adoption, delinquency, domestic violence, child abuse and neglect, search and arrest warrants, transcripts of closed court proceedings, and records containing certain financial and/or medical information.  In addition, under Rule 16-915, the custodian generally "shall deny inspection of a case record," or part of it, to the extent it reveals a social security number, a trade secret, and personal identifying information of a State employee or someone who reports abuse of a vulnerable adult.

Maryland Rule 16-916, titled "Case Records—Procedures for Compliance," states, in pertinent part (italics added):

(a)  **Duty of Person Filing Record. —**

   (1)  A person who files or authorizes the filing of a case record shall inform the custodian, in writing, whether, in the person's judgment, the case record, any part of the case record, or any information contained in the case record is confidential and not subject to inspection under the Rule in this Chapter.

   (2) The custodian is not bound by the person's determination that a case record, any part of a case record, or information contained in a case record is not subject to inspection and shall permit inspection of a case record unless, in the custodian's independent judgment, subject to review as provided in Rule 16-932, the case record is not subject to inspection.

   (3) Notwithstanding subsection (1)(2) or (b)(2) of this Rule, a custodian may rely on a person's failure to advise that a case record, part of a case record, or information contained in a case record is not subject to inspection, and, in default of such advice, the custodian is not liable for permitting inspection of the case

record, part of the case record, or information, even if the case record, part of the case record, or information in the case record is not subject to inspection under the Rules in this Chapter.

\* \* \*

(b) **Duty of Clerk.** —

(1) *The clerk shall make a reasonable effort*, promptly upon the filing or creation of a case record, *to shield any information that is not subject to inspection under the Rules in this Chapter* and that has been called to the attention of the custodian by the person filing or authorizing the filing of the case record.

Rule 16-918 is also pertinent.  It is titled "Access to electronic records" and states, in part

(italics added):

(a)  **In General.** — Subject to the other Rules in this Title and in Title 20 and other applicable law, a judicial record that is kept in electronic form is open to inspection to the same extent that the record would be open to inspection in paper form.

(b)     **Denial of Access.** —

(1)  **Restricted Information.** — *A custodian shall take reasonable steps to prevent access to restricted information, as defined in Rule 20-101(s)*, that the custodian is on notice is included in an electronic judicial record.

(2)  **Certain Identifying Information.** —

(A)  **In General.** —  Except as provided in subsection (b)(2)(B) of this Rule, a custodian shall prevent remote access to the name, address, telephone number, date of birth, e-mail address, and place of employment of a victim or nonparty witness in:

(i)  a criminal action,

(ii) a juvenile delinquency action under Code, Courts Article, Title 3, Subtitle 8A,

(iii) an action under Code, Family Law Article, Title 4, Subtitle 5 (domestic violence), or

(iv)  an action under Code, Courts Article, Title 3, Subtitle 15 (peace order).

\* \* \*

(C)  **Availability of Computer Terminals.** — Clerks shall make available at convenient places in the courthouses computer terminals or kiosks that the public may use to access judicial records and parts of judicial records that are open to inspection, including judicial records as to which remote access is otherwise prohibited.  To the extent authorized by administrative order of the Chief Judge of

-24-

the Court of Appeals, computer terminals or kiosks may be made available at other facilities for that purpose.

"Business day" is defined in Maryland Rule 20-101(b) as a day that the Clerk's Office is "Open for the transaction of business."  For the purpose of the rules, it begins at 12:00 a.m. and ends at 11:59 p.m.  *Id.*  Maryland Rule 20-101(s) defines "Restricted Information" as " information that, by Rule or other law, is not subject to public inspection or is prohibited from being included in a court record absent a court order."

Maryland Rule 20-201.1, titled "Restricted Information," is also relevant.  It sets forth what filers must do "when seeking to file a document that is wholly or partially not open to public inspection . . . ." ECF 50-3 at 15.  It states, in pertinent part (italics added):

(a) **Statement in Submission; Notice Regarding Restricted Information. —**

   (1) **Requirement. —** Each submission filed pursuant to Rule 20-201 that contains restricted information shall state prominently on the first page that it contains restricted information. Except for categories of actions specified in Rule 16-914 (a) [i.e. case records filed involving children] or in the Policies and Procedures adopted by the State Court Administrator pursuant to Rule 20-103 (b), if the submission contains restricted information, it shall be accompanied by a completed Notice Regarding Restricted Information on a form approved by the State Court Administrator. The completed Notice shall be subject to public inspection.

   (2) **Failure to File Notice Regarding Restricted Information. —** If the filer fails to file a completed Notice of Restricted Information as required, the clerk shall reject the submission without prejudice to refile the submission accompanied by the Notice. The clerk shall enter on the docket that a submission was received but was rejected for non-compliance with Rule 20-201.1 (a).

(b) **Submission Not Subject to Public Inspection. —** If the submission, as a whole, is not subject to public inspection by Rule, other law, or court order, the filer shall cite the grounds for such an assertion in the Notice.

(c) **Submission Containing Restricted Information. —**

   (1) **Requirements.** If a filer believes that a submission contains both restricted information that is not subject to public inspection and information that is subject to public inspection, and that the restricted information is necessary to be included in the submission, the filer shall (A) file both an unredacted version of the

submission, noting prominently in the title of the version that the version is "unredacted--to be shielded," and a redacted version of the submission that excludes the restricted information, noting prominently in the title of the version that the version is "redacted," and (B) state in the Notice the grounds for the assertion that some information is restricted information and for including the restricted information in the submission.

(2) **Failure to File Required Versions.** — If the filer fails to file both an unredacted and a redacted version of a submission when required under subsection (c)(1) of this Rule, *the clerk shall reject the submission without prejudice to refile the submission* with both versions included. The clerk shall enter on the docket that a submission was received but was rejected for non-compliance with Rule 20- 201.1 (c).

Maryland Rule 20-202 states:  "The MDEC system shall record the date and time an electronically filed submission is received by the MDEC system.  Subject to Rules 20-201(i) and 20-203, the date recorded shall be the effective date of filing and shall serve as the docket date of the submission filed."

Maryland Rule 20-203 is titled "Review by clerk; striking of submission; deficiency notice; correction; enforcement."  CNS points to this Rule to illustrate that the rules "do[] not require Defendants to review or docket newly filed complaints *before* they are made public." ECF 9-1 at 14 (emphasis in original).  Rule 20-203 states, in pertinent part:

(a) **Time and Scope of Review. —**

*      *      *

(2) **Review by Clerk. —** As soon as practicable, the clerk shall review a submission for compliance with Rule 20-201(g) and the published policies and procedures for acceptance established by the State Court Administrator. If the clerk determines that the filer has used an incorrect case number for the submission, and the error is not readily susceptible to correction pursuant to subsection (b)(1) of this Rule, the clerk shall reject the submission and promptly notify the filer. Unless otherwise ordered by the court for good cause shown, a refiled submission shall relate back to the filing of the rejected submission.

(b) **Docketing.**

(1) **Generally.** — The clerk shall promptly correct errors of non-compliance that apply to the form and language of the proposed docket entry for the submission.

The docket entry as described by the filer and corrected by the clerk shall become the official docket entry for the submission.

As plaintiff argues (ECF 9-1 at 14), the "plain language" of Rule 20-203(a)(2) does not require "a Clerk to review a newly filed complaint on this basis before docketing it." Indeed, Rule 20-203(a)(2), cited both by CNS and the defendants, would seem to have little relevance here. This is because it pertains to Rule 20-201(g). And, that rule concerns Certificates of Service. In particular, Rule 20-201(g)(1) expressly excludes from its application a submission that is an "original pleading," which would encompass a newly filed complaint.

In any event, the Rules as a whole make plain that lawsuits sometimes contain restricted, confidential information, to which public access is not appropriate or permitted. And, the Rules, read as a whole, confer responsibilities on the Clerks to limit access to such information.

Additional facts are included, *infra*.

## II.   Motion to Dismiss

### A.   Legal Standards

Defendants urge the Court to dismiss the Amended Complaint on the grounds of Eleventh Amendment immunity, abstention, and the Declaratory Judgment Act. Further, they contend that the twenty-two Clerks are not proper parties, and that the case is now moot due to the implementation of the new queue.

Defendants do not cite a rule to support dismissal. Therefore, I shall assume that they rely on Fed. R. Civ. P. 12(b)(1) and Fed R. Civ. P. 12(b)(6).

Federal district courts are courts of limited jurisdiction; they possess "'only that power authorized by Constitution and statute.'" *Gunn v. Minton*, 586 U.S. 251, 256 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)); *see Home Depot U.S.A., Inc. v. Jackson*, ___ U.S. ___, 139 S. Ct. 1743, 1746 (2019); *Exxon Mobil Corp. v.*

*Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005). Simply put, "if Congress has not empowered the federal judiciary to hear a matter, then the case must be dismissed." *Home Buyers Warranty Corp. v. Hanna*, 750 F.3d 427, 432 (4th Cir. 2014); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) ("'Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.'") (citation omitted). "Because jurisdictional limits define the very foundation of judicial authority, subject matter jurisdiction must, when questioned, be decided before any other matter." *United States v. Wilson*, 699 F.3d 789, 793 (4th Cir. 2012).

The Fourth Circuit has reiterated that the defense of sovereign immunity is a jurisdictional bar, explaining that "'sovereign immunity deprives federal courts of jurisdiction to hear claims, and a court finding that a party is entitled to sovereign immunity must dismiss the action for lack of subject-matter jurisdiction.'" *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 649 (4th Cir. 2018) (citation omitted), *cert. denied*, ___ U.S. ___, 139 S. Ct. 417 (2018); *see also Cunningham v. Lester*, 990 F.3d 361, 365 (4th Cir. 2021) (recognizing sovereign immunity as a jurisdictional limitation and describing it as "a weighty principle, foundational to our constitutional system").

Under Rule 12(b)(1), a plaintiff bears the burden of proving, by a preponderance of evidence, the existence of subject matter jurisdiction. *See Demetres v. E. W. Const., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015); *see also Williams v. Big Picture Loans, LLC*, 929 F.3d 170, 176 (4th Cir. 2019); *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 543 (4th Cir. 2014); *The Piney Run Preservation Ass'n v. Cty. Comm'rs of Carroll Cty.*, 523 F.3d 453, 459 (4th Cir. 2008); *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999). However, a court should grant a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) "'only if the material jurisdictional facts are not

in dispute and the moving party is entitled to prevail as a matter of law.'" *B.F. Perkins*, 166 F.3d at 647 (citation omitted).

A challenge to subject matter jurisdiction under Rule 12(b)(1) may proceed "in one of two ways": either a facial challenge or a factual challenge. *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009); *accord Hutton v. Nat'l Bd. of Exam'rs Inc.*, 892 F.3d 613, 620-21 (4th Cir. 2018). In a facial challenge, "the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns*, 585 F.3d at 192; *accord Clear Channel Outdoor, Inc. v. Mayor and City Council of Baltimore*, 22 F. Supp. 3d 519, 524 (D. Md. 2014).

In a factual challenge, on the other hand, "the district court is entitled to decide disputed issues of fact with respect to subject matter jurisdiction," *Kerns*, 585 F.3d at 192, "[u]nless 'the jurisdictional facts are intertwined with the facts central to the merits of the dispute.'" *United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 348 (4th Cir. 2009), *cert. denied*, 558 U.S. 875 (2009). In a factual challenge, the court "may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004); *see also Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). In particular, "the district court may ... resolve the jurisdictional facts in dispute by considering evidence ... such as affidavits." *Vuyyuru*, 555 F.3d at 348. When appropriate, the court may also "hold an evidentiary hearing to determine whether the facts support the jurisdictional allegations." *United States v. North Carolina*, 180 F.3d 574, 580 (4th Cir. 1999); *see also Schneider v. Donaldson Funeral Home, P.A.*, 733 F. App'x 641, 644 (4th Cir. 2018); *Kerns*, 585 F.3d at 192.

Defendants dispute whether CNS has alleged a violation of federal law. *See* ECF 23-1 at 43-61.  This is a facial challenge.  Therefore, I shall consider the facts alleged in the Complaint and assume the truth of the allegations to determine whether CNS has alleged facts sufficient to invoke subject matter jurisdiction.

A motion under Rule 12(b)(6) tests the legal sufficiency of a complaint. *Nadendla v. WakeMed*, 24 F.4th 299, 304-05 (4th Cir. 2022); *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 211 (4th Cir. 2019); *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom., McBurney v. Young*, 569 U.S. 221 (2013). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." *See Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 420 (4th Cir. 2005) (citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)); *Ibarra v. United States,* 120 F.3d 472, 473 (4th Cir. 1997).

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). *See Migdal v. Rowe Price-Fleming Int'l Inc.*, 248 F.3d 321, 325-26 (4th Cir. 2001); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555-56 (2007).

To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v.*

*Twombly,* 550 U.S. 544, 570 (2007); *see Ashcroft v. Iqbal,* 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions'...."); *see also Paradise Wire & Cable Defined Benefit Pension Plan v. Weil,* 918 F.3d 312, 317-18 (4th Cir. 2019); *Willner v. Dimon,* 849 F.3d 93, 112 (4th Cir. 2017). And, the court must accept as true all facts alleged in the suit, and draw all reasonable inferences from those facts in favor of the plaintiff. *Retfalvi v. United States,* 930 F.3d 600, 605 (4th Cir. 2019).

To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly,* 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.,* 574 U.S. 10, 10 (2014) (per curiam). But, "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli,* 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted). And, "[m]ere recitals of a cause of action, supported only by conclusory statements, are insufficient to survive" a Rule 12(b)(6) motion. *Morrow v. Navy Federal Credit Union,* ___ Fed. App'x ___, 2022 WL 2526676, at *2 (4th Cir. July 7, 2022).

In connection with a Rule 12(b)(6) motion, courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *King v. Rubenstein,* 825 F.3d 206, 214 (4th Cir. 2016) (citation omitted); *see Bing v. Brivo Sys., LLC,* 959 F.3d 605, 616 (4th Cir. 2020). But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan,* 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the

complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst,* 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies...if all facts necessary to the affirmative defense 'clearly appear[] *on the face of the complaint.*'" *Goodman,* 494 F.3d at 464 (emphasis in *Goodman*) (citation omitted).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6) courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448). Ordinarily, the court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein[.]" *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013), *abrogated on other grounds by Reed. v. Town of Gilbert*, ___ U.S. ___, 135 S. Ct. 2218 (2015); *see Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).

However, under limited circumstances, when a court is resolving a Rule 12(b)(6) motion, it may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015). In particular, a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits." *Goines*, 822 F.3d at 166 (citation omitted); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

"[B]efore treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F. 3d at 167. "When the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Id.* Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.*

A court may also "consider a document submitted by the movant that [is] not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Goines*, 822 F.3d at 166 (citations omitted); *see also Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied*, ___ U.S. ___, 138 S. Ct. 558 (2017); *Oberg*, 745 F.3d at 136; *Kensington Volunteer Fire Dep't. v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012). To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis in original). *See also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

## B.  Eleventh Amendment

Plaintiff filed suit pursuant to 42 U.S.C. § 1983. ECF 11 at 29. Under § 1983, a plaintiff may sue any "person" who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation

of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. *See, e.g., Filarsky v. Delia*, 566 U.S. 377 (2012); *see also Graves v. Loi*, 930 F.3d 307, 318-19 (4th Cir. 2019); *Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014), *cert. denied sub nom. Baltimore City Police Dep't v. Owens*, 575 U.S. 983 (2015).[12]

Defendants urge the Court to dismiss the suit on the basis of sovereign immunity, pursuant to the Eleventh Amendment to the Constitution. ECF 23-1 at 31-33. The Eleventh Amendment states: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or subjects of any Foreign State."[13]

---

[12] Section 1983 "'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). In other words, § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999).

The phrase "under color of state law" is an element that "is synonymous with the more familiar state-action requirement—and the analysis for each is identical." *Philips v. Pitt Cty. Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929 (1982)). A person acts under color of state law "only when exercising power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Polk County v. Dodson*, 454 U.S. 312, 317-18 (1981) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)); *see also Philips*, 572 F.3d at 181 ("[P]rivate activity will generally not be deemed state action unless the state has so dominated such activity as to convert it to state action: Mere approval of or acquiescence in the initiatives of a private party is insufficient.") (Citations and internal quotation marks omitted).

To state a claim under § 1983, a plaintiff must allege (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *see Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011), *cert. denied*, 565 U.S. 823 (2011); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997).

[13] In *Williams v. Morgan State Univ.*, 850 F. App'x 172, 174 (4th Cir. 2021) (per curiam), the Court described the Eleventh Amendment as a "rather narrow and precise provision . . . ." *Id.*

Sovereign immunity "protects the States, their agencies, and State officials acting in their official capacities from being sued in federal court without their consent." *Murphy v. Commonwealth of Virginia*, 2022 WL 17484286, at *1 (4th Cir. Dec. 7, 2022) (per curiam); *see Coleman v. Court of Appeals of Md.*, 566 U.S. 30, 35 (2012)  ("A foundational premise of the federal system is that States, as sovereigns, are immune from suits for damages, save as they elect to waive that defense."); *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 363 (2001) ("The ultimate guarantee of the Eleventh Amendment is that nonconsenting states may not be sued by private individuals in federal court."); *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54-55 (1996) ("For over a century we have reaffirmed that federal jurisdiction over suits against unconsenting States was not contemplated by the Constitution when establishing the judicial power of the United States.") (internal quotation marks and citation omitted); *see also Quern v. Jordan*, 440 U.S. 332, 345 (1979) ("[Section] 1983 does not explicitly and by clear language indicate on its face an intent to sweep away the immunity of the States[.]"); *Allen v. Cooper*, 895 F.3d 337, 347 (4th Cir. 2018).

The Supreme Court has explained: "Although by its terms the [Eleventh] Amendment applies only to suits against a State by citizens of another State, our cases have extended the Amendment's applicability to suit for damages by citizens against their own States." *Garrett*, 531 U.S. at 363 (collecting cases); *see Pense v. Md. Dep't of Public Safety and Correctional Services*, 926 F.3d 97, 100 (4th Cir. 2019) ("The Supreme Court 'has drawn on principles of sovereign immunity to construe the Amendment to establish that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State.'") (quoting *Port Auth. Trans–Hudson Corp. v. Feeney*, 495 U.S. 299, 304 (1990)); *see also*, *e.g.*, *Virginia Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 253 (2011); *Lapides v. Bd. of*

*Regents of Univ. Sys. of Georgia,* 535 U.S. 613, 618 (2002); *Kimmel v. Fla. Bd. of Regents*, 528 U.S. 62, 72-73 (2000); *Passaro v. Virginia*, 935 F.3d 243, 247 (4th Cir. 2019), *cert. denied*, __ U.S.__, 140 S. Ct. 903 (2020); *Lee-Thomas v. Prince George's Cty. Pub. Sch.*, 666 F.3d 244, 248 (4th Cir. 2012).

Sovereign immunity is "a weighty principle, foundational to our constitutional system." *Cunningham v. Lester*, 990 F.3d 361, 365 (4th Cir. 2021).  The preeminent purpose of state sovereign immunity is "to accord states the dignity that is consistent with their status as sovereign entities . . . ." *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 760 (2002).  Moreover, the defense of sovereign immunity is a jurisdictional bar.  As the Fourth Circuit has explained, "'sovereign immunity deprives federal courts of jurisdiction to hear claims, and a court finding that a party is entitled to sovereign immunity must dismiss the action for lack of subject-matter jurisdiction.'" *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 649 (4th Cir. 2018) (citation omitted), *cert. denied*, ___U.S. ___, 139 S. Ct. 417 (2018).  Thus, in the absence of waiver or a valid congressional abrogation of sovereign immunity, the states enjoy immunity from suits for damages brought in federal court by their own citizens.  *See Hans v. Louisiana*, 134 U.S. 1, 3 (1890).

Sovereign immunity bars suit not only against a state, but also against an instrumentality of a state, such as a state agency, sometimes referred to as an "arm of the state."  *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101-02 (1984) ("It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."); *see also Regents of Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997); *Pense*, 926 F.3d at 100; *McCray v. Md. Transit Admin.*, 741 F.3d 480, 483 (4th Cir. 2014); *Bland v. Roberts*, 730 F.3d 368, 389 (4th Cir. 2013); *Constantine v. Rectors*

*and Visitors of George Mason Univ.*, 411 F.3d 474, 479 (4th Cir. 2005).  Put another way, sovereign immunity applies when "'the governmental entity is so connected to the State that the legal action against the entity would . . . amount to the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties.'"  *Lane v. Anderson*, 660 F. App'x 185, 195-96 (4th Cir. 2016) (quoting *Cash v. Granville Cty. Bd. of Educ.*, 242 F.3d 219, 224 (4th Cir. 2001)) (cleaned up).   In contrast, sovereign immunity "does not immunize political subdivisions of the state, such as municipalities and counties, even though such entities might exercise a 'slice of state power.'" *Ram Ditta by and through Ram Ditta v. Md. Nat. Capital Park & Planning Comm'n*, 822 F.2d 456, 457 (4th Cir. 1987) (quoting *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 401 (1979)).

Of relevance here, "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.  As such, it is no different from a suit against the State itself." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) (internal citation omitted); *see Kentucky v. Graham*, 473 U.S. 159, 165 (1985) ("Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law.  Official-capacity suits, in contrast, generally represent only another way of pleading an action against an entity of which an officer is an agent." (internal quotation marks omitted)); *Murphy*, 2022 WL 17484286, at *2.  But, "the burden of proof falls to an entity seeking immunity as an arm of the state, even though a plaintiff generally bears the burden to prove subject matter jurisdiction." *Williams v. Big Picture Loans, LLC*, 929 F.3d 170, 176 (4th Cir. 2019) (citing *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 543 (4th Cir. 2014)); *see DiCocco v. Garland*,  18 F.4th 406, 414 (4th Cir. 2021).

As indicated, there are exceptions to the Eleventh Amendment's prohibition of suits against a state or an arm of the state.   In *Lee-Thomas*, 666 F.3d 244, the Court explained, *id.* at 249 (internal quotations omitted):

> First, Congress may abrogate the States' Eleventh Amendment immunity when it both unequivocally intends to do so and acts pursuant to a valid grant of constitutional authority.  *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) . . . .  Second, the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law.  *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004) . . . .  Third, a State remains free to waive its Eleventh Amendment immunity from suit in a federal court.  *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 618 (2002).

As mentioned, a state may waive its sovereign immunity and permit suit in federal court.  *See Lapides*, 535 U.S. at 618; *see also Pense*, 926 F.3d at 101; *Lee-Thomas*, 666 F.3d at 249.  But, the test to determine whether a state has waived its immunity from suit in federal court is a "stringent" one.  *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 240 (1985), *superseded on other grounds, as recognized in Lane v. Pena*, 518 U.S. 187, 198 (1996); *see Pense*, 926 F.3d at 101.  Under *Atascadero*, 473 U.S. at 254, a court may find that a state has waived its immunity "only where stated by the most express language or by such overwhelming implication from the text as will leave no room for any other reasonable construction." (internal quotation marks and alteration omitted); *accord Pense*, 926 F.3d at 101; *Lee-Thomas*, 666 F.3d at 250-51.

In the seminal case of *Ex parte Young*, 209 U.S. 123 (1908), the Supreme Court recognized that sovereign immunity does not extend to a request for prospective injunctive relief to correct an ongoing violation of federal law.  However, to avoid an Eleventh Amendment bar to suit on this basis, the complaint must be lodged against a state official, and it must "alleg[e] an ongoing violation of federal law and see[k] relief properly characterized as prospective."  *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002).

Of import here, "the inquiry into whether suit lies under *Ex parte Young* does not include an analysis of the merits of the claim." *Id.* at 636. In *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 281 (1997), the Court said: "An allegation of an ongoing violation of federal law where the requested relief is prospective is ordinarily sufficient to invoke the *Young* fiction." *See also D.T.M. ex rel. McCartney v. Cansler*, 382 F. App'x 334, 337-38 (4th Cir. 2010) ("In determining whether the *Ex parte Young* exception applies, 'a court need only conduct a "straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'") In other words, "to fall within the *Ex parte Young* exception, it is sufficient for Plaintiffs' suit to *allege* an ongoing violation of federal law; actually *proving* such an ongoing violation is unnecessary." *Id.* at 338 (emphasis in original); *see also* 17A MOORE'S FEDERAL PRACTICE – CIVIL, Suits Against State Offices, § 123.40[l][3][a][iii] (3d ed. 2021) ("The *Ex parte Young* exception to Eleventh Amendment immunity applies only when an ongoing violation of federal law is *alleged* …. Whether state officials are *actually* violating federal law is a merits question, not a question of Eleventh Amendment immunity.") (emphasis in original).

Additionally, "[i]n making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party." *Ex parte Young,* 209 U.S. at 157. The connection "need not be *qualitatively* special; rather, 'special relation' under *Ex parte Young* has served as a measure of *proximity to* and *responsibility for* the challenged state action." *S.C. Wildlife Fed'n v. Limehouse,* 549 F.3d 324, 333 (4th Cir. 2008) (emphasis in

original).  Notably, "[t]his requirement ensures that a federal injunction will be effective with respect to the underlying claim."  *Id.*

Notably, "a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'"  *Will*, 491 U.S. at 71 n.10 (quoting *Graham*, 473 U.S. at 167, n. 14).  Moreover, personal capacity suits, which seek to impose individual liability on a government official for an action taken under color of State law, are also not barred by the Eleventh Amendment.  *Murphy*, 2022 WL 17484286, at *2.[14]

At this juncture, CNS need not actually prove an ongoing violation of the First Amendment.  Rather, CNS need only *allege* a violation.  And, it is clear that the Amended Complaint alleges an ongoing First Amendment violation.  In particular, CNS has alleged that defendants consistently fail to provide timely access to newly-filed civil complaints, in violation of the First Amendment.  Thus, dismissal under the Eleventh Amendment is not appropriate.

## C. Abstention

### 1.

Defendants seek dismissal of the case under principles of abstention.  In particular, they ask the Court to abstain on the basis of *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943), and based on the concepts of equity, federalism, and comity.  ECF 23-1 at 39, 36.[15]

---

[14] In *Pfaller v. Amonette*, ___F.4th___, 2022 WL 17684802 (4th Cir. Dec. 15, 2022), the Fourth Circuit applied sovereign immunity with respect to a medical malpractice claim against a prison doctor, as the claim was premised on Virginia state law.  *Id.* at *13.

[15] As mentioned, defendants submitted three amicus briefs filed by the Conference of Chief Justices, in support of abstention based on principles of comity and federalism, in order to protect vital interests concerning state judicial independence.  *See* ECF 50-6; ECF 50-7; ECF 50-8.  The briefs focus on challenges to state rules governing the processing of judicial records, as promulgated by the highest courts of particular states. *See*, *e.g.*, ECF 50-6 at 14.

"'[A] federal court's obligation to hear and decide' cases within its jurisdiction 'is virtually unflagging.'" *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014) (quoting *Sprint Comm., Inc. v. Jacobs*, 571 U.S. 69, 77 (2013)); *see Mata v. Lynch*, 576 U.S. 143, 150 (2015); *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996); *see also England v. La. State Bd. of Med. Exam'rs*, 375 U.S. 411, 415 (1964) ("'When a Federal court is properly appealed to in a case over which it has by law jurisdiction, it is its duty to take such jurisdiction.'" (citation omitted)); *Wash. Gas Light Co. v. Prince George's Cty. Council*, 711 F.3d 412, 418 (4th Cir. 2013). The Supreme Court has noted that "[t]his use of equitable powers is a contribution of the courts in furthering the harmonious relation between state and federal authority without the need of rigorous congressional restriction of those powers." *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 501 (1941). However, abstention is "the exception, not the rule." *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976); *accord United States v. South Carolina*, 720 F.3d 518, 526 (4th Cir. 2013); *see also Martin v. Stewart*, 499 F.3d 360, 363 (4th Cir. 2007) ("[T]he abstention doctrines constitute 'extraordinary and narrow exception[s]' to a federal court's duty to exercise the jurisdiction conferred on it.") (quoting *Quackenbush*, 517 U.S. at 716). In addition, "appropriate consideration must be given to principles of federalism in determining the availability and scope of injunctive relief." *Rizzo v. Goode*, 423 U.S. 362, 379 (1976).

Nonetheless, the Supreme Court has recognized several carefully delineated categories of cases in which a federal court may abstain. *See New Orleans Pub. Serv. Inc. v. Cty. Council of New Orleans*, 491 U.S. 350, 359 (1989).

I do not write on a "clean slate" with respect to this issue. *See Courthouse News Service v. O'Shaughnessy*, 22-cv-201471-SDM-CMV, 2022 WL 17476835, at *1 (S.D. Ohio Dec. 6,

2022). Indeed, for the past several years, the issue of abstention has been considered on numerous occasions by other courts in connection with suits filed around the country by CNS. *Id.* And, with only a handful of exceptions, the courts have uniformly declined to abstain. *Id. See, e.g., Courthouse News Serv. v. New Mexico Admin. Off. of Cts.*, 53 F.4th 1245, 1257-58 (10th Cir. 2022) ("*New Mexico*"); *Courthouse News Serv. v. Planet*, 947 F.3d 581, 591 n.4 (9th Cir. 2020) ("*Planet III*"); *Courthouse News Serv. v. Omundson*, No. 1:21cv305, 2022 WL 1125357, at *7–9 (D. Idaho Apr. 14, 2022); *Courthouse News Serv. v. Price*, No. 1:20cv1260, 2021 WL 5567748, at *6–7 (W.D. Tex. Nov. 29, 2021).

## 2.

As noted, defendants rely, *inter alia*, on *Burford*, 319 U.S. 315. Under so called *Burford* abstention, a federal court may, in its discretion, abstain from consideration of cases over which it has jurisdiction in order to show "'proper regard for the rightful independence of state governments in carrying out their domestic policy.'" *Id.* at 318 (citation omitted). As the defendants point out, ECF 23-1 at 36, the Fourth Circuit never addressed *Burford* in its decision in *Courthouse News v. Schaefer*, 2 F.4th 318 (4th Cir. 2021).

Defendants posit that CNS asks the Court to "unduly intrude in Maryland's independence and its right to create and implement its domestic policies pertaining to its state courts." ECF 23-1 at 40. They assert: "[T]he State's highest court, its rules committee, and its State Court Administrator, among many others, spent years carefully establishing the administrative procedures that govern MDEC. As such, interference here would undoubtedly disrupt 'state efforts to establish a coherent policy with respect to a matter of substantial public concern.'" *Id.* at 41 (quoting *NOPSI,* 491 U.S. at 361-63).

CNS counters: "*Burford* abstention is particularly inappropriate where a plaintiff brings a First Amendment challenge because such a claim does not 'present difficult questions of state law concerning peculiarly local issues, nor would a federal decision disrupt the efficacy of an important and coherent state policy.'"  ECF 47 at 41 (quoting *Neufeld v. City of Baltimore*, 964 F.2d 347, 350-51 (4th Cir. 1992)).

*Burford* abstention "safeguards our federal system from the '[d]elay, misunderstanding of local law, and needless conflict with [a] state policy' that inevitably results from federal judicial intrusions into areas of core state prerogative." *Johnson v. Collins Entm't Co., Inc.*, 199 F.3d 710, 719 (4th Cir. 1999) (quoting *Burford*, 319 U.S. at 327; *see also Town of Nags Head v. Toloczko*, 728 F.3d 391, 395 (4th Cir. 2013) (*Burford* abstention "advances federal and state comity" by preventing "an incorrect federal decision" from "embarrass[ing] or disrupt[ing] significant state policies") (citation omitted).  "Although th[e] doctrine has many different forks and prongs, its central idea has always been one of simple comity."  *Johnson*, 199 F.3d at 718-19.

In *Burford*, 319 U.S. at 317, Sun Oil Company challenged the validity of an order of the Texas Railroad Commission ("Commission"), which granted Burford a permit to drill four oil wells on land in east Texas.  The Supreme Court noted that the case was arguably an "'appeal' from the Commission." *Id.* Moreover, it observed that the order was "part of the general regulatory system devised for the conservation of oil and gas in Texas, an aspect of 'as thorny a problem as has challenged the ingenuity and wisdom of legislatures.'" *Id.* at 318 (citation omitted).

The Supreme Court said, *id.* at 332: "Insofar as we have discretion to do so, we should leave these problems of Texas law to the State court where each may be handled as 'one more item in a continuous series of adjustments.'"  The Court concluded, *id.* at 333-34:

> The state provides a unified method for the formation of policy and determination of cases by the Commission and by the state courts. The judicial

review of the Commission's decisions in the state courts is expeditious and adequate. Conflicts in the interpretation of state law, dangerous to the success of state policies, are almost certain to result from the intervention of the lower federal courts. On the other hand, if the state procedure is followed from the Commission to the State Supreme Court, ultimate review of the federal questions is fully preserved here. *Cf. Matthews v. Rodgers*, 284 U.S. 521, 52 S.Ct. 217, 76 L.Ed. 447. Under such circumstances, a sound respect for the independence of state action requires the federal equity court to stay its hand.

The Court clarified its *Burford* decision in *New Orleans Public Services, Inc. v. Council of City of New Orleans*, 491 U.S. 350 (1989) ("*NOPSI*"). In *NOPSI*, an electrical utility filed suit challenging the decision of a local rate-making body concerning a proposed electricity rate increase. *Id.* at 352-53. The district court dismissed the case, finding, *inter alia*, that abstention was proper under *Burford*. *Id.* at 355-56, 357.

The Fifth Circuit affirmed. *Id.* at 358. But, the Supreme Court reversed. It said, *id.* at 361:

Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar"; or (2) where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."

Although the *NOPSI* Court recognized that *Burford* is "concerned with protecting complex state administrative processes from undue federal interference," *id.* at 362, it explained that *Burford* "does not require abstention whenever there exists such a process, or even in all cases where there is a 'potential for conflict' with state regulatory law or policy." *Id.* (citation omitted). Because the facts in *NOPSI* did not "demand significant familiarity with, and [would] not disrupt state resolution of, distinctively local regulatory facts or policies," the Supreme Court determined that *Burford* abstention was not appropriate. *Id.* at 364.

In *Quackenbush*, 517 U.S. at 716, the Supreme Court imposed an important limit on *Burford* abstention. Relying on *Burford*, the district court dismissed the plaintiff's lawsuit for

contract and tort damages, concerned that deciding the case might interfere with California's regulation of corporate insolvency. *Id.* at 709-10. The Ninth Circuit reversed on the ground that *Burford* only extended to cases where the requested relief was equitable in nature. The Supreme Court affirmed. *Id.* at 731.

Reviewing its abstention jurisprudence, the Court concluded that "the power to dismiss under the *Burford* doctrine, as with other abstention doctrines . . . derives from the discretion historically enjoyed by courts of equity." *Id.* at 728. It stated: "[F]ederal courts have the power to dismiss or remand cases based on abstention principles only where the relief being sought is equitable or otherwise discretionary." *Id.* at 731. Conversely, if the plaintiff seeks damages, a federal court is without discretion to dismiss the claim on *Burford* grounds. *Id.* at 730-31; *see I-77 Properties, LLC v. Fairfield Cty.*, 288 F. App'x 108, 110 (4th Cir. 2008) (per curiam) ("Where the plaintiff seeks damages, federal courts may not dismiss an action . . . .").

*Quackenbush*, however, does not cast the federal courts into the rough seas of state law whenever the plaintiff pursues damages. Rather, the federal court may "postpone adjudication of a damages action pending the resolution by the state courts of a disputed question of state law." *Quackenbush*, 517 U.S. at 730-31; *see MLC Auto., LLC v. Town of S. Pines*, 532 F.3d 269, 276 n.3 (4th Cir. 2008) (noting that the "district court correctly stayed [plaintiff's legal claim] rather than dismissing it"); *I-77 Props., LLC*, 288 F. App'x at 110 ("[I]t is still clear [after *Quackenbush*] that federal courts may dismiss claims for equitable relief on *Burford* abstention grounds while staying action on claims for damages.") (citing *Johnson*, 199 F.3d at 727-28). And, faithful adherence to *Quackenbush* "will sometimes require that the damages portion of an action remain in federal court while claims for equitable relief are dismissed entirely." *Johnson*, 199 F.3d at 728 (dismissing claims for injunctive relief and staying plaintiffs' claims for damages where plaintiffs'

lawsuit raised "a number of disputed questions of state law yet to be resolved by the state courts");

*cf. Clowdis v. Silverman,* 666 F. App'x 267, 270 (4th Cir. 2016) (vacating the district court's order

applying *Younger* abstention to dismiss the plaintiff's damages claims; instructing the court to stay

the claims pending the resolution of the issues in state court); *Beam v. Tatum,* 299 F. App'x 243,

248 (4th Cir. 2008) (per curiam) (same); *I-77 Props., LLC*, 288 F. App'x at 110 (affirming district

court's stay, on *Burford* grounds, of plaintiff's state law claims stemming from a zoning dispute);

*Snyder/Donaldson, LLC v. Anne Arundel Cty.*, RDB-17-02950, 2017 WL 67929171, at * 5 (D.

Md. Dec. 28, 2017) (staying legal claims raised in a land use lawsuit and remanding the plaintiff's

equitable claims to state court); 5C CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL

PRACTICE AND PROCEDURE § 4245 (3d ed. 2019) ("[A] court may stay, rather than dismiss, if

*Burford* abstention should be appropriate in an action for damages.").

      *Virdis Development Corp. v. Board of Supervisors of Chesterfield County*, 92 F. Supp. 3d

418 (E.D. Va. 2015), is informative.  In that case, the plaintiff sought injunctive relief and damages

against the county board of supervisors for violations of the Takings Clause and the Virginia

Constitution stemming from the denial of the plaintiff's application for a zoning amendment.  *Id.*

at 419-20.  The defendants moved to dismiss on *Burford* grounds.  The district court agreed,

finding "there are difficult questions of state and local land use law present in this case and federal

intervention could be disruptive of the [the state's] efforts to establish a coherent policy with

respect to a matter of public concern."  *Id.* at 424.  Notwithstanding the absence of pending state

proceedings, the court applied *Quackenbush*'s bifurcated approach.  *Id.* at 425.  That is, the court

dismissed "the entirety of the Amended Complaint to the extent that it [sought] declaratory and/or

injunctive relief," but stayed "those claims where relief sought by Plaintiff is in the nature of

monetary damages."  *Id.*

As I see it, *Burford* abstention is inapplicable. Defendants maintain that State officials "spent years carefully establishing the administrative procedures that govern MDEC." ECF 23-1 at 41. But, CNS does not seek to overhaul the MDEC process. Moreover, the issue here does not concern complex state administrative processes; federal review will not disrupt ongoing litigation in a Maryland court concerning MDEC in general or as to any particular case.

Defendants' argument stretches *Burford* beyond its limits. *Burford* does not require abstention simply because there is a potential for conflict with a state's practice in regard to clerical review of newly filed complaints. As the Fourth Circuit has noted, "the Supreme Court has *never* allowed abstention to be a license for free-form *ad hoc* judicial balancing of the totality of state and federal interests in a case. The Court has instead defined specific doctrines that apply in particular classes of cases." *Martin v. Stewart*, 499 F.3d 360, 364 (4th Cir. 2007) (emphasis in original).

### 3.

Defendants also urge this Court to abstain based on principles of "equity, comity, and federalism . . . ." ECF 23-1 at 37. They note that CNS has "directly challenge[d]" Md. Rule 16-904(b) and Md. Rule 20-203(a)(2), but assert that Maryland's Constitution authorizes the Maryland Court of Appeals to create the rules that govern the operation of the courts. *Id.* at 38 (citing Md. Const. Art. IV, § 18).

In support of their argument, defendants cite, *inter alia*, *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1 (1987). In *Pennzoil*, a defendant in a tort case in a Texas state court filed suit in federal court, complaining that the proceedings in the Texas court violated its constitutional rights. The Supreme Court concluded that the district court should have abstained based on principles of

comity, consistent with *Younger v. Harris*, 401 U.S. 37 (1971).  *Id.* at 17; *see also Rizzo*, 423 U.S. at 362; *O'Shea v. Littleton*, 414 U.S. 488 (1974).

In recent correspondence (ECF 62), defendants assert that they "do *not* rely on *Younger*." ECF 62 at 1 (emphasis in original).  During the telephone conference on December 19, 2022, the defense seemed to suggest that because it is not relying on *Younger*, it is of no moment that there is no pending State judicial proceeding concerning MDEC.  But, the case law and principles that defendants cite are within the ambit of *Younger*.  The defendants' attempt to disavow *Younger* is not persuasive.

The *Younger* abstention doctrine "requires a federal court to abstain from interfering in state proceedings, even if jurisdiction exists," if there is: "(1) an ongoing state judicial proceeding, instituted prior to any substantial progress in the federal proceeding; that (2) implicates important, substantial, or vital state interests; and (3) provides an adequate opportunity for the plaintiff to raise the federal constitutional claim advanced in the federal lawsuit." *Laurel Sand & Gravel, Inc. v. Wilson*, 519 F.3d 156, 165 (4th Cir. 2008).

"*Younger* is not merely a principle of abstention; rather, the case sets forth a mandatory rule of equitable restraint, requiring the dismissal of a federal action." *Williams v. Lubin*, 516 F. Supp. 2d 535, 539 (D. Md. 2007) (internal quotation omitted); *see New Mexico*, 53 F.4th at 1256. "Circumstances fitting within the *Younger* doctrine ... include ... 'state criminal prosecutions,' 'civil enforcement proceedings,' and 'civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions." *Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69, 73 (2013) (citing *NOPSI*, 491 U.S. at 367-68).  But, "[a]bsent any *pending* proceeding in State tribunals . . . *Younger* abstention [is] clearly erroneous." *Ankenbrandt v. Richards*, 504 U.S. 689, 705 (1992) (emphasis in original).

In *O'Shea*, 414 U.S. 488, a civil rights class action, the plaintiffs alleged that various defendants, including the county magistrate and a judge, engaged in a continuing pattern and practice of racial discrimination involving illegal bail setting, sentencing, and other practices, adverse to black defendants.  *Id.* at 492-93.  The plaintiffs requested injunctive relief "to prevent [defendants] from depriving others of their constitutional rights in the course of carrying out their judicial duties in the future." *Id.* at 493. The district court dismissed the case *"for want of jurisdiction to issue the injunctive relief"* and on "the ground that petitioners were immune from suit with respect to acts done in the course of carrying out their judicial duties in the future." *Id.* The Seventh Circuit  reversed and remanded, concluding that the Supreme Court "did not forbid the issuance of injunctions against judicial officers if it is alleged and proved that they have knowingly engaged in conduct intended to discriminate against a cognizable class of persons on the basis of race." *Id.* at 492.  The Supreme Court reversed.  *Id.*

The Supreme Court observed that the requested injunctive relief "would contemplate interruption of state proceedings to adjudicate assertions of noncompliance" with the injunction by the county magistrate and the judge.  In its view, the plaintiffs sought to "indirectly accomplish the kind of interference" that *Younger* "sought to prevent" through an "ongoing federal audit of state criminal proceedings." *Id.* at 500.  And, the Court reasoned that enforcing the injunction "would require ... the continuous supervision by the federal court over the conduct of" the state judicial officers "in the course of future criminal trial proceedings." *Id.* at 501.  Thus, the Supreme Court concluded that principles of "equity, comity, and federalism . . . preclude[d] equitable intervention" because the plaintiffs sought "an injunction aimed at controlling or preventing the occurrence of specific events that might take place in the course of future state criminal trials." *Id.* at 499-500; *see also Rizzo*, 423 U.S. at 380 (citing *O'Shea* in support of the Court's

position that principles of federalism "likewise have applicability where injunctive relief is sought, not against the judicial branch of the state government, but against those in charge of an executive branch of an agency of state or local governments").

*Courthouse News Serv. v. Schaefer*, 2 F.4th 318 (4th Cir. 2021), is instructive, although it did not involve electronic filing. In that case, CNS lodged a lawsuit under the First Amendment against the clerks of two Virginia courts, claiming that CNS was not provided with contemporaneous access to newly filed complaints. The district court declined to abstain based on *Younger* and its progeny. The Fourth Circuit affirmed, stating, *id.* at 324: "The Supreme Court has been explicit that *Younger* abstention is impermissible '[a]bsent any pending proceeding in State tribunals.'" (quoting *Ankenbrandt*, 504 U.S. at 705) (emphasis omitted). And, of import here, I am unaware of any pending State judicial proceedings concerning Maryland's MDEC system.

Defendants argue that *Schaefer* is distinguishable because in that case "there was no state law specifically implicated or attacked." ECF 23-1 at 37. In contrast, they claim that in this case CNS challenges Maryland Rules 16-904(b) and 20-203(a)(2). *Id.* at 38. Therefore, defendants assert that this case "presents a question of state law and this Court's review would disrupt a coherent policy of public concern." *Id.* at 38

Defendants' attempt to distinguish *Schaefer* is unconvincing. The claims in *Schaefer* were virtually identical to the claim here—that the defendants have violated the First Amendment by delaying public access to newly-filed civil complaints. And, the defendants in *Schaefer* claimed that the requested injunctive relief would conflict with a Virginia statute. *Schaefer*, 429 F. Supp. 3d at 206 n.5.

Recently, the Tenth Circuit considered similar allegations in a suit brought by CNS concerning the New Mexico judiciary. *See New Mexico*, *supra*, 53 F.4th 1245. CNS sought "an injunction affecting the speed at which the public and the press can access civil complaints. This requested relief 'target[ed] only the clerical processing of complaints,' which is 'a ministerial, administrative function' rather than one that implicates the state court's ability to perform its core judicial functions." *Id.* at 1257 (citation omitted). The court concluded that abstention was not warranted under *Younger*. *Id.*

CNS also relies on *Courthouse News Service v. Gabel*, No. 2:21-cv-000132, 2021 WL 5416650 (D. Vt, Nov. 19, 2021), *appeal docketed*, No. 21-3098 (2nd Cir. Dec. 21, 2021). There, CNS moved for a preliminary injunction, "seeking to enjoin Defendants from denying Plaintiffs access to newly filed civil complaints until after they were processed pursuant to the rules promulgated by the Vermont Supreme Court . . . ." *Id.* at *1.

I pause to review some of the facts in *Gabel* because they bear resemblance to the facts alleged here. From 2017 to March 2020, CNS could review newly filed paper complaints at the courthouse, including, in some cases, complaints that had yet to be docketed. *Id.* at *3. Before providing complaints to the press or the public, "court staff would complete a 'quick file audit' to confirm the absence of confidential information or remove previously identified confidential information." *Id.* But, as of March 15, 2021, the Vermont Rules for Electronic Filing and Vermont Rules for Public Access to Court Records required electronic submission of most documents to the Vermont Superior Courts. *Id.* The Vermont rules also required court staff to "review all electronic filings for compliance with these rules . . . ." *Id.* And, "[p]ublic access to filings is available only at designated display terminals located in courthouses and judiciary offices during regular business hours." *Id.*

The district court concluded: "Because this case does not fit within traditional abstention categories and because it will neither result in piecemeal litigation, nor require continuing federal oversight of state court proceedings, abstention on the grounds of comity, equity, and federalism is not required." *Id.* at *13. *But see Courthouse News Service v. Brown*, 908 F.3d 1063 (7th Cir. 2018); *Courthouse News Serv. v. Gilmer*, 543 F. Supp. 3d 759 (E.D. Mo. 2021)..

On the basis of the cases cited above, I conclude that abstention is not warranted under principles of "equity, comity, and federalism."

### D.  Declaratory Judgment Act

Defendants ask the Court to decline to exercise its "broad discretion under the Declaratory Judgment Act and [d]ecline [j]urisdiction." ECF 23-1 at 33.

The Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides:

In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

The Declaratory Judgment Act "is remedial only and neither extends federal courts' jurisdiction nor creates any substantive rights." *CGM, LLC v. BellSouth Telcoms., Inc.*, 664 F.3d 46, 55 (4th Cir. 2011) (citing *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671-72 (1950)); *see also Profiles, Inc. v. Bank of America Corp.*, 453 F. Supp. 3d 742, 752 (D. Md. 2020) ("The Declaratory Judgment Act 'provides a remedy in cases otherwise in the Court's jurisdiction; it does not create an independent cause of action.'") (quoting *Elec. Motor and Contracting Co., Inc. v. Travelers Indemnity Co. of Am.*, 235 F. Supp. 3d 781, 793 (E.D. Va. 2017)). In order to bring a declaratory judgment action under 28 U.S.C. § 2201, the plaintiff must establish the existence of a dispute that is "'definite and concrete, touching the legal relations of

parties having adverse legal interests'; and that [is] 'real and substantial[.]'" *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (citation omitted). This is necessary in order to satisfy the case or controversy requirement of Article III of the Constitution. *Id.* at 126-27.

Notably, "'[a] request for declaratory relief is barred to the same extent that the claim for substantive relief on which it is based would be barred.'" *CGM, LLC*, 664 F.3d at 55-56 (alteration in original) (citation omitted). Further, the statute's "permissive language has long been interpreted to provide discretionary authority to district courts to hear declaratory judgment cases." *United Capitol Ins. Co. v. Kapiloff*, 155 F.3d 488, 493 (4th Cir. 1998). Thus, the Declaratory Judgment Act "'merely permits' federal courts to hear those cases rather than granting litigants a right to judgment." *Medical Mutual Ins. Co. of N.C. v. Littaua*, 35 F.4th 205, 208 (2022) (quoting *Trustgard Ins. Co. v. Collins*, 942 F.3d 195, 201-02 (4th Cir. 2019)).

Defendants argue that this Court should decline jurisdiction because "reasonable inference suggests that CNS's actual 'need' for its desired relief is based on its 'need' to maximize its commercial profits, rather than any real concern for the First Amendment." ECF 23-1 at 34. According to defendants, CNS receives most of its net profit from the lawyers and law firms who subscribe to its litigation reports. *Id.* at 34-35. Thus, CNS is motivated by making a profit, not by defending the First Amendment. *Id.* at 35.

Further, defendants point out that "*less than 20% of the cases on which CNS 'reports' were filed in courts named as Defendants in this case* (*i.e.*, this Court and the Circuit Court for Baltimore City)." *Id.* at 35 (emphasis in original). They also claim that CNS does "not need" immediate access to complaints because there are several counties in which CNS reporters only visit the courts once or twice a week to once or twice a month. *Id.* at 36. In addition, defendants assert that the requested relief is "unclear" because CNS first requested "*only* a press queue that would provide

instantaneous access to the press, and *not* the public," and CNS requested the press queue "before it even began tracking *any* 'data' relating to this case[.]" ECF 50 at 8 (emphasis in original). And, they claim that the requested relief is "unclear" because it only concerns access to civil complaints, not other kinds of cases, such as criminal cases. *Id.*

The requested relief is clear. As stated, CNS seeks to enjoin defendants from "withholding newly e-filed non-confidential civil complaints from press and public view until after clerical review and docketing," and it seeks to obtain "contemporaneous access to all such complaints upon their receipt for filing." ECF 9-1 at 32. Although CNS's requested relief applies only to civil complaints and press access, this does not render the request for relief "unclear."

CNS disputes the allegation that it is not concerned with protection of its rights under the First Amendment. ECF 47 at 34. Additionally, CNS notes that "the frequency by which CNS visits or reports on cases in Defendants' courts does not somehow give Defendants a green light to violate the First Amendment." *Id*.

If CNS has pecuniary motives for bringing this lawsuit, it would hardly be unique. That CNS seeks to profit from its reporting services is certainly not surprising, nor does it distinguish CNS from many other news organizations and businesses. Regardless, defendants fail to explain why CNS's pecuniary motives have any bearing on whether this Court should exercise its jurisdiction in regard to declaratory relief. Moreover, the defendants' argument that CNS does not need declaratory relief due to the reporters' infrequent visits to the courthouses is also unavailing. The decision to grant declaratory relief is discretionary. *See Courthouse News Serv. v. Schaefer*, 440 F. Supp. 3d 532, 561 (E.D. Va. 2020).

In sum, at this juncture, I decline to dismiss the request for declaratory relief.

### E.  The Clerks

Defendants move to dismiss the suit as to the twenty-two Clerk defendants, claiming that a Clerk "'acts only as a ministerial officer of the Court'" and are therefore unable to provide the requested relief to the plaintiff.  ECF 23-1 at 41 (citing *Director of Finance of Baltimore City v. Harris*, 90 Md. App. 506, 513 (1992)).  According to defendants, the clerks "have no control over MDEC procedures and, therefore, no ability to effectuate any changes CNS desires in this case." *Id.* at 42. Further, defendants assert: "The clerks are also not permitted to 'procure any service or property except in accordance with procedures established by the State Court administrator.'" *Id.* at 41 (citing Md. Rule 16-402).  Rather, they assert that authority and control over MDEC policies and procedures rests with Harris as the State Court Administrator.  *Id.* at 42.

*Ex parte Young*, 209 U.S. at 157, requires a defendant to have "some connection with the enforcement" of the challenged conduct.  *See also Bostic v. Schaefer*, 760 F.3d 352, 371 n.3 (4th Cir. 2014).  Here, the twenty-two Clerk defendants are responsible for implementing and enforcing the alleged withholding of new civil suits until their staff reviews them and completes the docketing.  Even if the Clerks have no control as to MDEC, they are involved in the management of their respective offices.  Moreover, because the Clerks implement the alleged unconstitutional practices and/or policies, their actions allegedly resulted in constitutional violations.

Thus, I decline to dismiss the suit as to the Clerks.

### F.  Mootness

Defendants contend that the implementation of the new queue "assures *Schaefer* compliance and moots this case."  ECF 50 at 18.  They assert: "In the previous filing [ECF 23-1], Defendants used data for the period ending on May 24, 2022.  For this filing [ECF 50], Defendants have run a new set of data for the period beginning on June 1, 2022.  . . . The data between May

25 and May 31, 2022, was accounted for by factoring into the previous data set and updating that set as such." ECF 50 at 19.  According to the defendants, the most recent data they have provided, discussed earlier in detail, "surely meet[s] the *Schaefer* standard."  *Id.* at 20.

In response, CNS argues: "Any access improvements . . . do not alter the fundamental violation that exists in this case, unnecessary pre-access review and docketing in an e-filing court which causes delays of varying lengths violates the First Amendment.  For this reason alone, Defendants' mootness argument fails." ECF 55 at 4.

A case becomes moot when the issues presented are "'no longer live or the parties lack a legally cognizable interest in the outcome.'" *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000) (quoting *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)) (other internal citations omitted); *see also Grutzmacher v. Howard Cnty.*, 851 F.3d 332, 349 (4th Cir. 2017).  The Fourth Circuit has stated that "'mootness goes to the heart of the Article III jurisdiction of the courts.'" *Castendet-Lewis v. Sessions*, 855 F.3d 253, 260 (4th Cir. 2017) (quoting *Friedman's, Inc. v. Dunlap*, 290 F.3d 191, 197 (4th Cir. 2002)).

"'The inability of the federal judiciary to review moot cases derives from the requirement of Art. III of the Constitution under which the exercise of judicial power depends upon the existence of a case or controversy.'" *United States v. Hardy*, 545 F.3d 280, 283 (4th Cir. 2008) (quoting *DeFunis v. Odegaard*, 416 U.S. 312, 316 (1974)); *see  Chafin v. Chafin*, 568 U.S. 165, 171-72 (2016); *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990); *see also United States v. Payne*, ___ F.4th ___, 2022 WL 17333795, at *2 (4th Cir. Nov. 30, 2022) ("The doctrine of mootness ensures that courts abide by Article III's limitation of the judicial power to 'cases' and 'controversies.'").  Notably, "'[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present

adverse effects[.]'" *Davison v. Randall*, 912 F.3d 666, 677 (4th Cir. 2019) (quoting *Kenny v. Wilson*, 885 F.3d 280, 287-88 (4th Cir. 2018)) (alteration added).  Therefore, a plaintiff "seeking 'declaratory or injunctive relief ... must establish an ongoing or future injury in fact.'" *Id.*; *see also Los Angeles v. Lyons*, 461 U.S. 95, 105-10 (1983) (indicating that past injury confers standing for damages, but does not confer standing for prospective injunctive relief).

The PI Motion seeks  "contemporaneous access" to all electronically filed complaints "upon their receipt for filing." ECF 9-1 at 32.  The clerk defendants in *Schaefer* argued that the case was moot "because they ha[d] minimized document-access delays since Courthouse News initiated th[e] suit," and therefore the issues presented were no longer "'live.'"  *Schaefer*, 2 F.4th at 323 (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982)).  The Fourth Circuit rejected the defendants' argument, stating that "absent the relief Courthouse News sought, 'nothing bars [defendants] from reverting' to the allegedly unconstitutional rates of access in the future.'" *Id.* at 323-24 (quoting *Porter v. Clarke*, 852 F.3d 358, 365 (4th Cir. 2017)). Further, the Fourth Circuit said: "Whenever 'a defendant retains the authority and capacity to repeat an alleged harm, a plaintiff's claims should not be dismissed as moot.'" *Shaefer*, 2 F.4th at 323 (quoting *Wall v. Wade*, 741 F.3d 492, 497 (4th Cir. 2014)).

Even with the implementation of the new queue, the defendants have the power to revert to their alleged unconstitutional delays.  Thus, the case is not moot.

### G.  Conclusion

For the reasons set forth above, I shall deny the Motion to Dismiss.

### III.  Preliminary Injunction Motion

CNS seeks a preliminary injunction "precluding Defendants from withholding newly e-filed non-confidential civil complaints until after they have been reviewed and docketed by court

staff and thus requiring Defendants to provide contemporaneous access to such complaints upon receipt." ECF 9-1 at 8-9. Notably, CNS acknowledges that MDEC does not provide the press and public with remote access to court documents, and CNS does not seek remote access. ECF 59 at 95. In seeking that defendants make complaints accessible to the public upon receipt, CNS acknowledges that it must visit the courthouse in person to actually view the complaints. *Id.* at 18.

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *see Benisek v. Lamone*, ___ U.S. ___, 138 S. Ct. 1942, 1944 (2018); *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 339 (4th Cir. 2021) (en banc); *Roe v. Dep't of Defense*, 947 F.3d 207, 219 (4th Cir. 2020); *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 170-71 (4th Cir. 2019); *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 188 (4th Cir. 2013) (en banc). Rather, a preliminary injunction is " 'granted only sparingly and in limited circumstances.' " *Micro Strategy, Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 816 (4th Cir. 1991)). "This principle reflects the reality that courts are more likely to make accurate decisions after the development of a complete factual record during the litigation." *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 979 F.3d 219, 225 (4th Cir. 2020), *rev'd on other grounds*, 2 F.4th 330 (4th Cir. 2021) (en banc).

To obtain a preliminary injunction, four requirements must be established. First, a plaintiff "must establish that he is likely to succeed on the merits[.]" *Winter*, 555 U.S. at 20. Although that standard does not require "a 'certainty of success,'" the plaintiff "must make a clear showing that he is likely to succeed at trial.'" *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (citation omitted). However, "a preliminary injunction does not follow as a matter of course from a

plaintiff's showing of a likelihood of success on the merits." *Benisek*, 138 S. Ct. at 1943-44 (citing *Winter*, 555 U.S. at 32). "Rather, a court must also consider whether the movant has shown 'that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Benisek*, 138 S. Ct. at 1943-44 (quoting *Winter*, 555 U.S. at 20); *see Leaders of a Beautiful Struggle*, 2 F.4th at 339; *Centro Tepeyac*, 722 F.3d at 188.

A preliminary injunction cannot issue absent a clear showing that all four requirements are satisfied. *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013); *see Winter*, 555 U.S. at 22 (recognizing that because a preliminary injunction is "an extraordinary remedy," it "may only be awarded upon a clear showing that plaintiff is entitled to such relief"). And, the "'[p]laintiff bears the burden of establishing that each of these factors supports granting the injunction.'" *Direx Israel*, 952 F.2d at 812 (quoting *Tech. Publ'g Co. v. Lebhar-Friedman, Inc.*, 729 F.2d 1136, 1139 (7th Cir. 1984)); *see Shaffer v. Globe Protection, Inc.*, 721 F.2d 1121, 1123 (7th Cir. 1983). Accordingly, a court need not address all four *Winter* factors if one factor is not satisfied. *Henderson ex rel. NLRB v. Bluefield Hosp. Co., LLC*, 902 F.3d 432, 439 (4th Cir. 2018).

The irreparable harm factor is satisfied if a constitutional violation is likely. *Leaders of a Beautiful Struggle*, 2 F.4th at 346. In particular, "in the context of an alleged violation of First Amendment rights, a plaintiff's claimed irreparable harm is 'inseparably linked' to the likelihood of success on the merits of plaintiff's First Amendment claim." *W.V. Ass'n of Club Owners and Fraternal Services, Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009) (citation omitted). As the Fourth Circuit said in the context of permanent injunctive relief, "'[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable

injury.'" *Legend Night Club v. Miller*, 637 F.3d 291, 302 (4th Cir. 2011) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

Ordinarily, such a threatened injury to a plaintiff will "easily outweigh[] whatever burden the injunction may impose," because the government "is in no way harmed by issuance of an injunction that prevents the state from enforcing unconstitutional restrictions." *Legend Night Club*, 637 F.3d at 302-03. When a state is precluded from enforcing restrictions that are likely to be deemed unconstitutional, then "the balance of the equities favors preliminary relief ...." *Leaders of a Beautiful Struggle*, 2 F.4th at 346; *see Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002)). Furthermore, "it is well-established that the public interest favors protecting constitutional rights." *Leaders of a Beautiful Struggle*, 2 F.4th at 346 (citing *Centro Tepeyac*, 722 F.3d at 191).

"Because preliminary injunctions proceedings are informal ones designed to prevent irreparable harm before a later trial governed by the full rigor of usual evidentiary standards, district courts may look to, and indeed in appropriate circumstances rely on, hearsay or other inadmissible evidence when deciding whether a preliminary injunction is warranted." *G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709, 725–26 (4th Cir. 2016), *vacated on other grounds*, ___ U.S. ___, 137 S. Ct. 1239 (2017) (Mem.); *see Profiles, Inc.*, 453 F. Supp. 3d at 753.

### A. Likelihood of Success on the Merits

Plaintiff's likelihood of success on the merits depends, in part, on whether CNS has a First Amendment right of access to newly filed civil complaints.  If so, the Court must consider when that right attaches and the parameters of the right with respect to any delays.

### 1.  First Amendment Right of Access to Civil Complaints

The First Amendment, made applicable to the states through the Fourteenth Amendment, guarantees, *inter alia*, "freedom of speech and of the press." *Gitlow v. People of State of New York*, 268 U.S. 652, 666 (1925). Under the First Amendment, the media's right of access to court filings is coterminous with the public's right of access.  *See Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 609 (1978) (noting that the right of the press is not "superior to that of the general public").

It is well established that the public and the press enjoy a First Amendment right and/or a right under the common law to attend trial, *see Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980) (plurality opinion); to attend court proceedings, *see Press-Enterprise Co. v. Superior Court of California for the County of Riverside* 478 U.S. 1 (1986) ("*Press-Enterprise II*"); and a general right to inspect and copy judicial records and documents. *Nixon*, 435 U.S. at 597; *see also Doe v. Pub. Citizen*, 749 F.3d 246, 268-69 (4th Cir. 2014) (recognizing a presumptive right of access of the public and the press to docket sheets); *In re United States for an Order pursuant to 18 U.S.C. § 2603(D)*, 707 F.3d 283, 290 (4th Cir. 2013) ("[T]he common law presumes a right to access *all* judicial records and documents . . . .") (emphasis in original); *In re Washington Post Co.*, 807 F.2d 383, 390 (4th Cir.1986) ("[W]e hold that the First Amendment right of access applies to documents filed in connection with plea hearings . . . in criminal cases, as well as to the hearings themselves.").  The openness of the judicial process "'affords citizens a form of legal education and hopefully promotes confidence in the fair administration of justice.'"  *Richmond Newspapers, Inc.*, 448 U.S. at 572 (citation omitted).

In *Press-Enterprise II*, 478 U.S. 1, the Supreme Court considered whether the petitioner had a First Amendment right of access to the transcript of a closed preliminary hearing conducted

in a high profile criminal case.  *Id.* at 3.  The hearing had been closed at the defense request, in an effort to protect the defendant's right to a fair trial.  *Id.* at 7.

The Court noted that, in "dealing with the claim of a First Amendment right of access to criminal proceedings," its "decisions have emphasized two complementary considerations."  *Id.* at 8.  First, the Court has "considered whether the place and process have historically been open to the press and general public."  *Id.*  Second, it has "traditionally considered whether public access plays a significant positive role in the functioning of the particular process in question."  *Id.*  The Court characterized the considerations as ones of "experience and logic."  *Id.* at 9.  And, "[i]f the particular proceeding in question passes these tests of experience and logic, a qualified First amendment right of public access attaches."  *Id.*

As indicated, the right of access "is not absolute."  *Id.*  And, in a criminal case, the Court observed that "there are some limited circumstances in which the right of the accused to a fair trial might be undermined by publicity,[l] such that the qualified First Amendment right of access is overridden by the rights of the accused.  *Id.*

In this case, the records in issue are non-confidential civil complaints that are electronically submitted. Under the "experience" prong, the records must "have historically been open to the press and general public."  *Id.* at 8. Under the "logic" prong, public access must play a "significant positive role in the functioning of the particular process in question."  *Id.*

In *Schaefer*, 2 F.4th 318, the Fourth Circuit applied the experience and logic test and concluded that the public has a right of contemporaneous access to newly filed civil complaints.  I pause to review the facts established at the trial in that case, which culminated in the ruling.

The facts established that, at the time, the paper filing of a new complaint in the Prince William Circuit Court in Virginia went through several steps before it was made available to the

public: "(1) initial intake; (2) Circuit Court Case Management System ("CCMS") data entry; and (3) scanning." *Schaefer*, 440 F. Supp. 3d at 540. In November 2017, "a sign was posted in various locations in the Prince William Clerk's Office, including at the public access terminals, which stated: 'We are dedicated to scanning all new civil filings into our digital system within ten (10) days of receipt in this office.'" *Id.* at 543. The sign remained posted at the time of the lawsuit. *Id.*

Prior to 2018, CNS "was often able to review new complaints before CCMS data entry and scanning." *Id.* This allowed CNS "to review the vast majority of complaints on the day of filing." *Id.* But, in January 2018, in response to the plaintiff's request for several complaints that had been filed but not made publicly available, the plaintiff's representative was told that he could not review new complaints until they were available on the public access terminals, *i.e.*, after intake, data entry, and scanning. *Id.* From that period, until after the plaintiff filed its lawsuit, the plaintiff could only see new complaints after they had been fully processed and made available on public access terminals. *Id.*

The Norfolk Circuit Court followed a similar procedure of intake, data entry, and scanning. *Id.* The length of time required for data entry, also known as "docketing" or "indexing," depended on the complexity of the case. *Id.* at 541. In April 2017, a representative of CNS went to the Clerk's Office and sought "access to civil complaints that had been filed but not yet fully processed and scanned." *Id.* The clerk advised: "Plaintiff had to wait to see new complaints until they were available on the public access terminals – after initial intake, CCMS data entry, and scanning . . . .'" *Id.*

The Fourth Circuit stated, 2 F.4th at 326: "The First Amendment provides a right of access to a judicial proceeding or record:  1) that 'ha[s] historically been open to the press and general public;' and 2) where 'public access plays a significant positive role in the functioning of the

particular process in question.'"  (quoting *Press-Enterprise II*, 478 U.S. at 8-10) (alteration in *Schaefer*).  Notably, as to the experience prong, the Fourth Circuit reasoned, *id.* at 327, that "the experience prong supports a First Amendment right of access to civil complaints, even before any judicial action in the case."  With respect to the logic prong, the Court said, *id.*: "[W]e have no trouble concluding that public access to complaints logically plays a positive role in the functioning of the judicial process."  It explained that such access "allows the public to 'participate in and serve as a check upon the judicial process – an essential component in our structure of self-government.'"  *Id.* (quoting *Globe Newspaper Co. v. Superior Ct. for Norfolk Cty.*, 457 U.S. 596, 606 (1982)).

In reaching its decision, the Court observed, 2 F.4th at 327, that "a complaint instantaneously invokes a court's jurisdiction, and jurisdictional questions often implicate the public's confidence in the judiciary.  Moreover, a complaint carries significant implications for the parties' substantive legal rights and duties, by, among other things, triggering an obligation to preserve evidence and, in some cases, triggering a statute of limitations."  The Court concluded: "In sum, both the experience and logic prongs are satisfied here.  Accordingly, the press and public enjoy a First Amendment right of access to newly filed civil complaints."  *Id.* at 328.

In view of the foregoing, it is clear that, under the First Amendment, the public and the press have a contemporaneous right of access to non-confidential civil complaints.  Although *Schaefer* did not concern electronic submissions, the right of access does not depend on the manner in which a complaint is submitted to a court.

## 2.  Attachment of Right

The next question is *when* the First Amendment right of access attaches with respect to complaints that are electronically submitted.  In *Schaefer*, 2 F.4th at 327, involving paper filings, the clerks "quarrel[ed] with when access is required."

The district court in *Schaefer* recognized that "'the public and press generally have a contemporaneous right of access to court documents and proceedings when the right applies.'" *Id.* at 328 (citing *Doe*, 749 F.3d at 272) (emphasis added by Fourth Circuit). The district court then analyzed the meaning of "contemporaneous."  *Id.*  Notably, it defined "contemporaneous" in the context of the case to mean "*on the same day of filing, insofar as practicable and if not practicable within one court day.*"  *Schaefer*, 440 F. Supp. 3d 532, 559 (E.D. Va. 2020) (emphasis in original). But, the district court excepted "inconsequential deviations and extraordinary circumstances" that might delay access.  *Schaefer*, 2 F.4th at 328 (citing 440 F. Supp. 3d at 562).  And, the Fourth Circuit affirmed, observing that the district court "faithfully applied" principles of intermediate scrutiny. 2 F.4th at 328.

CNS insists that the right of access attaches upon the court's receipt of an electronically-filed complaint. ECF 9-1 at 24.  It asserts: "For decades it has been a tradition for the press to review new civil complaints in courts across the country on the day of filing minutes after they crossed the intake counter and went through initial manual intake – where the clerk took the filer's check, noted the parties' names, spent a minute or less to look over the face page and signature page, stamped the complaint 'filed,' and handed the filer a receipt – but before docketing."  ECF 11, ¶ 51; *see also* ECF 9-1 at 11.

Defendants seem to argue that the right attaches after clerical review and docketing.  ECF 23-1 at 49.  According to the defendants, "there is no history in Maryland of permitting press access to newly submitted complaints prior to docketing, nor any history of a 'press bin' or 'press

box' used to allow the press special access to newly submitted but not yet filed and docketed complaints." ECF 23-1 at 15. They state: "[H]istorically and generally, prior to electronic filing, at best if a member of the press or public physically presented at a clerk's office and requested to see a filing that had not yet been filed/docketed, then as a courtesy the person was asked to wait while the filing was quickly reviewed by the clerk's office, docketed, and completed out of order to satisfy the request." *Id.* (citing ECF 23-9; ECF 23-11; ECF 23-20; ECF 23-23 to ECF 23-28; ECF 23-30 to ECF 23-31).

Based on the briefing, it appears that, from the defense perspective, the submission of a complaint is not the same as the filing or docketing of a complaint.  In *Planet III*, 947 F.3d at 581, the Ninth Circuit said that "the qualified right of access to nonconfidential civil complaints arises *when they are filed with the court* . . . ." And, the court stated: "[W]e do not view that conclusion as demanding immediate, pre-processing access to newly filed complaints." *Id.* (emphasis added). More recently, in *New Mexico*, 53 F.4th 1245, the Tenth Circuit ruled: "[T]he press and the public have a First Amendment right of access to newly filed, non-confidential civil complaints, and . . . this right attaches when a complaint is filed with, or *submitted to*, the courts." *Id.* at *13 (emphasis added).

Because of the evolving use of technology, a complaint can be electronically submitted to most Maryland courts at any hour of the day or night.  I will assume, *arguendo*, that the right of public access attaches when a complaint is electronically submitted.  That the right attaches upon electronic submission does not end the inquiry, however.  I must also consider what, if any, delays in public access are constitutionally permissible with respect to electronic submissions.

-66-

### 3.   The Parameters of the Right

As seen, the First Amendment guarantees the public and the press a "contemporaneous right of access," to civil complaints. *Doe*, 749 F.3d at 272. The Court next considers the parameters of the right.

CNS asserts that the press and the public have a right of access to complaints, measured from the time of submission. ECF 9-1 at 32.  Moreover, in CNS's view, any delay due to clerical review and docketing violates the First Amendment.  *Id.*  According to defendants, CNS actually seeks "*instantaneous* access to newly submitted complaints intended for filing and docketing." ECF 23-1 at 44 (emphasis in original).

I consider two issues.  One pertains to the matter of clerical review prior to access.  The other concerns the way in which delay in access is calculated.

According to CNS, the Maryland Rules do not authorize a delay based on pre-access clerical review.  In particular, CNS asserts: "While clerks are authorized to issue a deficiency notice if they happen to notice restricted information in a filing, MR 20-203(e), they are not required to review filings for social security numbers or other restricted information." ECF 55 at 6.  Accordingly, CNS argues that Maryland has "decided *against* clerk review for restricted information." ECF 55 at 6 (emphasis in original).

CNS has cherry-picked a few of the Rules from a carefully crafted scheme in order to argue that the Rules do not countenance pre-access review, and to argue, alternatively, that there is no justification for such review.  At this juncture, I conclude that CNS is not likely to succeed on a claim of a First Amendment violation based on delays in access due to pre-access clerical review.

Decades ago, the Supreme Court observed:  "Every court has supervisory power over its own records and files."  *Nixon*, 435 U.S. at 598.  The processing of new law suits is "an area

traditionally regulated by the States." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). Collectively, as noted, the Rules establish the obvious goal of the State judiciary to provide public access to judicial filings while also safeguarding important privacy interests. The Court of Appeals has identified legitimate security concerns that seem to justify the need for some clerical review of complaints before making them public. For example, the clerks are supposed to ensure that certain sensitive information is not inadvertently disclosed to the public, such as the identity of a child in an abuse case or a person's social security number.

CNS concedes that the Maryland Rules require the Clerks to conduct some level of review upon receipt of a new complaint. It notes that Rule 20-203(a) provides that, "'*[a]s soon as practicable*, the clerk shall review a submission for compliance with Rule 20-201(g) [i.e., certificate of service] and the published policies and procedures for acceptance established by the State Court Administrator.'" ECF 47 at 24 (emphasis in original) (quoting Md. Rule. 20-203(a)(2)). However, CNS contends that such review can occur *after* filings are made public. *Id.; see also* ECF 55 at 7. According to CNS, defendants have offered "no sound explanation for why it would be more 'efficient' to keep new civil complaints secret until after clerks have checked them for clerical issues . . . ." *Id.*

The Maryland Rules do not explicitly *require* a clerk to review every page of every filing, in search of confidential information. However, CNS overlooks the full picture that the Maryland Court of Appeals has painted. A rule cannot be read in isolation, as CNS seems to do. Indeed, while claiming that Maryland Rule 20-203 does not require pre-access clerical review, CNS ignored other Rules that reflect the desire of the Maryland judiciary to prevent access to restricted information. The Court of Appeals has carefully navigated competing rights and interests.

Moreover, CNS's argument that any error in a submission may be corrected after the submission has been made public is patently flawed.  That is tantamount to closing the barn door after the horse has escaped.  The leaking of confidential information, even for a few hours, can have severe consequences with regard to a party's privacy, safety, and economic interests.

And, it is no answer that the burden is on the filer to identify confidential information, as CNS suggests.  To be sure, filers are supposed to redact confidential information.  But, merely because they have that responsibility, it does not mean that they will do so with precision.  As the Conference of Chief Justices observed in an amicus brief (ECF 50-6), knowing what records are meant to be confidential can be a "daunting task," *id.* at 37, and addressing "filer mistakes has always been part of the equation" for clerical staff.  *Id.* at 38.  It is certainly appropriate for clerical staff to check submissions, if done within a reasonable time.

Defendants point out that even registered e-filers who are attorneys have made mistakes when submitting pleadings in several matters concerning children and domestic violence.  ECF 50-5 at 13.  In addition, defendants have provided examples of mistakes that filers have made by inadvertently disclosing sensitive personal information, such as social security numbers and financial information.  *Id.* at 13-15. Indeed, Dr. Walter provided three pages of examples in which court clerical staff rejected filings for various reasons, such as the following, *id.*:

- SSN digits visible on the document
- Filed in the wrong court
- Filer submitted an exhibit without the complaint
- Financial statement did not contain Notice of Restricted Information
- Wrong complaint was uploaded.
- Could not perform payment processing because the account was declined.
- Filing location was incorrect.  The header stated that the case was for Harford County.
- Incorrect case type
- Petition for Protection must be filed in person, not online.
- Confidential exhibits were filed/scanned with the complaint.

-69-

In *Schaefer*, 2 F4th at 328, the Court described the access standard as "flexible," noting that it "does not require perfect or instantaneous access. Rather, it provides courts with some leeway where same-day access would be impracticable . . . ." *Id.* Further, the Court said, *id.*: "This flexibility accords with precedent in recognizing that the Constitution does not require the impossible."

Other courts have also endorsed a flexible standard with regard to access to civil complaints. For example, in *New Mexico,* 53 F.4th at 1245, the district court granted CNS's motion for a preliminary injunction, and enjoined the New Mexico courts from "withholding press and public access to newly filed, non-confidential civil complaints for longer than five business hours." *Id.* However, the Tenth Circuit rejected the district court's imposition of a "bright-line, five-business-hour rule" for disclosure because it "fail[ed] to accommodate the state's interests in the administration of its courts."

In *New Mexico*, the defendants used Odyssey File and Serve for their electronic filing system. *Id.* When explaining that system, the Tenth Circuit stated, *id.* at 1252: "A document that is submitted by an attorney through the Odyssey File and Serve system goes through five phases: (1) draft; (2) submitted; (3) under review; (4) processing; and (5) accepted/transmitted." Once a pleading is accepted, it is immediately available to the public. *Id.*

In general, the Tenth Circuit determined that the right of access attached as of electronic submission. *Id.* at 1263. But, it concluded that the preliminary injunction awarded by the district court did "not accommodate the New Mexico Courts' judicial administration interests in extraordinary circumstances where the five-business-hour rule cannot reasonably be met." *Id.* at 1273. In reasoning that would seem apt here, the court said, *id.* at 1271 (internal citations omitted):

> The New Mexico Courts raise valid concerns regarding their ability to
> ensure the orderly administration of justice in extraordinary circumstances. First,

the New Mexico Courts assert that "some New Mexico judicial districts have far fewer clerical staff who must process each pleading, including criminal, family, civil, and sequestered cases," and "[i]n situations where a clerk cannot come to the court—as a result of sickness or weather, perhaps—pleadings cannot be processed as quickly as they might be otherwise, or at all, in some jurisdictions." Second, the New Mexico Courts point out that "certain criminal documents must take priority over civil complaints in those districts that do not have a designated civil department and where all incoming pleadings are processed by the same clerical staff." Third and finally, the New Mexico Courts correctly note that the district court imposed its five-business-hour rule on all of New Mexico's district and magistrate courts—regardless of the court's size, staffing, and geographical location—without considering the different resources that each court has at its disposal. As a result of the broad statewide application of the district court's preliminary injunction, the New Mexico Courts face an even greater risk that they will be unable to protect their interests in orderly judicial administration when extraordinary circumstances arise.

CNS also relies on *Gabel*, 2021 WL 5416650, a District of Vermont case, discussed earlier. There, CNS sought "to enjoin Defendants from denying Plaintiffs access to newly filed civil complaints until after they were processed pursuant to the rules promulgated by the Vermont Supreme Court . . . ." *Id.* at *1. The defendants argued: "Although none of Vermont Judiciary's electronic filing rules clearly state that the public shall not have access to a newly filed complaints until a pre access review process is completed, . . . the rules, when read collectively, authorize a process which entitles the Vermont Superior Courts to withhold access to newly filed complaints until a manual review for certain information takes place." *Id.* at *5.

Explaining the pre-access review process, in a process that is akin to that of Maryland, the *Gable* Court stated, *id.*:

> After they are electronically filed in the Vermont Superior Courts, newly filed complaints are placed in an electronic review queue which is not accessible to the public. A clerk checks for a signature, unredacted personally identifying information exempt from disclosure, and comments left by the filer. The clerk verifies that the complaint is correctly designated as public, confidential, or sealed; that the right filing codes are selected; and that the filing fee and case type selected are correct. The clerk then accepts or rejects the filing. Accepted nonconfidential filings become available for public viewing only after this review process is complete.

-71-

Further, the *Gabel* Court noted: "If a filing is accepted, it becomes available electronically for the public viewing upon acceptance." *Id.* at *6. Additionally, the court said that since the implementation of Odyssey File and Serve, 22.6% of complaints were accessible to the public one day after filing, 4.6% were accessible two days after filing, 6.7% were accessible three days after filing, and 11.4% were accessible four or more days after filing. *Id.*

The *Gabel* Court found that the defendant's pre-access review process was unconstitutional. It noted that the process "often takes several days to complete" and "[t]here is, moreover, no guarantee when public access will be provided." *Id.* at *15. The court reasoned, *id.* at *16:

> Although Defendants argue that the absence of pre-access review would place "the onus solely on filers" and would "less effectively protect the integrity of the civil litigation process and privacy interests," (Doc. 44 at 30), the Vermont Superior Court filing rules already place primary responsibility on filers. *See* V.R.P.A.C.R. 7(a)(1)(A) ("[T]he filer of a case record, whether in physical or electronic form, [must] determine whether all or part of the record being filed is not publicly accessible"); V.R.P.A.C.R. 7(a)(1)(B) (requiring filer to certify compliance with V.R.P.A.C.R.). Defendants provide no evidence that these safeguards, combined with post-access review, are insufficient. To the contrary, Defendants' own evidence reveals that placing the onus on filers has been overwhelmingly effective.

The *Gabel* Court concluded, *id.*: "Because Defendants fail to demonstrate a 'substantial probability' that the orderly administration of justice and privacy rights of litigants and third parties would be significantly impaired without their pre-access review, that practice cannot withstand constitutional scrutiny."

There are obvious similarities between *Gabel* and this case in regard to the clerical review process and procedural rules. Nevertheless, *Gabel* is distinguishable. In *Gabel*, the plaintiff proved significant delays in access, and they were not inconsequential or due to extraordinary

circumstances.  In contrast, as discussed, *infra*, any delays here due to pre-access review do not appear to be unduly lengthy.

CNS also relies on *Planet III*, 947 F.3d at 581, a case that did not involve electronic filing. *Id.* at 586.  The Ninth Circuit held that the defendants' pre-access review policy did not pass constitutional scrutiny. According to CNS, *Planet III* held that "'[t]he First Amendment secures a right of timely access to publicly available civil complaints that arises before any judicial action upon them.'" ECF 9-1 at 28 (quoting *Planet III*, 947 F.3d at 600).

*Planet III*, like *Schaefer* and *Gabel*, involved CNS as the plaintiff.  Court documents in *Planet III* were filed in paper format and maintained in hard copy at the Clerk's office.  *Id.* Before making the complaints publicly accessible, the defendants required a "seven-step procedure to process a new civil complaint" using the Case Court Management System.  *Id.* The seven-step process included reviewing the documents, entering the required case information in the case management system, generating a receipt from the case management system, stamping the documents "filed", labeling the documents by courtroom assignment and filing date, and placing the documents in a physical file.  *Id.*  Holding that the delays violated the First Amendment, the court reasoned, *id.* at 598 (emphasis added): "It is undisputed that the policy resulted in substantial and meaningful delays in access to complaints, at times delaying access for *up to two weeks*. . . . During several documented periods between 2012 and 2014, it took two or more court days for CNS to access one-fifth to two-thirds of newly filed complaints . . . ."  The Ninth Circuit also noted that "[t]he policy did not protect the privacy interest: *it was stipulated that the complaints did not contain private or confidential information*." *Id.* (emphasis added).

*Planet III* is distinguishable.  First, the seven-step procedure at issue in *Planet III* is far more extensive than the review procedure that the defendants utilize here.  In *Planet III*, the seven-

step process, which included generating a receipt from the case management system, stamping the documents "filed", and labeling the documents by courtroom assignment and filing date, all occurred before the public could view the complaint.  In addition, in *Planet III* the complaints did not contain confidential information.  And, the delays at issue in *Planet III* were more extensive than the delays at issue here.  *Planet III* involved delays of up to two weeks, whereas CNS alleges here that the defendants have delayed access to complaints for a few days.

At a trial, if the evidence shows that a delay falls outside of the constitutionally permissible time frame, the burden would fall on the defendant to show that the delay was inconsequential or caused by extraordinary circumstances. *Id.* at 329. CNS asserts that defendants also have that burden in the context of the PI Motion. *See, e.g., Courthouse News Service v. Tingling*, No. 16-cv-8742, 2016 WL 8739010, at 52 (S.D.N.Y. Dec. 16, 2010) (granting CNS's motion for a preliminary injunction because "the clerk has failed to meet its burden of demonstrating that its policy of refusing to provide the public and press access to newly filed complaints until after they are reviewed and logged is either essential to preserve higher values or is narrowly tailored to serve that interest"); *Courthouse News Service v. Brown*, No. 17 C 7933, 2018 WL 318485, at *6 (N.D. Ill. Jan. 8, 2018) (granting CNS's motion for a preliminary injunction because the defendant "has failed to meet her burden of demonstrating that her policy of delaying access to e-filed complaints until official acceptance is narrowly tailored to preserve any higher value"), *rev'd and remanded on other grounds*, 908 F.3d 1063 (7th Cir. 2018).

A delay due to pre-access review would not seem to fall under the category of inconsequential or extraordinary circumstances. *Id.*  And, in *Schaefer*, the Fourth Circuit said, 2 F.4th at 329 (emphasis in original):

> [T]he district court found that, although the Clerks put forth a variety of possible explanations as to why their delays prior to the filing of this action *might* have been

-74-

necessary or unavoidable, they failed to offer facts establishing that any of these explanations did actually cause delays. To be sure, if the Clerks had conclusively demonstrated that delays during this period were substantially more frequent due to some unpreventable circumstance — inclement weather or a security threat, for example — the result might well be different. But the Clerks offered no evidence that such emergencies caused the delays, and "argument unsupported by the evidence will not suffice to carry the government's burden." *Reynolds v. Middleton*, 779 F.3d 222, 229 (4th Cir. 2015).

If the delays are not inconsequential or caused by extraordinary circumstances, then the defendants must establish that delays due to court policies satisfy intermediate scrutiny, *i.e.*, that they are "'content-neutral, narrowly tailored and necessary to preserve the court's important interest in the fair and orderly administration of justice.'" *Id*. at 328.

For purposes of measuring delay, the parties disagree on whether to use calendar days or court days. Certainly, if a complaint is filed when a court is closed, the Constitution is not violated because of a delay in access on that basis. Similarly, in calculating whether a delay in access is unconstitutional, the analysis must be predicated on business or work days, not calendar days.

As stated, litigants in Maryland may file suits electronically, twenty-four hours a day, in twenty-two circuit courts. But, court personnel are obviously not available twenty-four hours a day. A typical work day is eight hours. Generally, courts are open from either 8 a.m. to 4 p.m. on Monday through Friday, or 8:30 a.m. to 4:30 p.m., or perhaps 9:00 a.m. to 5:00 p.m. There are also thirteen holidays in Maryland when the courts are closed. *See Court Holidays*, MARYLAND COURTS, https://mdcourts.gov/administration/holidays (last accessed Oct. 19, 2022). And, on occasion, courts are closed for unexpected reasons, such as inclement weather.

The COVID-19 pandemic is a glaring example of unexpected delays. Court operations were severely affected at the height of the pandemic. *See Maryland Judiciary COVID-19 Timeline*

*of Events*, MARYLAND JUDICIARY, marylandjudiciarycovid19timeline.pdf (mdcourts.gov) (last accessed Dec. 7, 2022).[16]

A hypothetical is helpful to the analysis.  If a complaint is filed this year at noon on Christmas Day, which is a Sunday, and the courts are closed the next day, Monday, December 26, 2022, plaintiff will have found a delay in access of about 44 hours when the court reopens on Tuesday, December 27, 2022, at 8:00 a.m.  Further, CNS claims it should obtain immediate access to the suit.

In my view, and as *Schaefer* recognized, 2 F.4th at 328, the Constitution does not "require the impossible."  If, for example, a complaint is filed on Friday at 4:59 p.m., and the Clerk's Office closes at 5:00 p.m., and  Monday is a holiday, the Clerk does not violate *Schaefer* if it makes that complaint available to the public at some point on the following Tuesday.  If the courthouse is not open for business, then the time of closure cannot be charged as a delay.

In sum, the First Amendment requires the defendants to provide contemporaneous access to civil complaints, meaning access on the same day that it is submitted, insofar as practicable, and if not practicable, within one court day.  *Schaefer*, 2 F.4th at 328. This Court interprets this standard to measure delays in terms of court days and business hours, *i.e.*, when the courts are open to the public.

### 4.  The Data

I next examine the parties' data to determine whether, as CNS asserts, defendants have failed to provide contemporaneous access, such that injunctive relief is warranted.

---

[16] At oral argument, when asked what constituted an "inconsequential" delay, CNS's counsel suggested that inclement weather or delays due to the COVID pandemic could be considered inconsequential.  ECF 59 at 31.

CNS claims that for the period of October 2, 2021, to September 30, 2022, 55.85% of new civil complaints were accessible on the same day; 27.43% were accessible one day after filing; 4.84% were accessible two days after filing; and 11.88% were accessible three or more days after filing.  ECF 55-1 at 5.  For the period from October 1, 2021, to September 30, 2022, CNS asserts: "Among the 22 Maryland Circuit Courts, the percentage of new civil complaints made available on the same day they were filed, on average, ranged from a low of 32.72 percent to a high of 86.47 percent." *Id.* at 3. Further, for the period from June 1, 2022, to September 30, 2022, CNS asserts: "Among the 22 Maryland Circuit Courts, the percentage of new civil complaints made available on the same day they were filed, on average, ranged from a low of 39.47 percent to a high of 94.34 percent." *Id.* at 4.  Further, according to CNS, for complaints filed between October 1, 2021, through September 30, 2022, "the data demonstrates pervasive delays: 55.% same-day access; 27.4% one day delay; and 16.7% two or more days delays." ECF 55 at 2 (citing ECF 55-1 (Kancherla Decl. at 2-4).

Plaintiff also asserts that in *Schaefer* the Fourth Circuit affirmed the district court's "'reasonable expectation . . . that 85-90% of the new civil filings will be accessible to the public and press on the date of filing.'" ECF 55 at 3 (quoting *Schaefer*, 440 F. Supp. 3d at 562).  According to CNS, "Defendants, even on their best behavior during the New Period [June 1, 2022 to September 30, 2022], have failed to come close to that benchmark, with only 67.1% of new complaints available on the day of filing and 32.9% withheld until at least the next day (with 6.8% withheld for three days or more). . . . Thus, Defendants' new evidence confirms that they cannot achieve access consistent with the First Amendment if they withhold new complaints until after clerical review and docketing.[]" ECF 55 at 3.

According to CNS, defendants have violated the standard set forth in *Schaefer*.  However, CNS does not distinguish between complaints filed during business hours and complaints filed after business hours or on a weekend or holiday. Given that a typical business day is eight hours long, defendants' data shows that most newly filed civil complaints are accessible within a constitutionally permissible time frame.

Defendants seek to refute CNS's allegations with data of their own.  As discussed, defendants measure delays in terms of business hours, rather than calendar days.  ECF 23-33 at 1. For that reason, I credit their submissions.

Initially, defendants focused on the period from October 1, 2021, to May 24, 2022.  ECF 23-1 at 7.  In that period, Maryland's MDEC courts made newly submitted civil complaints accessible to the press and the public, on average, within 3.9 business hours of submission and, statewide, 85.2% of all newly submitted civil complaints were made available to the press and public within 8 business hours and 1 business minute. ECF 23-33, ¶ 17.  When omitting the Circuit Court for Montgomery County, because it had only just begun to use MDEC on October 25, 2021, and there is a learning curve, the average time was 2.7 business hours and the median was 1.2 business hours. *Id.* Defendants also claim that, statewide, 91.7% of all newly submitted complaints were accessible within 8 business hours and 1 business minute.  *Id.*

After the implementation of a new queue, which was fully operational on June 1, 2022, defendants updated their analysis to address the period from June 1, 2022, to September 30, 2022. ECF 50 at 19 n.14.  As shown earlier, from October 1, 2021, to September 30, 2022, there were a total of 10,845 complaints filed statewide in MDEC circuit courts. ECF 50-5 at 5. The average and median business hours it took to make the complaints accessible to the public were 3.0 and 1.2

hours, respectively. *Id.* When omitting Montgomery County, the average and median time was 2.2 and 1.0 hours, respectively. *Id.*

In analyzing the data by circuit court, the results are similar. For example, there were 2,436 complaints filed in Baltimore County. ECF 50-5 at 5. The average and median number of business hours to make the complaints publicly accessible was 1.7 and 1.0 hours, respectively, and 98.2% of the complaints were accessible within 8 business hours and 1 business minute. *Id.* Similarly, Anne Arundel County had 1,253 complaints filed within the same time period. *Id.* The average and median number of business hours to make the complaints publicly accessible was 4.0 hours and 2.1 hours, respectively, and 82.9% of complaints were publicly accessible within 8 business hours and 1 business minute. *Id.*

In addition, the most recent data from Tyler shows that, as a result of the new queue, between June 1, 2022, and September 30, 2022, the statewide average and median business hours it took to make complaints accessible were 1.5 and 0.8 hours, respectively. ECF 50-5, ¶ 6. [17] In September 2022 alone, the average and median business hours were 1.5 and 0.75, respectively. *Id.* ¶ 11. Between June 1, 2022, and September 30, 2022, statewide, 98.4% of newly submitted civil complaints were publicly accessible within 8 business hours and 1 business minute. *Id.* In September, 98.9% of newly submitted civil complaints were publicly accessible within 8 business hours and 1 business minute. *Id.* ¶ 13.

Further, the data shows that since the implementation of the new queue, 85% of newly submitted civil complaints are publicly accessible within 3 business hours, 90% are accessible

---

[17] In ECF 23-1, the defendants used data for the period ending on May 24, 2022. In the reply, ECF 50, the defendants ran a new set of data covering the period beginning on June 1, 2022. According to the defendants, the data between May 25 and May 30, 2022, "was accounted for by factoring it into the previous data set and updating that set as such." *Id.* at 19 n.14.

within 3.8 business hours, 95% are accessible within 5.5 business hours, and approximately 99% are accessible within 8 business hours or 8 business hours and one minute. *Id.* ¶¶ 14-15.

## IV.     Conclusion

In effect, CNS attempts to convert the Fourth Circuit's holding from a flexible standard to a bright line rule.  This mischaracterizes *Schaefer*.

*Schaefer* does not require instantaneous access upon a court's receipt of the complaint.  In general, complaints must be made publicly available on the day of submission, if it is a business day, or within one court day of submission, assuming the Court is open.  But, the *Schaefer* standard does not bar a brief delay, due to clerical review, for the purpose of addressing operational and security issues before allowing public access to a complaint.

It is also worth noting that although the district court in *Schaefer* for the purpose of found that the defendants' delays were unconstitutional, this occurred after the parties engaged in full discovery and proceeded to trial.  The Fourth Circuit stated, 2 F.4th at 329:

> Evidence produced at trial – including expert testimony – supports the district court's findings as to the  necessity and propriety of this flexible standard. The court found that, by the end of the tracking period, the evidence demonstrated that the Clerks provided access to substantially all (almost 90%) of complaints on the day of filing without changing any policies, hiring any new employees, or increasing employees' hours.  From this evidence the district court concluded that it was both possible and practicable to provide same-day access to most newly-filed complaints. . . .

In much the same way, CNS may produce evidence at trial that proves that the defendants have failed or continue to fail to provide access to newly filed complaints within the time frame set forth in *Schaefer.*  But, at this stage, the evidence does not establish that defendants have violated the First Amendment.  Therefore, it is unnecessary to determine whether defendants' policy of pre-access clerical review satisfies intermediate scrutiny.  If, at trial, CNS provides data

showing that the defendants do not provide contemporaneous access, then the defendants will need to prove that their policies and practices satisfy intermediate scrutiny.

In sum, CNS has failed to show that its claims are likely to succeed on the merits at trial. Because CNS has failed to show that it is likely to succeed at trial, it is unnecessary to examine the remaining PI elements.

For the foregoing reasons, I shall deny the PI Motion and the Motion.

An Order follows, consistent with this Memorandum Opinion.


Date:   December 22, 2022                          _____/s/_____
                                                  Ellen L. Hollander
                                                  United States District Judge