**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| COURTHOUSE NEWS SERVICE,<br><br>Plaintiff,<br><br>v.<br><br>JUDY K. RUPP, in her official capacity as the State Court Administrator of the Administrative Office of the Courts of Maryland, *et al*.,<br><br>Defendants. | ) | Case No. 1:22-cv-00548-BAH |

**PLAINTIFF COURTHOUSE NEWS SERVICE'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**


I. INTRODUCTION ..... 1

II. BACKGROUND ..... 1

A. The Parties ..... 1

B. Press Access to New Civil Complaints in the Paper- and E-Filing Eras ..... 3

C. Press Access to New Civil Complaints in Maryland's Circuit Courts ..... 5

1. Maryland Circuit Courts Adopt E-Filing ..... 6

D. Access Delays in Maryland's Circuit Courts ..... 7

E. Courthouse News' Efforts to Resolve Access Restrictions Without Litigation ..... 10

F. The AOC Pressures Circuit Courts to Process E-Filed Civil Complaints More Quickly ..... 11

III. ARGUMENT ..... 12

A. The First Amendment Requires Contemporaneous Access to Newly Filed Civil Complaints ..... 12

1. The Schaefer Case ..... 13

2. Defendants' Burden to Show that Restrictions are Narrowly Tailored and Necessary ..... 14

B. Where the Preliminary Injunction Order Went Astray ..... 15

C. Defendants Made No Meaningful Attempt to Examine Interests or Less Restrictive Alternatives Because They Believed They Were Insulated by Rules and a Safe Harbor They Erroneously Read into Schaefer ..... 17

1. Court Rules Must Give Way to the United States Constitution ..... 17

2. Schaefer Does Not Create an Amount of Access Delay that is Per Se Constitutional ..... 20

D. The No-Access-Before-Processing Policy Is Neither Narrowly Tailored Nor Necessary to Serve the Circuit Courts' Interest in Confidentiality ..... 21

1. Maryland Requires Filers to Flag Confidential Filings and Does Not Require Clerks to Look for Confidential Information ..... 21

2. Defendants' Concerns About Confidentiality Were Based on Unsupported Supposition Rather than a Meaningful Inquiry into Relevant Information ..... 23

3. Maryland's Circuit Courts Reject Fewer than 0.02% of E-Filed Civil Complaints Based on Restricted Information ..... 24

E. Defendants' Failure to Consider – Let Alone Try – Less Restrictive Alternatives is Fatal to Their Attempt to Satisfy Even Intermediate Scrutiny ........ 25

F. Courthouse News is Entitled to Declaratory Relief and a Permanent Injunction Preventing Defendants from Denying Access for Processing ........ 27

IV. CONCLUSION ........ 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bailey v. Sys. Innov'n, Inc.*,
852 F.2d 93 (3d Cir. 1988)....................18

*Billups v. City of Charleston, S.C.*,
961 F.3d 673 (4th Cir. 2020)....................1, 25, 28

*Brandenburg v. Seidel*,
859 F.2d 1179 (4th Cir. 1988)....................18

*Brandon v. Guilford Cnty. Bd. of Elections*,
921 F.3d 194 (4th Cir. 2019)....................19

*Centennial Life Ins. Co. v. Poston*,
88 F.3d 255 (4th Cir. 1996)....................29

*Courthouse News Serv. v. Boyce*,
2023 WL 7287878 (E.D.N.C. Nov. 3, 2023)....................16, 21

*Courthouse News Serv. v. Gabel*,
2021 WL 5416650 (D. Vt. Nov. 19, 2021)....................12, 21, 25, 29

*Courthouse News Serv. v. Jackson*,
2009 WL 2163609 (S.D. Tex. July 20, 2009)....................29

*Courthouse News Serv. v. New Mexico Admin. Off. of Cts.*,
53 F.4th 1245 (10th Cir. 2022)....................12

*Courthouse News Serv. v. Planet*,
947 F.3d 581 (9th Cir. 2020)....................12, 14, 15

*Courthouse News Serv. v. Schaefer*,
2 F.4th 318 (4th Cir. 2021).................... *passim*

*Courthouse News Serv. v. Schaefer*,
440 F. Supp. 3d 532 (E.D. Va. 2020)....................13, 14, 17

*Courthouse News Service v. Smith*
(Case No. 22-2110)....................1, 8

*In re Express-News Corp.*,
695 F.2d 807 (5th Cir. 1982)....................18

*Leaders of a Beautiful Struggle v. Baltimore Police Dep't*,
2 F.4th 330 (4th Cir. 2021) ....................29

*Legend Night Club v. Miller*,
637 F.3d 291 (4th Cir. 2011) ....................28

*McCullen v. Coakley*,
573 U.S. 464 (2014)....................28

*People for the Ethical Treatment of Animals, Inc. v. N. Carolina Farm Bureau Fed'n, Inc.*,
60 F.4th 815 (4th Cir. 2015) ....................30

*Press-Enterprise Co. v. Superior Court*,
478 U.S. 1 (1986)....................14, 17

*Reynolds v. Middleton*,
779 F.3d 222 (4th Cir. 2015) ....................15, 24, 25, 28

*Roscoe v. Butler*,
367 F. Supp. 574 (D. Md. 1973)....................19

*Turner Broad. Sys., Inc. v. F.C.C.*,
512 U.S. 622 (1994)....................25

*Washington-S. Nav. Co. v. Baltimore & Phil. Steamboat Co*.,
263 U.S. 629 (1924)....................18

**Statutes**

code ("RESTRICT")....................24

RESTRICT....................25

**Other Authorities**

First Amendment .................... *passim*

First and Fourteenth Amendments....................29

*Baltimore Sun*, *The New York Times* ....................2

*Dictionary of Modern Legal Usage* 678 (2d ed. 1995)....................14

*Garner* at 676, 678....................14

*Los Angeles Times*, *The Boston Globe*....................2

Maryland Rule 20-103(a) ....................3

Notice of Restricted Information and (2) ....................23

*Practicable*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/practicable (last visited Jan. 12, 2024) ....................13

*Press-Enterprise II* ....................17

Restricted Information Notice. Fetterly Decl., Exh. E-25 ....................26

Rule 16-701(d)(2)(B), (g) ....................19

Rule 16-904 ....................20

Rule 16-904(b) ....................19

Rule 16-916(a) ....................22

Rule 16-916(a)(3) ....................22

Rule 16-916(b)(1) ....................22, 23, 24

Rule 16-918(b)(1) ....................22, 23

Rule 20-201.1 ....................22, 23

Rule 20-201.1(c) ....................23

Rule 20-203(a)(2) ....................20

Rule 20-203(a)(3), (c) ....................20

Rule 20.101(s) ....................23

Rules 16-918(c) ....................8

United States Constitution ....................18

*The Wall Street Journal* ....................2

*Washington Post*, *Chicago Tribune* ....................2

, www.courthousenews.com ....................1

# I. INTRODUCTION

The First Amendment "requires courts to make newly filed civil complaints available as expeditiously as possible." *Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 328-29 (4th Cir. 2021). While some access delays might be inevitable in paper-filing courts, e-filing enables courts to make non-confidential civil complaints available as the courts receive them. Defendants, however, choose to withhold each new complaint e-filed at Maryland's Circuit Courts from the press and public until a court clerk has completed clerical processing tasks.

The qualified nature of the First Amendment access right gives Defendants the chance to prove their no-access-before-processing is "'content-neutral, narrowly tailored and necessary to preserve the court's important interest in the fair and orderly administration of justice.'" *Id*. at 328 (quoting *Courthouse News Serv. v. Planet*, 947 F.3d 581, 585 (9th Cir. 2020) ("*Planet III*")). To meet this burden, they must not only "demonstrate that [they] actually tried or considered less-speech-restrictive alternatives and that such alternatives were inadequate" but also that the "restriction does not burden substantially more speech than necessary." *Billups v. City of Charleston, S.C.*, 961 F.3d 673, 687-88 (4th Cir. 2020). The record shows that Defendants, who concede they never seriously considered any alternatives, can do neither.

# II. BACKGROUND

## A. <u>The Parties</u>

***Courthouse News Service.*** Courthouse News is a nationwide news service founded more than 30 years ago to cover civil litigation. Girdner Decl., ¶¶ 5-6. It employs about 240 people, most of them editors and reporters, covering state and federal courts in all 50 states. *Id*., ¶ 7. Courthouse News publishes a news website, www.courthousenews.com, which is free to the public and read by roughly 70,000 people each weekday. *Id.,* ¶ 8. Subscriber publications

include New Litigation Reports, which contain original, staff-written reports on new civil litigation in a particular geographic region. New Litigation Reports are e-mailed to subscribers in the early evening each court day. *Id.,* ¶ 18. Among Courthouse News' approximately 2,750 subscribers are law firms, news media, government entities, and businesses. *Id.,* ¶¶ 13-15.

Courthouse News functions as a pool reporter for civil litigation, with subscribers like *The Washington Post*, *Chicago Tribune*, *Los Angeles Times*, *The Boston Globe*, and *The Wall Street Journal*. *Id.,* ¶ 15. Its reporting is frequently credited as the source for news stories (*e.g.*, *The Baltimore Sun*, *The New York Times*, *The Wall Street Journal*, and WBAL-TV). *Id.,* ¶ 16.

To prepare New Litigation Reports and identify new cases that might warrant a website article, Courthouse News' reporters traditionally visited the physical courthouses for their assigned courts to review new complaints. *Id.,* ¶ 19. The review now often takes place in the electronic courthouse, online. *Id.,* ¶ 21. Courthouse News' New Litigation Reports in Maryland are the *Baltimore Report* and the *Greater Maryland Report,* which cover civil actions filed in the U.S. District Court for the District of Maryland and in each of Maryland's Circuit Courts. Abbott Decl., ¶ 9. In Maryland, as in other states, Courthouse News does not cover criminal cases, juvenile or family law matters, name changes, probate filings, most mortgage foreclosures, or collection actions. *Id*., ¶ 8. Courthouse News also does not review or report on the tiny percentage of complaints that are confidential by rule or law or accompanied by a motion to seal. *Id*. Both the *Baltimore Report* and the *Greater Maryland Report* are written by Maryland-based reporter Edward Erickson. Girdner Decl., ¶ 26.

***Defendants.*** Defendants are Maryland's State Court Administrator and the Clerks for each of the state's 23 e-filing Circuit Courts, each in his or her official capacity. The Administrator is "responsible for the administration of the MDEC system," Maryland Rule 20-

103(a), and "for implementing those rules with respect to MDEC." Fetterly Decl., ¶ 27 & Exh. E-24 (Rupp Depo. 16:6-20). "[T]he authority and control over MDEC policies and procedures rests mainly with [her]." *Id.* (Rupp Depo. 15:15-18); Harris P. Inj. Decl., ¶ 9 (ECF 23-32).

Pamela Harris was State Court Administrator at the outset of this case. She retired in June 2023, but remains employed by the Administrative Office of the Courts ("AOC") as "an advisor." Fetterly Decl., ¶ 32 & Exh. E-18 (Harris Depo. 10:5-11:6). Defendant Judy Rupp succeeded Harris as Administrator in May 2023. *Id.*, Exh. E-24 (Rupp Depo. 8:3-12).

**B. <u>Press Access to New Civil Complaints in the Paper- and E-Filing Eras</u>**

In the age of paper records, state and federal courts around the country made new non-confidential civil complaints available to reporters as they were received by the court. Girdner Decl., ¶¶ 29-34; Abbott Decl., ¶ 22. This allowed the press to report on new civil actions while they were still newsworthy and likely to capture the public's attention. Girdner Decl., ¶¶ 23, 34. When CNS encountered delays in paper-filing courts, it was because courts would not let reporters see newly filed complaints that were waiting for a clerk to "process" them. *Id.*, ¶ 35. Despite the difficulties inherent in working with paper complaints – only one person can handle the document at any one time – reporters and court staff found ways to work cooperatively so that everyone could do their jobs. *See id.*, ¶ 34.

Providing contemporaneous access in an e-filing court is even easier. An e-filed complaint is simply a .pdf document to be viewed or downloaded. Girdner Decl., ¶ 36; Fetterly Decl., ¶ 28, Exh. E-25 (Derrick Depo. 44:5-45:14, 91:4-93:8). That document is sitting right there in a virtual box, and the clerks can process it as schedules permit, regardless of whether the press or public have already read it, or even if they are reading it at that very moment. *Id.* (47:18-50:9); *see also* Girdner Decl., ¶ 36. Moreover, courts can and do require filers to enter

into the e-filing interface whatever information the court needs to automatically sort and filter new filings, including automatically segregating confidential filings. Girdner Decl., ¶ 36.

As in the paper world, access in e-filing courts is delayed only if courts withhold new civil complaints until after staff complete clerical processing. As they transitioned to e-filing, the great majority of federal district courts – including this Court – maintained the tradition of contemporaneous access by making e-filed complaints available as they are submitted to the court. *Id.*, ¶ 37; Abbott Decl., ¶ 50. Most district courts – including this one – "accept" complaints on receipt, automatically filtering out confidential filings based on filer designations and allowing anyone with a PACER account to view non-confidential complaints. Girdner Decl., ¶ 47; Abbott Decl., ¶ 50. Such systems are often called "auto-accept" systems. *Id.*

Many state e-filing courts – including in Alabama, Arizona, California, Connecticut, Florida, Georgia, Hawaii, Nevada, New York, Ohio, Texas, Utah, and Vermont – have also preserved or restored contemporaneous access to e-filed civil complaints. Girdner Decl., ¶¶ 52-77, 80, 82-99. Missouri and New Mexico will soon join their ranks. *Id.*, ¶¶ 78-79, 81. Some of these state courts use software developed in-house (*e.g.*, Connecticut, Hawaii, New York). *Id.*, ¶¶ 71, 77, 82. Others use software from one of numerous e-filing software vendors. *See, e.g., id.*, ¶¶ 53, 57, 64, 720, 80-81. Some push nonconfidential complaints onto the public docket in an auto-accept system (*e.g.*, Connecticut, Hawaii, and Utah). *Id.*, ¶¶ 71, 77, 97. Others make complaints available to credentialed users prior to processing or "acceptance," in what is often called a "press review queue" (*e.g.*, Arizona, Florida, Vermont). *Id.*, ¶¶ 53, 73, 99. Still others make complaints available on websites accessible to the public at large as soon as the court receives them, sometimes with watermarks indicating that the complaint has not yet been reviewed (*e.g.*, New York, Ohio). *Id.*, ¶¶ 82-85, 91-93.

Some of these courts implemented contemporaneous access mechanisms when they first launched e-filing, while others did so at the urging of Courthouse News and other members of the press. *See, e.g., id.*, ¶¶ 37, 54-55, 60, 64, 76. A few did so after Courthouse News brought litigation. *See, e.g., id.*, ¶¶ 58-59, 68, 74, 78-79, 81, 87. None of these courts – including those that insisted during litigation that pre-processing access would create terrible problems – have reported any problems arising from the implementation of pre-processing access. *Id.*, ¶¶ 54, 63, 66, 69-70, 87-90, 96.

Unfortunately, some courts built delay into their systems as they transitioned to e-filing, not allowing access to new e-filed civil complaints until court staff complete processing. *Id.*, ¶ 38. Most courts struggle to complete these clerical tasks for all the day's complaints on the day the complaint is filed, which means that post-processing access nearly always prevents the press from learning about all of the day's new actions until at least the day after filing, at which point the public has already moved on to the next day's news. *Id.*, ¶ 23, 39. Despite the successful implementation of pre-processing access in most federal district courts and in state courts in more than a dozen states, some courts choose to litigate to maintain such delayed access systems.

**C. <u>Press Access to New Civil Complaints in Maryland's Circuit Courts</u>**

When Courthouse News began covering Maryland's Circuit Courts in 2004, it did so by visiting courthouses in person, covering as many as it could on a daily basis, taking into account the practical and logistical limitations inherent in covering multiple courthouses across the state. Abbott Decl., ¶¶ 10-20. Courthouse News visited Baltimore City courthouse every day and traveled to other courthouses in higher-populated areas, including Baltimore, Anne Arundel, and Prince George's Counties, one or more times a week on a rotating schedule. *Id.*, ¶¶ 13-14. Until recently, the Maryland reporter's beat entailed visiting the Baltimore City courthouse at the end

of the day, after visiting other courthouses earlier in the day. *Id.*, ¶ 14; Girdner Decl., ¶¶ 27-28.

Consistent with Courthouse News' experience in other metropolitan courts, reporters typically had access to new paper-filed complaints on the day they were filed, after their receipt by intake clerks but before court staff completed clerical processing. Abbott Decl., ¶¶ 23-30. In Baltimore City, Anne Arundel County, and Prince George's County, new civil complaints were placed in wire baskets next to or behind the intake counters. *Id*. From these baskets, Courthouse News' reporters could read new civil complaints before they had been placed in file-folder jackets and moved to the records room, thus allowing Courthouse News to see new civil complaints as they were received by the courts and without the delays associated with waiting until completion of administrative processing and routing to records rooms. *Id*.[1]

### 1. Maryland Circuit Courts Adopt E-Filing

Maryland's Circuit Courts began transitioning to mandatory e-filing on a county-by-county basis in 2014. Abbott Decl., ¶ 33. Maryland chose a software suite from popular e-filing and case management vendor Tyler Technologies, branded MDEC in Maryland. *Id.*, ¶ 6. As of January 2024, e-filing is mandatory in each of the Circuit Courts, except Baltimore City, which is scheduled to launch MDEC in May 2024. Fetterly Decl., Exh. 18 (Harris Depo. 19:3-11).

The default configuration for Tyler's e-filing and case management software holds each newly e-filed complaint in an electronic queue where it sits until a clerk finds time to process it. Fetterly Decl., Exh. E-25 (Derrick Depo. 12:16-14:18, 27:7-30:7). Clerks process new complaints by logging on to their computers, accessing a queue of newly submitted complaints, and reviewing them to make the "binary" determination of whether they should be "accepted" or

[1] Unfortunately, these courts eventually took away on-receipt access to paper-filed records as unrelated events – a courthouse remodel, migration to e-filing, and the pandemic of 2020 – disrupted prior access procedures. Abbott Decl., ¶¶ 24, 27, 28.

"rejected." *Id.*, Exh. E-20 (Preston Depo. 96:9-97:3, 97:8-99:14, 118:3-15; 125:10-20), Exh. E-14. Once accepted, the filing moves into the case management system. *Id.* (98:5-99:6). Clerks may reject a submission only under very limited circumstances. *Id.* (118:10-119:12), Exh. E-15.

Tyler's software can also be configured to automatically accept certain filings based on whatever parameters the court chooses. For example, a court might choose to auto-accept civil complaints e-filed by attorneys but continue to hold pro se e-filings until after clerk processing. *Id.*, Exh. E-25 (Derrick Depo. 69:4-70:16, 73:12-84:14), Exhs. E-9, E-17. For an annual charge, Tyler also offers "press review tool" software that courts can use to provide credentialed users access to newly e-filed complaints prior to processing. *Id.* (90:12-96:3). For courts who choose to develop their own press review queue software or have another vendor develop it, Tyler will provide, at no charge, the application programming interfaces (APIs) necessary to display new e-filed complaints while they await clerk processing. *Id.* (114:5-115:12). Maryland, however, has chosen to use the default configuration of Tyler's software, restricting access to all newly e-filed civil complaints until after clerk processing. *See id.*, Exh. E-21 (Walter Depo. 55:2-57:12, 59:7-60:6). Unfortunately, consistent with Courthouse News' experience at other courts, withholding access until after processing has resulted in pervasive and persistent access delays.

**D. <u>Access Delays in Maryland's Circuit Courts</u>**

***Methodology.*** Defendants produced Tyler-generated data reflecting information about every case-initiating civil complaint e-filed in Maryland's Circuit Courts from January 1, 2021 to December 13, 2023. *Id.*, Exh. E-1. Thus, the parties are working from a common data set, which should enable a fair and neutral understanding of how withholding complaints until clerk review has impacted access. Because Maryland does not currently provide remote access to

court records,[2] however, the parties differed at the preliminary injunction stage as to how to treat complaints e-filed when the court is closed. Defendants' calculations treated such complaints as if they had been e-filed on the next day the court was open to the public. *Id.*, Exh. 21 (Walter Depo. 68:6-15, 91:20-97:19). This results in misleading statistics because it overstates the percentage of complaints that were made available on the day of submission. *See* Angione Decl., ¶ 16. For example, Defendants treated a complaint e-filed at 5:30 p.m. on a Thursday as having been submitted on Friday, and if clerks finished processing the complaint on Friday, they counted that filing as having been made available on the day it was filed, which is not accurate.

In turn, Courthouse News treated complaints e-filed after-hours and on weekends and holidays as having been submitted the day the filer actually submitted them. If such a complaint were processed and made available the following day, Courthouse News treated access as having been delayed by one day. For example, Courthouse News treated a complaint e-filed at 5:30 p.m. on a Thursday as having been submitted on Thursday, and if clerks finished processing the complaint on Friday, Courthouse News counted it as having been available on Friday, which is accurate.[3] However, Defendants faulted this approach on the grounds that even without the no-access-before-processing policy, Courthouse News could not have seen the complaint until the court opened on Friday morning (due to access being available only at the courthouse), such that – in Defendants' view – after-hours filings should not be considered delayed if they are made

---

[2] Maryland allows parties to see documents from their own cases online but requires others to travel to a courthouse for court records. Rules 16-918(c); 20-109. The Fourth Circuit is considering remote access restrictions in Virginia courts in *Courthouse News Service v. Smith*, (Case No. 22-2110). In the instant case, Courthouse News has not challenged Maryland's remote access restrictions, confining its challenge to Maryland's no-access-before-processing policy. Ultimately, both restrictions must be resolved to provide contemporaneous access to all newly e-filed documents, but eliminating the no-access-before-processing restriction will materially improve access even if remote access remains unavailable.

[3] To see what delays look like with after-hours filings included, *see id.*, ¶¶ 28-29, Exhs. C-4, C-6.

available the following day. *See id.*, ¶¶ 13-15.

These differences in methodology resulted in unnecessary and distracting confusion at the preliminary injunction hearing and in the resulting order. In the interest of enabling the Court to evaluate the impact of Defendants' access restrictions without having to "give" either party the benefit of after-hours filings, Courthouse News now provides the Court with statistics that remove after-hours filings from consideration altogether by calculating the percentage of complaints that were both e-filed on a given day and made available by 4:30 p.m. (when the clerks' offices closed to the public) that same day. *Id.*, ¶¶ 17-22 & Exh. C-2.

***Impact of No-Access-Before-Processing Policy.*** These "after-hours excluded" statistics provide a fair and accurate measure of the percentage of complaints that were e-filed each day and were sitting on the clerks' virtual desks, but whose existence was kept secret from the press and public because court staff had not yet processed them. Exhibit 2 to the Angione declaration presents "after-hours excluded" statistics for each of the twenty-three MDEC courts in each month from January 1, 2021 to December 13, 2023. Were it not for Defendants' practice of withholding access for processing, every entry on this exhibit would reflect a percentage of 100%. *Id.*, ¶ 25. To visually represent the extent to which the no-access-before-processing policy impacted access, entries reflecting months in which fewer than 90% of the complaints e-filed before the clerks' offices closed each day were available to the press and public are highlighted in yellow. Entries reflecting that fewer than 70% of each day's complaints were available are in red text.

The impact of Defendants' policy is evident at a glance. A closer look reveals that, for example, throughout 2021 and 2022 the Anne Arundel Circuit Court routinely made ***fewer than half*** of complaints that were e-filed by 4:30 (when the clerk's offices closed to the public)

available that day. *Id*., ¶ 24 & Exh. 2. Though Defendants assert that measures implemented in April and May 2022 resolved any issues, *see, e.g.*, Harris P. Inj. Decl., ¶ 15 (ECF 23-32); Fetterly Decl., Exh. 19 (Harris 30(b)(6) Depo. 33:3-34:3), access in Anne Arundel Circuit Court was still terrible from June 2022 to the end of 2022. Angione Decl., Exh. 2. Only in the months leading up to summary judgment briefing did the court begin consistently making 90% or more of the day's complaints available (excluding after-hours filings). *Id*.

While some courts in some months were able to provide contemporaneous access, there was ***not a single month*** in the entire three-year period in which no court fell below 70%. *Id*., ¶ 23 & Exh. C-2. Even with the pressure of litigation, bad access persisted in 2023 (*e.g.*, 64% and 69% in Baltimore County in July and August; 55% in Carroll in January; 62% in Howard in January; 63% in Montgomery in January; 69% in Prince George's in August; 64% in Washington in February and August; 68% and 57% in Wicomico in January and December; and 50% in Worcester in December). *Id*., Exh. C-2.

### E. **<u>Courthouse News' Efforts to Resolve Access Restrictions Without Litigation</u>**

On October 1, 2021, Courthouse News' editor William Girdner wrote to Harris, asking that the Maryland courts provide a press review queue as part of the statewide e-filing roll-out and providing information about other courts that provide on-receipt access through a press review queue or other means. Girdner Decl., ¶ 42 & Exh. E-2. The request was referred to the Major Projects Committee of the Maryland Judiciary, which "addresses policy-related matters regarding the implementation and ongoing operation of new and existing technology projects …." Fetterly Decl., Exh. 18 (Harris Depo. 115:10-16); *id*., ¶ 32 & Exh. 29. The Committee is "the final decision-making body for policy decisions regarding MDEC," and the State Court Administrator is co-chair of the committee. *Id*., Exh. 29.

The Committee "looked at the request" at their October 19, 2021 meeting, but "hit a dead stop … [w]hen [they] looked at the rules" and "decided that [Maryland's] rules and statutes would not allow" pre-processing access. *Id.*, Exh. 18 (Harris Depo. 123:4-124:2). "[A]t that point, that was the end of the conversation." *Id.* An e-mail from the AOC told Girdner that the Committee "discussed [his] request and determined that the installation of this configuration would not be in compliance with the Maryland Rules of Procedure, therefore, [his] request [was] denied." Girdner Decl., ¶ 43 & Exh. E-3. Girdner responded the following day, asking which rule barred on-receipt access. Girdner Decl., ¶ 44 & Exh. E-4. The Committee discussed Girdner's question in a subsequent meeting and "came out with the same decision in that [Maryland's] rules did not allow [it] to do this," Fetterly Decl., Exh. 18 (Harris Depo. 133:4-134:20), but the AOC did not respond to Girdner's e-mail. Girdner Decl., ¶ 45. Courthouse News sent another letter to Harris on February 14, 2022. *Id.*, ¶ 45; Complaint, Exh. 3 (ECF 1-4). Subsequent discussion between counsel failed to resolve the matter, *see* Ginsberg P. Inj. Decl., ¶ 3 (ECF 9-14), and Courthouse News filed its lawsuit on March 7, 2022.

On April 18, 2022, Courthouse News filed a motion for a preliminary injunction to enjoin Defendants from continuing the no-access-before-processing policy. ECF 9. The Court denied the motion on December 22, 2022, in an order that misapplied governing legal standards in several fundamental respects. Mem. Op. (ECF 66) ("P.I. Order")

### F. The AOC Pressures Circuit Courts to Process E-Filed Civil Complaints More Quickly

Rather than evaluate the impact and utility of the no-access-before-processing policy in response to the lawsuit, Harris tried to get Circuit Court Clerks to process new e-filed civil complaints more quickly. Fetterly Decl., Exh. 18 (Harris Depo. 147:9-22). In April 2022, the AOC configured the e-filing software to make it easier to prioritize review of civil complaints

over review of other filings. *See id*. (147:9-16; 211:7-213:14; 214:10-14); *id*., ¶ 25 & Exh. 22 (Bushell Depo. 21:5-22:17; 34:18-22; 39:19-42:18); *id*., ¶ 30 & Exh. 27 (Poyer Depo. 14:8-14; 15:13-16:6; 48:3-12); Harris P. Inj. Decl. at ¶ 15 (ECF 23-32). In May 2023, the AOC also began sending reports to Circuit Courts listing civil complaints that had been e-filed by 3:00 p.m. the day before but had not been processed, presumably to persuade clerks to reach a goal of getting every civil complaint e-filed by 3:00 processed before the court closed at 4:30 each day. *Id*., Exh. 21 (Walter Depo. 105:2-108:3; 109:17-110:10).

## IV. ARGUMENT

### A. The First Amendment Requires Contemporaneous Access to Newly Filed Civil Complaints

The Fourth Circuit recognizes that "the press and public enjoy a First Amendment right of access to newly filed civil complaints." *Schaefer*, 2 F.4th at 328. "This right requires courts to make newly filed civil complaints available as expeditiously as possible." *Id*. at 329. The First Amendment access right attaches when the court receives a complaint, *see, e.g.*, *Courthouse News Serv. v. New Mexico Admin. Off. of Cts.*, 53 F.4th 1245, 1262 (10th Cir. 2022); *Planet III*, 947 F.3d at 594; *Courthouse News Serv. v. Gabel*, 2021 WL 5416650, at *13 (D. Vt. Nov. 19, 2021), but it is not absolute and "does not require the impossible." *Schaefer*, 2 F.4th at 328. Rather, it is a qualified right, *id*. at 326, which means that the proponent of a restriction that delays access has the chance to meet its burden of establishing that the restriction is "'content-neutral, narrowly tailored and necessary to preserve the court's important interest in the fair and orderly administration of justice.'" *Id*. at 328 (quoting *Planet III*, 947 F.3d at 585). Thus, the standard is "flexible" and "does not require perfect or instantaneous access," instead permitting defendants to establish that a delay-causing restriction is narrowly tailored and necessary. *Schaefer*, 2 F.4th at 328. This does not mean that procedures resulting in instantaneous access

are disfavored, however. In fact, immediate access is the natural result in an e-filing court if the court does not withhold new civil complaints for clerical processing.

### 1. The *Schaefer* Case

In *Schaefer*, Courthouse News alleged that two Virginia clerks "unnecessarily delayed access to newly filed civil complaints in violation of the First Amendment." 2 F.4th at 322. After a bench trial, Judge Morgan "held that the First Amendment guarantees the press and the public a contemporaneous right of access to newly filed civil complaints, which requires courts to make complaints available as soon as practicable." *Id.* The courts at issue were not mandatory e-filing courts, which meant court staff had to work with paper copies of most newly filed civil complaints, and only one person at a time could handle the complaint until an electronic copy had been created through scanning. *Courthouse News Serv. v. Schaefer*, 440 F. Supp. 3d 532, 539-541 (E.D. Va. 2020).

Judge Morgan concluded that contemporaneous access – based on the facts at these two paper-filing courts – meant "on the same day of filing, insofar as practicable and if not practicable within one court day." *Id.* at 559. "Practicable" means "capable of being put into practice or of being done or accomplished." *Practicable*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/practicable (last visited Jan. 12, 2024); Bryan A. Garner, *A Dictionary of Modern Legal Usage* 678 (2d ed. 1995) ("*Practicable* = capable of being accomplished; feasible; possible."). "Practicable" is ***not*** the same as "practical." *See, e.g., Garner* at 676, 678.

Thus, the order required access to complaints on the day of filing unless the court was unable to do so. It did not permit delays where same-day access would have been inconvenient. The "same day, if practicable" formulation accounted for the possibility that, in a ***paper-filing***

court, there might be circumstances in which it is simply not possible for the press to see a particular complaint on the day it is filed. Judge Morgan concluded that, "[b]ased upon the evidence in this case," he expected that "85-90% of the new civil filings will be accessible to the public and press on the date of filing." *Schaefer,* 440 F. Supp. 3d at 562. But he also anticipated that full-scale implementation of ***e-filing would eliminate access delays altogether***. *Id*. at 563 ("Improved technology at the [statewide] OES level will likely moot the access issue.").

The Fourth Circuit affirmed Judge Morgan's decision. It followed the Ninth Circuit in adopting a level of scrutiny "more relaxed" than strict scrutiny. *Schaefer*, 2 F.4th at 328; *Planet III*, 947 F.3d at 595-96 (applying the "more relaxed scrutiny" of *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1 (1986) ("*Press-Enterprise II*"), which is "'rigorous,' but not strict, scrutiny."). Defendants bear the burden of proving that access-delaying policies and practices are "'content-neutral, narrowly tailored and necessary to preserve the court's important interest in the fair and orderly administration of justice.'" *Schaefer*, 2 F.4th at 328-29 (quoting *Planet III*, 947 F.3d at 585). The court found that ***in the context of the Schaefer facts***, Judge Morgan's fact-specific "same day, if practicable" formulation accorded with the Fourth Circuit's overarching definition of "contemporaneous" as meaning "'as expeditiously as possible.'" *Id*. at 328-29 (quoting *Public Citizen v. Doe*, 749 F.3d 246, 272 (4th Cir. 2014)). The court also agreed that the defendant clerks had failed to carry their burden of establishing through evidence that various "possible explanations" justified the delays at issue. *Schaefer*, 2 F.4th at 328-29.

#### 2. Defendants' Burden to Show that Restrictions are Narrowly Tailored and Necessary

The applicable rigorous scrutiny standard is more exacting than traditional intermediate scrutiny. *Schaefer*, 2 F.4th at 328; *Planet III*, 947 F.3d at 595. But even under the less demanding intermediate scrutiny applied to time, place, and manner restrictions, the narrow

tailoring requirement means that a restriction must not "'burden substantially more speech than is necessary to further the government's legitimate interests." *Reynolds v. Middleton*, 779 F.3d 222, 226 (4th Cir. 2015) (quoting *McCullen v. Coakley*, 573 U.S. 464, 486 (2014)).

"[T]he burden of proving narrow tailoring requires [the defendant] to prove that it actually tried other methods to address the problem." *Reynolds*, 779 F.3d at 231. "'[I]t is not enough for [the government] simply to say that other approaches have not worked.' … Instead, the government must '***show*** [ ] that it seriously undertook to address the problem with less intrusive tools readily available to it,' … and must '***demonstrate*** that [such] alternative measures ... would fail to achieve the government's interests, not simply that the chosen route is easier.'" *Id*. at 231-32 (quoting *McCullen*, 573 U.S. at 467) (emphasis in *Reynolds*).

**B. Where the Preliminary Injunction Order Went Astray**

The Court's analysis in the P.I. Order contained several fundamental errors. First, Courthouse News' position was not (and is not) that "any delay due to clerical review and docketing violates the First Amendment," Mem. Op. at 67 (ECF 66), but rather that any delay to clerical review and docketing must be justified under the appropriate constitutional test. *See* ECF 9-1 at 23-25. The answer to the P.I. Order's question of "what, if any, delays in public access are constitutionally permissible with respect to electronic submissions," Mem. Op. at 66, can only be answered by applying rigorous scrutiny.

Ironically, the P.I. Order said that "CNS attempts to convert the Fourth Circuit's [*Schaefer*] holding from a flexible standard to a bright line rule." Mem. Op. at 66. But applying rigorous scrutiny to a delay-causing practice does not lead to a bright line rule. Rather, it is Defendants who urge a bright-line rule, based on a fact-specific definition of contemporaneity. *See, e.g.*, Fetterly Decl., Exh. E-19 (Harris 30(b)(6) Depo. 32:19-20) (no need to justify policy

because "we're within the standard that *Schaefer* sets out"). Judge Morgan's same-day-if-practicable standard "did not, as defendants suggest, articulate a safe harbor by which any court in the circuit, under any circumstances, could satisfy the First Amendment solely by making complaints available 'on the next court date' after filing." *Courthouse News Serv. v. Boyce*, 2023 WL 7287878, at *5 (E.D.N.C. Nov. 3, 2023). Rather, it represents a fact-specific determination of what was possible under particular circumstances.

The P.I. Order did not subject Defendant's no-access-before-processing policy to ***any*** constitutional scrutiny. Instead, it concluded that a high percentage of complaints were available by the next court day after filing and that this alone precluded a finding "that defendants have violated the First Amendment," making it "unnecessary to determine whether defendants' policy of pre-access clerical review satisfies intermediate scrutiny." P.I. Order at 80. Allowing courts to first make some unguided, ad hoc determination of whether access is "contemporaneous," only applying rigorous scrutiny if they find it is not, would create a First Amendment dead zone in which a clerk may refuse to let a reporter see a new complaint for any reason – or no reason at all – without any constitutional scrutiny, simply because some arbitrary threshold of time had not yet been passed. The *Schaefer* district court made clear that this cannot be so: "A denial of access or a deliberate delay in the same would be an obvious First Amendment violation . . .." 440 F.Supp.3d at 563. Moreover, even if contemporaneity were a threshold question, it would nevertheless be improper to answer it based on some arbitrary, pre-set measure of time, divorced from the facts of the case.

It is beyond question that Maryland's Circuit Courts could provide access to new non-confidential e-filed civil complaints when those complaints are received, if they chose to. *See, e.g.*, Fetterly Decl., Exh. E-25 (Derrick Depo. 71:19-75:19; 97:3-107:16; 200:4-202:22). It is

also beyond question that Maryland's Circuit Courts are not doing so. Angione Decl., Exh. C-2. Instead, they routinely fall short of even the "85-90%" same-day access that Judge Morgan expected to see from a paper-filing court, *id.*, *Schaefer*, 440 F. Supp. 3d at 562.

### C. Defendants Made No Meaningful Attempt to Examine Interests or Less Restrictive Alternatives Because They Believed They Were Insulated by Rules and a Safe Harbor They Erroneously Read into *Schaefer*

Defendants cannot survive summary judgment because they cannot prove the no-access-before-processing policy is narrowly tailored and necessary to preserve overriding interests. *See Schaefer*, 2 F.4th at 328; *Press-Enterprise II*, 478 U.S. at 9. In refusing to modify the policy, Defendants never got as far as any serious evaluation of relevant interests or less restrictive alternatives. Instead, they concluded that a change to the policy would require a change to Maryland's Rules and took their evaluation no further, even after Courthouse News brought this lawsuit. They evidently drew comfort from their mistaken belief that the Fourth Circuit's *Schaefer* decision provides a safe harbor, immunizing the policy from First Amendment scrutiny as long as complaints are available by the next day after the court receives them.

#### 1. Court Rules Must Give Way to the United States Constitution

Defendants' initial rejection of Courthouse News' request for pre-processing access was based primarily, if not entirely, on their view that access prior to clerk review would require a change to Maryland's court rules. *See, e.g.*, Fetterly Decl., Exh. E-18 (Harris. Depo. 123:13-124:2; 149:13-17); Exh. E-19 (Harris 30(b)(6) Depo. 20:17-21:10). Defendants maintain that position to this day. *See, e.g.*, Fetterly Decl., ¶ 31 & Exh. E-28 at 33, 34, 39.

A state's court rules, however, must give way to the requirements of the Constitution. As the Supreme Court has explained:

> The function of rules is to regulate the practice of the court and to facilitate the transaction of its business. This function embraces, among other things, the

> regulation of the forms, operation and effect of process; and the prescribing of forms, modes and times for proceedings. Most rules are merely a formulation of the previous practice of the courts. … But no rule of court can … abrogate or modify the substantive law.

*Washington-S. Nav. Co. v. Baltimore & Phil. Steamboat Co*., 263 U.S. 629, 635 (1924); *see also*, *e.g.*, *Bailey v. Sys. Innov'n, Inc.*, 852 F.2d 93, 97 (3d Cir. 1988) (a court rule "is certainly subject to first amendment scrutiny, and the fact that it is a rule promulgated by the district court does not exempt this Court from so inquiring"); *Brandenburg v. Seidel*, 859 F.2d 1179, 1194 (4th Cir. 1988) (authority of state courts "to promulgate procedural rules for their own courts [is] subject … to constitutional limitations").

The State Court Administrator is responsible for implementing Maryland's MDEC rules and for developing MDEC policies and procedures. Fetterly Decl., Exh. 24 (Rupp Depo. 15:5-16:20). If the Administrator's implementation of, or development of policies and procedures based on, those rules results in a restriction on constitutional rights, pointing to the underlying rules is not sufficient to justify the restriction. *See, e.g.*, *In re Express-News Corp.*, 695 F.2d 807, 811 (5th Cir. 1982) (permitting juror interview where rule prohibiting interview was unconstitutional as applied to reporter); *Roscoe v. Butler*, 367 F. Supp. 574, 582 (D. Md. 1973). Nor can Defendants save their policy by pointing out that they did not enact the Maryland Rules. It is not unusual for "neutral enforcement entities" to be "defendants in civil rights lawsuits challenging the constitutionality of state laws that the entities did not pass." *Brandon v. Guilford Cnty. Bd. of Elections*, 921 F.3d 194, 199 (4th Cir. 2019).[4]

---

[4] Moreover, the Maryland Rules are ***meant*** to evolve. The Rules Committee – of which the State Court Administrator is a member – is charged with "keep[ing] abreast of emerging trends and new developments in the law that may affect practice and procedure in the Maryland courts" and must "review relevant … proposals from persons and groups interested in the Maryland judicial system to determine whether any … changes to existing Rules may be advisable." Rule 16-

Reliance on Maryland's rules is also problematic for other reasons. Rule 16-904(b) – one of two rules at the center of prior briefing – states that "[t]o protect judicial records and prevent unnecessary interference with the official business and duties of the custodian and other judicial personnel, a ***clerk*** is not ***required*** to permit public inspection of a case record filed with the clerk for docketing in a judicial action … until the document has been docketed …."[5] This rule allows – but does ***not*** require – clerks to deny access to case records prior to docketing. It does ***not*** permit the State Court Administrator or AOC to deny access to case records based on docketing status. Moreover, the legislative history of the rule reveals that the rationale behind it was rooted in the paper-filing world and no longer exists: "[prior to docketing, court records] are usually in stacks awaiting processing, and clerks are legitimately concerned about removing them from those stacks for public inspection. They can get lost, stolen, altered, or misplaced before any official record is made of them." Recommendations at 14 (Nov. 17, 2003) (ECF 23-7). There is, of course, no risk of an e-filed document's being stolen, altered, or misplaced. The e-filing software automatically creates a record of every e-filed document when it is submitted to the court. *See* Fetterly Decl., Exh. E-25 (Derrick Depo 22:9-21, 92:18-8). Thus, irrespective of Courthouse News' claim, Rule 16-904 appears to be obsolete and in need of revision.

Rule 20-203(a)(2) provides that "[a]s soon as practicable, the clerk shall review a submission for compliance with [certificate of service requirements] and the published policies and procedures for acceptance established by the State Court Administrator." The rule provides for rejection of filings under certain circumstances and striking of filings under others. Rule 20-

701(d)(2)(B), (g). Maryland's e-filing rules have been adjusted many times, often with the involvement of the Major Projects Committee. *See, e.g.*, Fetterly Decl., Exh. E-18 (Harris Depo. 45:9-47:7; 90:20-91:12; 92:5-93:18; 146:12-147:1; 164:17-165:14).

[5] All emphases are added and internal citations omitted unless otherwise noted.

203(a)(3), (c). The rule does not prohibit access by the press or public before or while the clerk is conducting the review. The rule does not address access at all. The Court need not strain to understand Defendants' interpretation, however. If the rule, or its implementation, results in unconstitutional restrictions, it must conform to the Constitution – not the other way around.

### 2. *Schaefer* Does Not Create an Amount of Access Delay that is Per Se Constitutional

Defendants also refused to consider pre-processing access in the mistaken belief that *Schaefer* creates a safe harbor, insulating delay-causing practices from First Amendment scrutiny if courts make new complaints available by the next day after filing. As Harris explained:

> [W]e got to a line of demarcation with the rules process, the statutory process, that we did not continue to evaluate, especially once we knew that we were within the standard that the *Schaefer* case has … spoken about …. We really have … stopped at that line of demarcation.

Fetterly Decl., Exh. E-19 (Harris 30(b)(6) Depo. 21:4-15); *see also, e.g., id*. (32:19-33:9) ("[W]e're within the standard that *Schaefer* sets out. … We're where we should be right now today without doing anything."); Fetterly Decl., Exh. E-28 at 10, 18, 21.

Given the frequency – even in 2023 – in which Circuit Courts made ***fewer than 70%*** of e-filed civil complaints available by the end of the day on which they were filed, Angione Decl., Exh. C-2, Harris evidently views constitutional obligations satisfied if complaints are available by the day after filing, irrespective of whether Defendants can show that "***any*** delay is appropriate." *Gabel*, 2021 WL 5416650, at *14 (emphasis in original); *see also, e.g.*, Fetterly Decl., Exh. E-21 (Walter Depo. 81:9-20 (AOC's analysis "consider[s] the Schaefer standard. … [F]or us, we would consider anything after 3:00 as impracticable for [clerks] to complete.")).

This view cannot be squared with Fourth Circuit's precedent. "[T]he First Amendment standard articulated in *Schaefer* does not depend upon a specific time frame, but rather is

dependent upon 'provid[ing] courts with some leeway ***where same-day access would be impracticable***,' and in all cases 'requires courts to make newly filed civil complaints available ***as expeditiously as possible***.'" *Boyce,* 2023 WL 7287878, at *5 (quoting *Schaefer*, 2 F.4th at 328-29) (emphasis in *Boyce*).

Nor can Defendants escape constitutional scrutiny by insisting that court staff are processing new e-filed civil complaints as quickly as possible. Conditioning access on processing is the very restriction Courthouse News challenges. It does so precisely because even when court staff are doing their best to process quickly, delays are inevitable if access is conditioned on prior action by a human clerk. *See* Girdner Decl., ¶¶ 38-39; Angione Decl., Exh. C-2. Simply by eliminating the no-access-before-processing policy with respect to non-confidential civil complaints, Defendants could provide access to ***all*** such complaints e-filed by close of business each day. *See Gabel*, 2021 WL 5416650, at *14 ("[B]ut for the pre-access review process, there would be no delay."). Thus, such access is demonstrably practicable.

### D. The No-Access-Before-Processing Policy Is Neither Narrowly Tailored Nor Necessary to Serve the Circuit Courts' Interest in Confidentiality

Like all courts, Maryland's Circuit Courts have an interest in keeping confidential court records confidential. Maryland's existing rules and procedures related to confidentiality do not preclude pre-processing access, as Defendants suppose. Instead, they provide a procedural framework highly suited to pre-processing access.

#### 1. Maryland Requires Filers to Flag Confidential Filings and Does *Not* Require Clerks to Look for Confidential Information

The "duty" of identifying confidential information lies with the filer, who "shall inform the custodian, in writing, whether … the case record … or any information contained in the case record is confidential …." Rule 16-916(a). Court staff "may rely on a person's failure to advise

that a case record … or information contained in a case record is not subject to inspection" and in the event of such failure "the custodian is not liable for permitting inspection." Rule 16-916(a)(3). Placing the duty to identify confidential information on filers makes sense given that filers "control whether the documents contain information that's exempt from public access …." Fetterly Decl., Exh. E-18 (Harris Depo. 150:4-11).

The clerk's "duty" is to "make ***a reasonable effort*** .. to shield" confidential information "***that has been called to the attention of the custodian" by the filer***. Rule 16-916(b)(1); *see also* Rule 16-918(b)(1) ("A custodian shall take ***reasonable steps*** to prevent access to restricted information … that the custodian is ***on notice*** is included in an electronic judicial record.").

Court staff take such "reasonable steps" by securing court records that are filed with Maryland's mandatory Notice Regarding Restricted Information form ("Restricted Information Notice"). *See* Fetterly Decl., Exh. E-12; Rule 20-201.1. The Restricted Information Notice form lists particular documents that are confidential by rule or statute (*e.g.*, child abuse/neglect records), and a filer who believes that a document can be kept confidential in its entirety must check the appropriate box. *Id.*[6] The Restricted Information Notice also contains a space for filers to indicate that an otherwise public document contains confidential information and to specify the rule or order authorizing confidentiality for the information. *Id.* E-filed submissions "***shall not*** contain any restricted information," unless the filer includes a Restricted Information Notice. E-filers cannot complete the e-filing process without affirmatively acknowledging: "This submission does not contain any restricted information OR, if it does, I have filed (1) a Notice of Restricted Information and, (2) if applicable, a redacted and unredacted version of the

[6] For purposes of Maryland's e-filing rules, "'restricted information' means information that, by Rule or other law, is not subject to public inspection or is prohibited from being included in a court record absent a court order." Rule 20.101(s).

submission per Rule 20-201.1(c)." Abbott Decl., ¶ 48.

If a filing does not include a Restricted Information Notice, then the court is not "on notice" of any confidential information and has no duty to prevent access to the information. Rule 16-918(b)(1); *see also* Rule 16-916(b)(1). It is simply not true that Circuit Court Clerks and their staff are "require[d] … to review newly submitted documents … for confidential information before determining whether to accept or reject the document." Fetterly Decl., Exh. E-28 at 26. As the Judiciary's own "Court Practice Directive" instructs, "[t]he clerk is ***not*** required to read every filing to determine if it contains restricted information." Fetterly Decl., Exh. E-15 at 2. "[T]he clerk should reject the filing" only "if it is ***apparent*** the filing contains restricted or confidential information" and lacks a Restricted Information Notice. *Id.*

### 2. Defendants' Concerns About Confidentiality Were Based on Unsupported Supposition Rather than a Meaningful Inquiry into Relevant Information

The Major Project Committee did not undertake any analysis of the extent to which restricted information appears in civil complaint filings or the extent to which pre-acceptance clerk review has prevented restricted information in civil complaints from entering the public record. Fetterly Decl., Exh. E-18 (Harris Depo. 155:11-160:18). Instead, the committee members "sitting around the table" shared "anecdotal" information about confidential filings generally. *Id.* (155:11-157:14). For example, one member recalled an instance in which "nude pictures" had been included with an appellate filing. *Id.* (150:15-17; 160:2-9).

Much of the conversation seems to have related to non-civil case categories. *Id.* (Harris Depo. 152:2-6) ("[T]he Court was always very concerned about private information, about … people looking up their next-door neighbor's divorce case or the juvenile cases or … whatever it may be ...."); *see also, e.g.*, Fetterly Decl., Exh. E-22 (Bushell Depo. 44:9-45:6) (concerned

about information in juvenile cases). The Committee appears not to have solicited the views of Circuit Court Clerks or their staff. Fetterly Decl., Exh. E-19 (Harris 30(b)(6) Depo. 20:17-21:15); *id.*, ¶ 26 & Exh. E-23 (Ensor Depo. 32:8-33:1, 33:12-34:21; 37:1-38:4); *id.*, Exh. E-22 (Bushell Depo. 25:18-26:2; 30:9-13); *id.*, Exh. E-27 (Poyer Depo. 35:6-36:3, 41:20-42:19).

Defendants cannot meet their burden to justify the no-access-before-processing policy through supposition that the restriction prevents disclosure of confidential information in e-filed civil complaints. "[A]rgument unsupported by the evidence will not suffice to carry the government's burden." *Reynolds*, 779 F.3d at 229.

### 3. Maryland's Circuit Courts Reject *Fewer than 0.02%* of E-Filed Civil Complaints Based on Restricted Information

If Defendants had undertaken an analysis of their own data, they would have learned that rejections related to restricted information are exceedingly rare. Clerks have a particular code ("RESTRICT") to select when they reject an e-filing because of restricted information. *Compare* Fetterly Decl., ¶ 2, Ex. E-1 (Column P), *with* ¶ 17, Ex. E-14. The Tyler-generated data produced by Defendants reflects that out of the more than 35,000 civil complaints e-filed in Maryland's Circuit Courts from January 1, 2021, to December 13, 2023, fewer than ***two-tenths of one percent*** were rejected with the restricted information code. Angione Decl., ¶ 35 & Exh. C-8. In 12 of the 23 MDEC courts, not a single complaint was rejected for restricted information over the span of nearly three years. *Id.*

This "minute fraction of the total complaints," *Gabel*, 2021 WL 5416650 at *15, shows that Defendants cannot "demonstrate … that [the no-access-before-processing policy] alleviate[s]" the disclosure of confidential information in a "material way." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 664 (1994) (applying intermediate scrutiny). Rather, the fact that the policy resulted in withholding the ***more than 99.8%*** of all civil complaints that did not

require a "RESTRICT" rejection based on the rationale that clerk review is necessary to prevent the disclosure of confidential information shows that the restriction is "not narrowly tailored because it burden[s] substantially more speech than necessary to serve" that interest. *Reynolds*, 779 F.3d at 228.

### E. Defendants' Failure to Consider – Let Alone Try – Less Restrictive Alternatives is Fatal to Their Attempt to Satisfy Even Intermediate Scrutiny

Narrow tailoring requires Defendants "to prove that [they] actually tried other methods to address the problem" intended to be served by the restriction. *Reynolds*, 779 F.3d at 231-32; accord *Billups v. City of Charleston, S.C.*, 961 F.3d 673, 681 (4th Cir. 2020). Defendants concede that they did not seriously consider, let alone try, less restrictive alternatives. *See, e.g.*, Fetterly Decl., Exh. E-18 (Harris Depo. 123:13-124:2), Exh. E-19 (Harris 30(b)(6) Depo. 21:4-15; 32:19-34:3; 39:10-40:5), Exh. E-20 (Preston Depo. 182:15-186:2, 208:22-209:17; 210:16-212:8, Exh. E-26 (Bruchalski Depo. 54:15-58:6; 63:12-68:1; 71:9-73:14; 89:19-102:5; 126:21-127:14).

As detailed above, *infra* at 3-5, most federal district courts and many state courts provide pre-processing access to e-filed non-confidential civil complaints. Confidentiality concerns are not a barrier to pre-processing access because the courts can (and do) require filers to enter whatever information is necessary for the court to filter out confidential filings. Girdner Decl., ¶ 36. Maryland's requirement that confidential civil filings include a Restricted Information Notice, *see infra* at 21-23, provides a useful mechanism for filtering, as civil complaint filings that include a Restricted Information Notice can easily be segregated out. *See*, *e.g.,* Fetterly Decl., Exh. E-20 (Preston Depo. 77:19-79:15, 173:17-176:21, 81:10-83:11).

Defendants could easily provide pre-processing access to non-confidential civil complaints by having Tyler configuring the MDEC e-filing and case management software to

automatically accept new civil complaints that do not include a Restricted Information Notice. Fetterly Decl., Exh. E-25 (Derrick Depo. 78:21-80:19); *id*., Exh. E-20 (Preston Depo. 36:13-43:15, Exs. 32, 34). Tyler offers this auto-accept configuration as a "free, out-of-the box" option for its customers. *Id*., Exh. E-25 (Derrick Depo. 71:19-72:19). Defendants could further tailor the auto-accept parameters to, for example, only automatically accept civil complaints e-filed by attorneys, sending pro se filings for pre-access clerk review. *Id*. (Derrick Depo. 77:7-82:10, 122:9-22). Clerks would remain free to make any necessary corrections to documents, they would just do so after acceptance, as they currently do under the current deficiency rules and processes. Fetterly Decl. Exh. E-20 (Preston Depo. 155:16-156:11, 214:20-215:21).

The same sort of tailoring is available if Defendants chose to use Tyler Technologies' press review tool. Fetterly Decl., Exh. E-25 (Derrick Depo. 97:3-107:16; 200:4-202:22). If Defendants prefer not to pay Tyler for its press review tool, Tyler will provide APIs at no charge that would enable the AOC's "very large" Judicial Information Systems department to develop its own press or public review queue, *id*. (Derrick Depo. 114:5-16); *id*., Exh. E-18 (Harris Depo. 25:2-9), as other courts have done. *See* Girdner Decl., ¶ 77, 82; Fetterly Decl., Exh. E-26 (Bruchalski Depo. 9:1-15:1; 16:14-17:1; 23:16-27:5; 28:6-29:19) (JIS capacity and expertise). Defendants could also use auto-redaction software that they have ***already licensed from Tyler*** to provide yet another layer of protection for confidential information. *Id*., Exh. E-26 (Bruchalski Depo. 73:17-76:16; 77:1-78:10).

Though Courthouse News' October 2021 letter identified court systems that provide pre-processing access to new civil complaints, Defendants appear to have made no attempt to learn about the experiences of those court systems. *See* Fetterly Decl., Exh. E-28 at 46, 49-50, 51, 53-54, Exh. E-19 (Harris Depo. 221:19-230:4), Exh. E-24 (Rupp Depo. 36:8-15, 37:21-38:7, 40:9-

42:22), Exh. E-22 (Bushell Depo. 29:19-30:13), Exh. E-27 (Poyer Depo. 27:17-28:12; 37:10-41:9), Exh. E-26 (Bruchalski Depo. 56:8-58:6; 67:8-68:1).[7] And though Tyler representatives attend the Major Projects Committee's bi-weekly meetings, the Committee did not request a demonstration of Tyler's press review tool until January 2023 – more than a year after Courthouse News' first request and ten months after Courthouse News brought this lawsuit. Fetterly Decl., Exh. E-18 (Harris Depo. 119:19-121:18, 173:21-174:1, 181:20-183:4). As Harris explained, "[W]e're within the standard that *Schaefer* sets out. … We think we are where we should be, and we don't think that we need to build a system, build an API, help Tyler do whatever. We don't think it's necessary." *Id.*, Exh. E-19 (Harris 30(b)(6) Depo. 32:19-33:9); *see also, e.g., id.* (18:13-19:5; 20:4-9; 26:18-27:4).

At most, Defendants' "evidence show[s] that … officials ***thought*** less-speech-restrictive alternatives would not be as effective as" restricting access to all e-filed civil complaints until after clerk processing, which "fail[s] to satisfy the 'actually tried' evidentiary standard …." *Billups*, 961 F.3d at 681 (emphasis in original). "[T]estimony from [Defendants] regarding the predicted ineffectiveness of the suggested alternatives … is not sufficient to satisfy the evidentiary standards established by *Reynolds* and *McCullen*." *Id.* at 688. "[P]ost-hoc justifications" for why an alternative would not work without "evidence demonstrating that [Defendants] 'seriously undertook' to" use the alternative is not enough. *Id*. at 689.

[7] Harris suggested that Debra DeBerry, the clerk of press review queue court DeKalb County, Georgia, told her in passing that DeBerry "was unhappy with that press tool," *id*., Exh. E-18 (Harris Depo. 226:17-230:4), Harris evidently misunderstood DeBerry, who has confirmed that "[t]he press review queue has operated without incident since it was implemented," that she has "never had an issue with the press review queue," and that she has "never told anyone that [she] had an issue with the press review queue. Decl. of Debra E. DeBerry, ¶¶ 2-3.

### F. Courthouse News is Entitled to Declaratory Relief and a Permanent Injunction Preventing Defendants from Denying Access for Processing

Courthouse News is entitled to a permanent injunction because it has shown that it has suffered irreparable injury; remedies available at law, such as monetary damages, are inadequate to compensate for that injury; considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and the public interest would not be disserved by a permanent injunction." *Legend Night Club v. Miller*, 637 F.3d 291, 297 (4th Cir. 2011).

"[I]t is well established that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Id*. at 302 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). "Moreover, monetary damages are inadequate to compensate for the loss of First Amendment freedoms." *Legend*, 637 F.3d at 302. The balance of hardships also supports an injunction. Courthouse News "will be denied its First Amendment right of access to new case-initiating documents unless the Court issues this … injunction, while Defendants have alternative, constitutional ways to achieve their goals and address their administrative concerns." *Courthouse News Serv. v. Jackson*, 2009 WL 2163609, at *5 (S.D. Tex. July 20, 2009); *see also Gabel*, 2021 WL 5416650, at *17. "Finally, it is well-established that the public interest favors protecting constitutional rights." *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021).

Courthouse News is also entitled to a declaration that Defendants' policy and practice of denying access to newly e-filed civil complaints until after processing is unconstitutional under the First and Fourteenth Amendments. A declaratory judgment is appropriate "'when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and ... when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" *Centennial Life Ins. Co. v. Poston*, 88 F.3d 255, 256 (4th Cir. 1996).

Defendants continue to insist that Maryland's Circuit Courts are free to withhold complaints until after clerical processing without satisfying any constitutional scrutiny and that demonstrated access delays, *see* Angione Decl., Exh. C-2, are per se constitutional. Declaratory relief is thus appropriate to clarify and settle the legal relationships at issue in this case.

## IV. CONCLUSION

There is no question that Defendants are not making e-filed civil complaints available "as expeditiously possible," with delays persisting even after the AOC pressured clerks to process as quickly as possible. Nor is there any question that other courts successfully make e-filed complaints available as they are received, using alternatives equally available to Defendants. Defendants are not free to thumb their noses at these alternatives. "'[A]ctual evidence' … that lesser restrictions will not do" is "a nonnegotiable requirement in this Circuit." *People for the Ethical Treatment of Animals, Inc. v. N. Carolina Farm Bureau Fed'n, Inc.*, 60 F.4th 815, 831 (4th Cir. 2015). Undisputed facts show that Defendants cannot satisfy their burden to justify their no-access-before-processing policy, and the Court should grant summary judgment to Courthouse News.

Dated: January 23, 2024

**Bryan Cave Leighton Paisner LLP**

*<u>/s/ Jonathan Fetterly</u>*

Jonathan Fetterly, Esq. (*admitted pro hac vice*)
Katherine Keating, Esq. (*admitted pro hac vice*)
Three Embarcadero Center, 7th Floor
San Francisco, California 94111
Telephone: (415) 675-3400
Facsimile: (415) 675-3434
E-Mail: jon.fetterly@bclplaw.com
E-Mail: katherine.keating@bclplaw.com

**McNamee Hosea, P.A.**

/s/ *James Tuomey*
James Tuomey, Esq. (28395)
John P. Lynch, Esq. (07433
888 Bestgate Road, Suite 402
Annapolis, Maryland 21401
Telephone: (410) 266-9909
Facsimile: (410) 266-8425
E-Mail: jtuomey@mhlawyers.com
E-Mail: jlynch@mhlawyers.com

*Counsel to Courthouse News Service*