IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

COURTHOUSE NEWS SERVICE,                  *

       *Plaintiff*,                              *

       v.                                     *       Civil Action No. BAH-22-0548

JUDY K. RUPP, ET AL.,                     *

       *Defendants*.                            *

    *    *    *    *    *    *    *    *    *    *    *    *

## DEFENDANTS' REPLY MEMORANDUM

ANTHONY G. BROWN
Attorney General of Maryland

/s/ Kevin M. Cox
_____
KEVIN M. COX (29012)
KATHRYN HUMMEL (21991)
Assistant Attorney General
Office of Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
kcox@oag.state.md.us
khummel@oag.state.md.us
(410) 576-6388

March 26, 2024                            Attorneys for Defendants

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................................1

ARGUMENT ..........................................................................................................................1

I.     THIS COURT CORRECTLY INTERPRETED SCHAEFER AS CREATING A REASONABLE TIMELINESS STANDARD. ...................................................................................................1

II.    PRE-ACCESS CLERK REVIEW WAS NOT INVALIDATED IN SCHAEFER.....................................2

III.   ANY DECREASE IN DELAY CAUSED BY A TRANSITION TO ELECTRONIC FILING IS UNRELATED TO CLERK REVIEW...............................................................................................4

IV.   AN AS-APPLIED ANALYSIS SHOULD APPLY THE EXPERIENCE AND LOGIC PRONGS TO THE FACTS OF THIS CASE, AS PRESENTED BY THESE DEFENDANTS. ...................................5

V.    WHERE CNS SEEKS EXTRAORDINARY RELIEF WHILE OMITTING THE FULL BREADTH OF RELEVANT PRECEDENT, DEFENDANTS OFFER THE TRADITIONAL DISTINCTION BETWEEN THE COMMON LAW AND THE FIRST AMENDMENT AS IMPORTANT CONTEXT, NOT AS A BRIGHTLINE RULE. ..........................................................................8

VI.   IN AN AS-APPLIED CHALLENGE, THIS COURT CORRECTLY REFUSED TO APPLY CONSTITUTIONAL SCRUTINY WHERE NO CONSTITUTIONAL PROBLEM EXISTS..................10

VII.  CNS'S CONTENTIONS RELATED TO THE DATA ARE UNRELIABLE AND FLAWED................12

      A.    This Court Correctly Determined that Alleged Delays Should be Measured in Business Hours. .................................................................................................12

      B.    Dr. Walter is an Expert in the Field of Research Methodology and Statistics, While CNS's Non-Expert Declarant is Not. .........................................................13

      C.    Mr. Angione's "After-Hours Excluded Calculations" Bias the Data and Must be Disregarded. ...................................................................................13

      D.    Mr. Angione's Analysis of the Data by County-Month Does Not Use a Meaningful Unit of Analysis and Distorts the Data................................................14

      E.    A Proper Analysis Confirms that Non-Same Day Transmitted Complaints are Generally Submitted at the End of the Business Day and are Transmitted Quickly the Following Business Day. .................................................................15

VIII. IF CONSTITUTIONAL SCRUTINY IS SOMEHOW APPLIED, IT MUST BE RELAXED SCRUTINY, AND PRE-ACCESS CLERK REVIEW MEETS THE BURDEN. .................................17

IX.    GRANTING THE RELIEF REQUESTED WILL FORCE THIS COURT TO MANDATE A CHANGE TO THE STATE COURTS' OPERATION OF ITS ELECTRONIC SYSTEMS. ....................19

CONCLUSION.........................................................................................................................20

## INTRODUCTION

Defendants have demonstrated that they expeditiously review and make publicly available documents submitted electronically as case-initiating civil complaints. Despite CNS's attempts to twist the law to meet its business model ideals, there is no constitutional violation here.

## ARGUMENT

### I.   THIS COURT CORRECTLY INTERPRETED *SCHAEFER* AS CREATING A REASONABLE TIMELINESS STANDARD.

Among the "significant errors" CNS accuses this Court of making is a misreading of *Schaefer* "as creating a bright-line rule immunizing delays from constitutional scrutiny as long as complaints are available by the end of the next court day after filing." (ECF 99 at 7.) This Court never interpreted *Schaefer* as creating a "bright-line rule," but rather said quite literally the opposite: "In effect, [it is] CNS [that] attempts to convert the Fourth Circuit's holding from a flexible standard to a bright line rule. This mischaracterizes *Schaefer*." (ECF 66 at 80.) Further, this Court did not interpret *Schaefer* as creating an immunization from delays, ECF 66 at 80-81,[1] but rather as creating a reasonable timeliness standard to which Defendants will adhere: "*Schaefer* does not require instantaneous access upon a court's receipt of the complaint. *In general,* complaints must be made publicly available on the day of submission, if it is a business day, or within one court day of submission, assuming the Court is open." (*Id.* at 80) (emphasis added). That is, this Court properly articulated general guidance that would allow Defendants to understand the Court's expectations, *id.* at 80-81, which is especially reasonable in light of CNS's attempts to carve out new obligations for state courts nationwide.

---

[1] CNS pulls the "safe harbor" comment from *CNS v. Boyce*, No. 5:23-CV-280-FL2023, WL 7287878 at *5 (E.D. N.C. Nov. 3, 2023) out of context. (ECF 99 at 7.) The comment was made while contemplating dismissal based on the claim that CNS "foreclosed its own claim." *Id.*

**II.**    **PRE-ACCESS CLERK REVIEW WAS NOT INVALIDATED IN *SCHAEFER*.**

Despite CNS's contention to the contrary, ECF 99 at 6, 9, this Court correctly found that *Schaefer* "does not bar a brief delay, due to clerical review, for the purpose of addressing operational and security issues before allowing public access to a complaint." (ECF 66 at 80 (emphasis added)); *see Schaefer*, 440 F. Supp. 3d at 554, 561-62. As purely case-law interpretation, and thus unrelated to any factual analysis, burden level, or discovery, the Court's finding here would be the same regardless of whether it was made in the context of a preliminary injunction or a dispositive motion. As such, it is a rule of law that "should continue to govern the same issues in subsequent stages in the same case." *Fusaro v. Howard*, 19 F.4th 357, 367 (4th Cir. 2021) (internal quotation marks and citations omitted).

Relatedly, CNS misleadingly asserts, "The Fourth Circuit has already decided a challenge to a state court's policy of restricting access to newly filed civil complaints until after court staff complete administrative processing." (ECF 99 at 6.) In *Schaefer*, CNS may have challenged the state court's pre-access clerk review policies, but the Court did not invalidate them. 440 F. Supp. 3d at 554, 561-62. Rather, the Court found that based on the facts in that case "a qualified right of access to newly-filed civil complaints contemporaneous with the filing of the complaint," and explained the necessity of a declaratory judgment because (1) CNS was experiencing "persistent and widespread" delays in the two courts at issue, and (2) both clerk defendants "refuse[d] to accept the [reality] that they are fully capable of providing contemporaneous access." *Id*. at 554, 562. The Fourth Circuit upheld the declaratory judgment, explaining that the public enjoys a "reasonably contemporaneous" right and that "[t]his flexible standard does not require perfect or instantaneous access." 2 F.4th 318, 328 (4th Cir. 2021). Like the District Court, the Fourth Circuit did not invalidate the process of pre-access clerk review. *Id*.

2

CNS's suggestion that the *Schaefer* decision invalidated pre-access clerk review policies, ECF 99 at 6, is directly contradicted by the record in one of CNS's own lawsuits filed just weeks after *Schaefer*'s resolution.  *See* Exhibit 1, Docket and Compl., No. 3:21-cv-00460; *CNS v. Hade*, 631 F. Supp. 3d 349 (E.D. Va. 2022).  In *Hade*, CNS filed suit in the same court that adjudicated the *Schaefer* trial and against <u>one of the same defendants CNS sued in *Schaefer*</u>.[2]  *Id*.  At the time of the factual record in *Schaefer*, "the paper filing of a new complaint in the Prince William Circuit Court in Virginia went through several steps before it was made available to the public: '(1) initial intake; (2) Circuit Court Case Management System ('CCMS') data entry; and (3) scanning.'" (ECF 66 at 62-63 (quoting 440 F. Supp. 3d at 540).)  And subsequently, CNS acknowledged that in the same court:  "A new *non-confidential* civil filing[3] filed at the Prince William Circuit Court, and other Virginia circuit courts, *goes through several stages before it is available for viewing online at either the courthouse via public access terminals or remotely* via OCRA: (1) initial intake; (2) data entry into CCMS; and (3) scanning into CIS," and that: "The Prince William Clerk and her staff review new civil filings for any unredacted social security numbers or other identification numbers appearing on a driver's license, credit card, debit card, bank account, or other billing or payment system and, if discovered, redact such information *before* scanning the filing into CIS."  Exhibit 3, Jt. Stip. at ¶¶ 46, 51 (emphasis added).

---

[2] Jacqueline Smith, the Clerk of Circuit Court for Prince William County, is defendant in both cases.  The issues in *Hade* are different but related to the instant case.  In *Hade*, CNS sought *remote* access to civil complaints.  631 F. Supp. 3d 349.  CNS has at least intimated that is what it ultimately hopes to obtain in Maryland.  (*See* Exhibit 2, Hr'g. Tr., ECF 59, at 109.)

[3] Prince William County has transitioned to e-filing for certain filings.  Exhibit 4, Attorney eFiling information page, available at *https://www.pwcva.gov/department/circuit-court/attorney-efiling* (last visited Mar. 21, 2024).  All of Virginia's state courts are notably absent from CNS's list of courts that utilize its proposed alternatives to pre-access clerk review.  (ECF 95-7.)

Additionally, not only did the same pre-access clerk review policies and practices remain in place both pre- and post-*Schaefer* in the same court that CNS had "defeated" in *Schaefer*, *id*. at ¶¶ 46, 51, CNS did not challenge pre-access clerk review in *Hade*, 631 F. Supp. 3d 349, Exhibit 1, Compl., but instead actually used the fact that Clerk Smith and her staff continue to perform pre-access clerk review as <u>support</u> for its arguments.  Exhibit 5, CNS Brief, at 21, 70 (upper red numbers).  While addressing Clerk Smith's concerns about private and/or confidential information being disseminated if the general public is allowed remote access to filings, CNS offered as solace the fact that under Virginia law, Clerk Smith and her staff "review[] civil filings to ensure the redaction of social security numbers, driver's license numbers and other identification numbers," and CNS suggests that "[i]t would be a straightforward task to expand that review to include the other categories of information . . ." *Id*.

## III.   ANY DECREASE IN DELAY CAUSED BY A TRANSITION TO ELECTRONIC FILING IS UNRELATED TO CLERK REVIEW.

CNS asserts that full-scale implementation of electronic filing should "eliminate" all access delays, and it offers as support for this "elimination" assertion the Eastern District of Virginia's statement in *Schaefer* that "[i]mproved technology at the OES level will likely moot the access issue."  (ECF 99 at 11.)  There is a disconnect here between improved technology and CNS's desire to abolish pre-access clerk review.  Preliminarily, the district court in *Schaefer* never stated that electronic filing would *eliminate* all delays altogether, 440 F. Supp. 3d at 563, and as outlined in detail above, *Schaefer* never mandated an *elimination* of pre-access clerk review.  *See supra*, Section II.  To the contrary, when this statement is properly read within its context, the district court in *Schaefer* was likely contemplating that "improved technology" will allow for the process to be *generally* faster and thus cause delays to brief enough to fall into the constitutionally accepted timeframe.  440 F. Supp. 3d at 563.  That is, a more reasonable interpretation of the statement that

4

improved technology will likely moot the alleged problem is that the Court was contemplating a system like Maryland's MDEC system in which improved technology ensures that delays are brief enough to negate the necessity of a declaratory judgment.  (*See* ECF 98-1 at 31, n. 21 and n. 22) (explaining how CNS's publications demonstrate how the shift from paper to electronic filing has improved timeliness).)  Indeed, as the Ninth Circuit noted, "Even in this era of electronic filing systems, instantaneous public access to court filings, especially complaints, could impair the orderly filing and processing of cases with which clerk's offices are charged.  After all, litigants are not uploading their complaints to the internet; they are filing them with a court, making them subject to judicial administration."  *CNS v. Planet*, 947 F.3d 581, 596 (9th Cir. 2020).

## IV.  AN AS-APPLIED ANALYSIS SHOULD APPLY THE EXPERIENCE AND LOGIC PRONGS TO THE FACTS OF THIS CASE, AS PRESENTED BY THESE DEFENDANTS.

While simultaneously conceding that *this* case must be an as-applied challenge, ECF 99 at 32-33,[4] CNS insists that this Court take a decision upholding a fact-specific declaratory judgment entered against two county court clerks in Virginia whose sometimes-ten-days-long paper filing processes were at issue, and apply that decision as a broad constitutional right to immediately access, prior to clerk review, all electronically submitted civil complaints in Maryland's electronic courts, where "delays" average barely one business hour, ECF 99 at 17-18; ECF 98-1 at 12-15;

---

[4] CNS alleged in its amended complaint that "Defendants' policies and practices . . . prevent CNS – *and by extension its readers, including its subscribers* – and other members of the press *and public*, from obtaining newly filed civil complaints in a contemporaneous manner as expeditiously as possible," and that Defendants' actions "deprive CNS, *and by extension its subscribers, readers, members, and the public*, of the right of access to judicial records . . . ."  (ECF 79 at ¶¶ 70, 87) (emphasis added).  But when challenged on this (ECF 98-1 at 15-17), CNS now claims the limitations presented by *United Reporting Pub. Corp.*, 528 U.S. 32 "are irrelevant" because CNS attacks the Defendants' policies based only on its *own* rights, and *not* "based on others' rights."  (ECF 99 at 32-33.)  This is but one example of how, repeatedly, CNS makes a vague assertion, and then when challenged, claims it did not make such an assertion and then insincerely questions Defendants' reasoning.

ECF 98-6.  In applying the *Press-Enterprise II* test, however, "a court must base its decision on specific factual findings rather than conclusory assertions alone."  *United States v. Doe*, 962 F.3d 139, 147 (4th Cir. 2020) (internal quotation marks and citations committed).  As outlined, the "experience and logic" test fails when applied to the electronic court records process at issue *in this case* and the factual record *in this* case, ECF 98-1 at 17-25, and where Defendants are not violating the "reasonably contemporaneous" timeliness standard that is applicable to them, ECF 98-1 at 12-15.  *Schaefer*, 2 F.4th at 328.

CNS contends "*Schaefer* precludes Defendants from using the first part of the *Press-Enterprise II* test to avoid the second part of the test," and it insists that a decision based on the factual analysis of another state's court practices and delays are "binding" on Defendants.  (ECF 98-1 at 17-19.)  While Defendants have been diligently adhering to the Fourth Circuit's timeliness standard from *Schaefer* (ECF 66 at 80; ECF 98-1 at 12-15; ECF 98-6), Defendants also respectfully request that this Court consider *their* record based on the process at issue in *their* case, in comparison to *Schaefer*.  (ECF 98-1 at 17-25.)  In *Schaefer*, the Court stated, "There is no evidence in the record to suggest that, historically, complaints have been kept from public view."  440 F. Supp. 3d at 557.  In this record, however, Defendants prove an important distinction between how Maryland's courts and others distinguish between case-initiating submissions and case filings, as well as the manner of dissemination.  (ECF 98-1 at 21-22.)

On this issue, CNS skews Defendants' contentions by stating, "Defendant [sic] mistakenly asserts that neither this Court nor other federal district courts make new civil complaints available on receipt" and by suggesting that Defendants must be confused.[5]  (ECF 99 at 29, n.14.)  The point

---

[5] To the extent that there has been confusion about how CNS accesses case-initiating complaints in federal courts, it was created by CNS.  (ECF 98-2 at 204) ("Federal courts . . . provide on-receipt access to efiled complaints *through the PACER system*.") (emphasis added);

Defendants *actually* make is that the federal district courts make certain distinguishments between case-initiating documents and subsequent filings, between the submission of a document and its filing, between remote and physical courthouse access, and among the varying degrees of what is *widely* publicly accessible.  (*Id.*); *see also supra*, note 5.  Further, CNS does not, ECF 99 at n.14, and cannot refute the case-initiating practices in the federal appellate courts.  (ECF 98-1 at 22-23); *see CNS v. Brown*, 908 F.3d 1063, 1065 (7th Cir. 2018) (where CNS sought release of "newly filed complaints to the press at the moment of receipt by her office—not after processing" (*i.e.*, the same issue now before this Court), Seventh Circuit explained federal appellate courts do not provide "this sort of instant access to court filings," but instead "the clerks' offices undertake certain administrative processing before a filing is made publicly available, giving our practices a similarity to the practices in state court challenged in this case," which "would make it unusual, and perhaps even hypocritical, for us to order a state court clerk to provide such instant access on the basis of the same Constitution that applies to federal courts").

---

(ECF 9-2 at ⁋ 33) (complaints available "right after they cross the electronic equivalent of the intake counter *via the PACER public access system*;" case-initiating documents are automatically accepted and can be "viewed remotely *via PACER* even when the Court is closed"); (ECF 59, at 37, 108) (". . . a complaint would automatically flow onto the public docket like it does in *the PACER system* . . ."; ". . . in federal district courts, in this Court, *on PACER*, when a complaint is submitted, it is, upon receipt, available to the public").  As a result of discovery, CNS now states that it accesses new complaints through the CM/ECF *document filing* sites (ECF 99-2 at ⁋ 3), which for this Court is ecf.mdd.uscourts.gov and notes prominently: ". . . for official judiciary business only."  Exhibit 6, Notice.  Further, what Defendants *actually* stated about PACER case locater was that it "delays remote online access to new cases to the general public" (ECF 98-1 at 22).  That is, in order for the general public to obtain *same-day remote* access to *case-initiating* electronically submitted civil complaints, the public generally cannot depend on PACER Case Locator (ECF 98-1 at 22), but instead can retrieve the documents if they have the discrete knowledge that they can separately sign into each courts' *electronic filing system* (*see* ECF 99-2), and if they are comfortable retrieving documents from an electronic *filing* site meant "for official judiciary business only."

Further, although CNS seeks to avoid having this Court apply the alleged problem here to any actual harm caused to CNS by using conclusory statements like "meritless" and "hardly damning," rather than providing legal support to combat Defendants' arguments (ECF 99 at 35), it is clear that "[i]n order to prevail on an as-applied First Amendment challenge, a plaintiff must show that the regulations are unconstitutional as applied to their particular speech activity." *Fusaro*, 19 F.4th at 368 (internal quotation marks and citations omitted). "[A]n as-applied challenge is based on a developed factual record and the application of a statute to a specific person." *Id.* (internal quotation marks and citations omitted). "As-applied challenges are fact-specific inquiries because of "the general rule that constitutional adjudication requires a review of the application of a statute to the conduct of the party before the Court." *Id.* (internal quotation marks and citations omitted). To satisfy the applicable test, this Court must find unconstitutional delays based on the factual record in this case, *see supra*, Section IV, which are creating a constitutional problem to their specific challenger (*i.e.*, CNS, *only*) and not some imagined or general desire for the public to have "fresh" news. (ECF 98-1 at 29-30.)

V.    **WHERE CNS SEEKS EXTRAORDINARY RELIEF WHILE OMITTING THE FULL BREADTH OF RELEVANT PRECEDENT, DEFENDANTS OFFER THE TRADITIONAL DISTINCTION BETWEEN THE COMMON LAW AND THE FIRST AMENDMENT AS IMPORTANT CONTEXT, NOT AS A BRIGHTLINE RULE.**

As CNS did in *Schaefer*, 2 F.4th at 326, n.4, CNS insists here that because CNS chooses to ignore the common law right to access court documents, the common law has "no bearing" on this case. (ECF 99 at 16.) The decision of which standard to apply, however, should be the decision of the Court (not CNS). *See Rushford v. New Yorker Mag., Inc.*, 846 F.2d 249, 253 (4th Cir. 1988) ("With regard to substantive requirements, we find it necessary to decide whether the interests of [the newspaper] arise from the First Amendment or from the common law right of access."). Assuming *arguendo* that this Court determines that a "judicial document" includes a

document electronically *submitted* to a court that has not yet been docketed and thus not yet been

*filed* with a court—an issue Defendants do <u>not</u> concede (*see* ECF 98-1 at 23) and an issue central

to the Idaho defendants' case in *CNS v. Omundson*, Case No. 1:2021-cv-00305 (currently awaiting

a decision)—the common law presumption is applicable to all judicial records. *See Stone v. Univ.*

*of Md. Med. Sys. Corp*., 855 F.2d 178, 180 (4th Cir. 1988) ("While the common law presumption

in favor of access attaches to all judicial records and documents, the First Amendment guarantee

of access has been extended only to particular judicial records and documents.").

Further, CNS mischaracterizes Defendants' inclusion of the full breadth of the legal

precedent and twists Defendants' words by inaccurately claiming that Defendants contend "the

First Amendment protects *only* against censorship while the common law right applies to court

record access."[6]  (ECF 99 at 16) (emphasis added).  Defendants do not make such a brightline

contention.  Rather, Defendants contend, as they have carefully stated,[7] that this is the *general* rule.

---

[6] In addition to this being an inaccurate reiteration of Defendants' briefing, it is taken out of context.  While Defendants stated that "it is critical to recognize that this case concerns only the right to access government records, as distinguished, *significantly*, from the right to be protected from government censorship of speech," this request for recognition was made within the context of a specific argument.  (ECF 98-1 at 15-16 (emphasis in original).)  It was based on CNS's repeated assertions that it was bringing this case to protect the rights of others to have access to "fresh news" (ECF 79 at ¶¶ 70, 81, 87), which CNS now abandons (ECF 99 at 32-33).  The distinction between access and censorship is vital where plaintiffs, as CNS *once did* (ECF 79 at ¶¶ 70, 81, 87), claim to be protecting the First Amendment rights of others (ECF 98-1 at 15-16).  *LAPD v. United Reporting Pub. Corp.*, 528 U.S. 32 (1999).

[7] What Defendants *actually* stated was that the common law standard "is the standard the *Supreme Court* has *traditionally* applied to requests for government information, including court *records* . . .," that the *Supreme Court* has "*regularly* declined to adopt a *broad* constitutional right to obtain government information," and that "[t]he First Amendment . . . has *traditionally* been applied against government actors, including the courts, as a mechanism to protect against censorship of speech."  (ECF 98-1 at 17-18) (emphasis added).  Nowhere do Defendants contend there is a brightline rule, nor that the First Amendment has *never* been applied to access cases.  (ECF 98-1 at 17-19.)  To the contrary, Defendants clearly acknowledge the *Press-Enterprise II* line of cases, and their application in *Schaefer*, ECF 98-1 at 19, and Defendants have been diligently adhering to the Fourth Circuit's standard from *Schaefer*, ECF 66 at 80; ECF 98-1 at 12-

*See Fusaro v. Cogan*, 930 F.3d 241, 249-50 (4th Cir. 2019) ("no *general* First Amendment right to access a government record. . . . *general rule* is that of *Houchins*: there is no First Amendment right to government information or sources of information within the government's control") (emphasis added) (internal quotations marks and citations omitted).   Similarly, it is entirely inaccurate to suggest that Defendants are confused about this general rule based on a "misreading" of *Media Gen. Operations, Inc. v. Buchanan*, 417 F.3d 424, 429 (4th Cir. 2005), as CNS contends. (ECF 99 at 17.)   Defendants do not cite *Buchanan* as support for a brightline rule, as CNS mischaracterizes, but rather, as support for this clearly stated contention: "Subsequent to *Press-Enterprise II*, in several cases involving judicial documents, the Fourth Circuit rejected an application of the First Amendment."  (ECF 98-1 at 18.)[8]

## VI.   IN AN AS-APPLIED CHALLENGE, THIS COURT CORRECTLY REFUSED TO APPLY CONSTITUTIONAL SCRUTINY WHERE NO CONSTITUTIONAL PROBLEM EXISTS.

CNS contends that this Court erred "by predicating its refusal to reach the second part of the *Press-Enterprise II* test (which evaluates whether an access restriction is justified) on its conclusion that the access delays at issue were permissible because they resulted from 'clerical review.'"  (ECF 99 at 8.)  This is another mischaracterization of this Court's opinion.  This Court conducted the same kind of timeliness analysis that had been conducted in *Schaefer*, *see infra*, and: (1) examined the data to determine whether "defendants have failed to provide contemporaneous

---

15; ECF 98-6.  Because, however, CNS's request in this case is extraordinary, and because the full range of legal precedent is fact-specific and nuanced (and omitted by CNS), Defendants offer the "big picture" to implore this Court to contemplate this case within the context of the government harms to which the First Amendment has *traditionally* been applied, *see Press-Enterprise II*, 478 U.S. at 1 (media barred from accessing trial records of nurse charged with murdering 12 patients by administering massive doses of medication), as compared to what CNS alleges as harm in this case.  (*See* ECF 98-1 at 17-18, 29-30.)

[8] Defendants' parenthetical quote from *Buchanan* regrettably omitted an ellipsis at the end, but that does not translate into a misreading.

access" (2) found that the defendants were providing contemporaneous access, and then (3) found that because the defendants' delays were brief enough, the evidence had not established any violation. (ECF 66 at 76-80.) This Court found that the facts presented no constitutional problem because the clerk review process in Maryland's MDEC courts is performed quickly enough to satisfy the flexible and reasonable timeliness standard from *Schaefer*.

Relatedly, CNS claims that "the Court was required to subject the no-access-before-processing policy to constitutional scrutiny" prior to determining whether Defendants had actually created constitutionally impermissible delays. (ECF 66 at 8.)    To the contrary, this Court's interpretation of the "order of operations" was correct. *See Schaefer*, 440 F. Supp. at 556-57*; see also McCullen v. Coakley*, 573 U.S. 464, 485 (2014) (explaining that it is an "uncontroversial principle of constitutional adjudication [] that a plaintiff generally cannot prevail on an as-applied challenge without showing that the law has in fact been (or is sufficiently likely to be) unconstitutionally applied to him").

This Court correctly found that if "the evidence does not establish that defendants have violated the First Amendment," then "it is unnecessary to determine whether defendants' policy of pre-access clerical review satisfies intermediate scrutiny," ECF 66 at 80, and this is the "order of operations" this Court should continue to follow. This analytical framework is supported by *Schaefer*, where the district court applied the *Press-Enterprise II* test in this order: (1) it examined whether the First Amendment applied by applying *both* the experience and logic prongs to the factual record in that case, (2) it then found that the record in that case established a contemporaneous right, and (3) it then stated, "The *levels in access* prior to this lawsuit are so inadequate as to constitute a practice or custom of making newly filed civil complaints publicly available in a manner that is not contemporaneous with filing. *Therefore, the burden shifts* to the

Defendant to prove their polices, practices, and customs are narrowly tailored to serve compelling government interest."  440 F. Supp. at 556-57 (emphasis added).

This analytical framework is also supported by the Fourth Circuit's application of the test in other cases involving access to court records.  *See Fisher v. King*, 232 F.3d 391, 396 (4th Cir. 2000) (in an as-applied challenge, declining to reach the point of applying constitutional scrutiny, where, in spite of precedent applying the First Amendment to documents submitted in criminal trials, finding no constitutional violation when plaintiff denied access to a 911 tape played in open court when applied to the precise issue as presented in that case);  *In re U.S. for an Ord. Pursuant to 18 U.S.C. Section 2703(D)*, 707 F.3d 283, 291-93 (4th Cir. 2013) (applying the "experience and logic" test and having found it failed, ending its First Amendment analysis).

## VII.   CNS'S CONTENTIONS RELATED TO THE DATA ARE UNRELIABLE AND FLAWED.

CNS claims that Defendants "obscure delays by presenting only statewide aggregate same-day statistics."  (ECF 99 at 5.)  CNS further claims that "Most of Defendants' evidence is directed at establishing that circuit court staff cannot process all complaints on the day they are filed."  (*Id.* (emphasis in original).)  As explained below, this is inaccurate.

### A.   This Court Correctly Determined that Alleged Delays Should be Measured in Business Hours.

CNS complains that "Defendants start the delay clock only when the court is open and stop the clock whenever the court is closed."  (ECF 99 at 15.)  But this Court addressed this issue and correctly found that "in calculating whether a delay in access is unconstitutional, the analysis must be predicated on business or work days, not calendar days."  (ECF 66 at 75.)  "Certainly, if a complaint is filed [or submitted for filing] when a court is closed [and the press and public would not have access to it because they do not have access to the court MDEC kiosk to electronically view the complaint], the Constitution is not violated because of a delay in access on that basis."

(*Id.*)  This specific legal issue is unaffected by discovery, the stage in litigation was immaterial, and CNS fails to articulate any proper justification to analyze time differently.  (ECF 99 at 15.) As such, the Court's decision on the legal issue of time measurement "should continue to govern the same issue" now.  *Fusaro*, 19 F.4th at 367 (internal quotation marks and citations omitted).

**B.**     **Dr. Walter is an Expert in the Field of Research Methodology and Statistics, While CNS's Non-Expert Declarant is Not.**

Dr. Walter is an expert in research and program analysis and provides statistical and analytical reports on court performance, caseloads, and other court data.  Exhibit 7, Walter Decl. at ¶ 7, pp. 8-9.  She is experienced in research design, data collection, and statistical analysis and has taken coursework and taught courses relevant to her work in this case.  *Id.* at ¶¶ 8-9, pp. 9-11. Dr. Walter was also designated as an expert in this case.  Exhibit 8, Expert Designation.

CNS's data "declarant," Adam Angione (a longtime CNS employee), on the other hand has no similar or relevant experience or "expertise" relative to this matter.  (*See e.g.,* ECF 95-29 ¶¶ 1-2, pp.1-2; ECF 99-3 ¶ 1, p. 1.)  Mr. Angione is not an expert in this case.  Exhibit 9, CNS Expert Designation.   When comparing Dr. Walter's credentials and qualifications to Mr. Angione's for the purpose of providing testimony in this matter relating to the data, Dr. Walter is far more qualified and experienced.  *Compare* Exhibit 7, Walter Decl. at ¶¶ 7-9, pp. 8-11 and ECF 96-6 at ¶¶ 2-6, pp. 1-2 (Dr. Walter's credentials and qualifications) with ECF 95-29 ¶¶ 1-2, pp.1-2 and ECF 99-3 ¶ 1, p. 1 (Mr. Angione's non-credentials and non-qualifications).

**C.**     **Mr. Angione's "After-Hours Excluded Calculations" Bias the Data and Must be Disregarded.**

CNS self-servingly uses a methodology to calculate its presentation of the data to the Court by surprisingly excluding complaints submitted for filing after business hours.  (ECF 99 at 8); Exhibit 7, Walter Reply Decl. at ¶¶ 13-14, pp. 13-14.  This means that CNS only uses for its

calculations complaints submitted between the hours of midnight and 4:30 p.m. on court business days.  Exhibit 7, Walter Reply Decl. at ¶ 14, p. 14.  There are several fallacies in this methodology.

Initially, these calculations ignore over 20% of the complaints in the shared dataset.  *Id.* at ¶ 13, p. 13.  CNS's approach intentionally "truncates the data," which biases the results.  *Id.*  CNS also ignores the other complaints and court submissions the clerks must process.  *Id.* at ¶ 13, pp. 13-14.[9]  Second, Mr. Angione's approach converts "the full population of envelopes with new civil circuit court complaints into a nonrandom sample of envelopes[10] with new civil circuit court complaints."  *Id.* at ¶ 14, p. 14.  Because the full universe of data is available, it is improper to use a sample.  *Id.* at ¶¶ 14-15, pp. 14-15.  Third, notwithstanding that using a sample is unnecessary and inappropriate, Mr. Angione "fails to use proper statistical sampling methods that help to ensure validity and reliability."  *Id.* at ¶ 15, p. 15.  Basic tenets of sampling techniques in statistical analysis forbid "cherry picking data," which is what Mr. Angione has done.  *Id.* at ¶ 16, pp. 15-17.

Mr. Angione's technique of sampling the data is flawed and "undermines the reliability and validity of his analyses."  *Id.* at ¶ 17, p. 17.  His "after-hours excluded calculations" should be disregarded in favor of more rigorous methodologies to ensure trustworthy conclusions.  *Id.*

### D.    Mr. Angione's Analysis of the Data by County-Month Does Not Use a Meaningful Unit of Analysis and Distorts the Data.

CNS equally uses a self-servingly methodology of presenting the data by county-month.  (*See e.g.,* ECF 99-3 at ¶¶ 9-12, pp. 4-7); Exhibit 7, Walter Reply Decl. at ¶¶ 18-23, pp. 17-22.  Mr. Angione's methodology of using "unweighted county-months as the unit of analysis is misguided and should be ignored."  Exhibit 7, Walter Reply Decl. at ¶ 18, p. 17.  There "is nothing

---

[9] Clerks have always reviewed complaints for confidential data while processing them, and this process continues today.  (ECF 98-2, Harris Decl. at ¶ 5.)

[10] MDEC submissions are made with electronic "envelopes."  *See* Exhibit 7, Walter Reply Decl. at ¶ 11, p. 11.  Electronic envelopes occasionally contain more than one document.  *Id.*

intrinsically meaningful about months" in this case and aggregating up to the month is unnecessary when all the data exists. *Id.* The same is true "for an analysis of the data by county-day and/or even a day-by-day analysis." *Id.* Nonetheless, even if a day-by-day and month-by-month analysis is used, Dr. Walter demonstrates in one chart how quickly Maryland courts transmit complaints both in terms of business hours and same-day transmissions. *Id.* at ¶ 23, p. 22.

Even if county months were "independently significant and relevant, Mr. Angione's failure to weight them by the number of envelopes in the month provides a misleading picture with less information than from simply using the individual envelope data." *Id.* at ¶ 19, p. 18. To describe a population accurately, procedures should not be employed to inflate variation and then allow cherry-picking datapoints to support a position. *Id.* at ¶ 21, pp. 18-19. That is exactly what Mr. Angione did by focusing on specific and CNS self-serving county-months, by cutting up the data across 36 months (for most of the courts) and 23 courts. *See id.* at ¶¶ 20-21, pp. 18-19.

"To summarize a dataset statistically one would typically use measures of central tendency," which means that the mean and median are more informative than single datapoints. *Id.* at ¶ 22, p. 19; *id.* at ¶ 17, pp. 16-17. Mr. Angione does not do this and, instead, selectively cherry picks "favorable data for CNS," which is "improper." *Id.* at ¶ 23, p. 20. Nonetheless, even when such data is examined, most complaints result in same day access. *Id.* at ¶ 23, pp. 20-21.

E.    **A Proper Analysis Confirms that Non-Same Day Transmitted Complaints are Generally Submitted at the End of the Business Day and are Transmitted Quickly the Following Business Day.[11]**

CNS does not dispute that 88.2% of all complaints during the last year of data were submitted and transmitted on the same business day. *Id.* at ¶ 26, p. 25. This percentage includes

_____

[11] At the initial preliminary motions phase, Defendants presented the data to the Court in terms of mean and median business hours, as well as what is essentially eight business hours. (ECF 66 at 14-20, 78-80.) The Court accepted Defendants' presentation as determinative of the

complaints submitted after 4:30 p.m. on one business day and before 8:30 a.m. the next business day, as well as complaints submitted and transmitted during the same business day. *Id.*; (*see* ECF 98-6 at 6-7 (explaining how Defendants treat submissions and transmissions for calculations)).

Likewise, CNS does not dispute that only 11.6% (or, 1,609) of all complaints during the last year of data were transmitted the business day after the business day of submission (*e.g.*, they were submitted on a business Monday but were transmitted on a business Tuesday). *Id.* at ¶¶ 26-27, p. 25. For those 1,609 submissions, the mean and median from submission to transmission were, respectively, 2.5 and 1.6 business hours. *Id.* at ¶ 29, p. 26. The median submission time was 3:36 p.m., meaning that at least half of the 1,609 complaints were submitted during the last hour of the court business day. *Id.* at ¶ 30, p. 26. The median transmission time was "8:33 a.m. the morning of the next court business day, meaning that at least half of" the 1,609 complaints were transmitted before 8:35 a.m. the first business day after submission. *Id.* at ¶ 30, p. 26.

Thus, the bulk of the submissions transmitted the business day after submission "were submitted late in the court business day and transmitted relatively early the following court business morning." *Id.* at ¶ 32, p. 27. More than half of the 1,609 submissions were submitted after 3:36 p.m.[12] *Id.* at ¶ 33, p. 28. Almost 40% (618) were transmitted within one business hour of submission. *Id.* at ¶ 34, p. 29. And 75% (1,207) were transmitted by 9:30 a.m.

---

fact that Defendants were not violating the First Amendment in terms of providing access to newly submitted civil complaints. (*Id.* at 80.) There is no reason to depart from this analysis. However, to the extent that the Court now wishes to perform an additional analysis, focusing solely on "same day" access in addition to how quickly complaints are transmitted after submission in terms of business hours, that data is provided in Dr. Walter's February 13 declaration (ECF 98-6 at ¶¶ 26-28, pp. 34-42) and Exhibit 7, Walter Decl. at ¶¶ 26-35, pp. 25-30; *id.* at p. 22.

[12] This data, and the charts included in paragraphs 26 – 35, pp. 24-30 of Dr. Walter's reply declaration, undoubtedly demonstrate that this case is really just about CNS desiring immediate access to complaints submitted late in the business day despite having access to 75% of such complaints by 9:30 a.m. the next business morning. *See id.* at ¶ 35, p. 30.

"Clearly, the data confirms that the end-of-day submissions result in next-business-day transmissions, but even then the complaints are transmitted early the next business morning after end-of-day submission." *Id.* at ¶ 23, pp. 20-21.  This confirms that there is near instantaneous access for CNS to its "fresh news."  Thus, there is no dispute of material fact that there are not unlawful delays in access for CNS to new civil complaints in Maryland.

**VIII.   IF CONSTITUTIONAL SCRUTINY IS SOMEHOW APPLIED, IT MUST BE RELAXED SCRUTINY, AND PRE-ACCESS CLERK REVIEW MEETS THE BURDEN.**

On the issue of scrutiny, CNS accuses Defendants of "evading" the standard and again misrepresents Defendants' contentions.  (ECF. 99 at 20-21.)  If, however, the Court reaches the point of applying constitutional scrutiny (which it should not), "relaxed scrutiny" should be applied, which requires that access delays "be content-neutral, narrowly tailored and necessary to preserve the court's important interest in the fair and orderly administration of justice."  *Schaefer*, 2 F.4th at 328 (internal quotations and citations omitted).  As Defendants outlined, brief delays in access for clerk review are content-neutral, narrowly tailored, and necessary to preserve the fair and orderly administration of justice.  (ECF 98-1 at 21-25; ECF 98-2 at 14-19; ECF 50 at 11-18).

Despite CNS's attempts to downplay this, ECF 99 at 26, Defendants have an interest in operational efficiency, which will be greatly affected if filers, and not Defendants, have complete control over new electronic case initiation.  Exhibit 10, Preston Dep. at 203-05; (ECF 98-2 at ¶ 47-49; *see also* ECF 98-50 at 5 (in federal district courts "[s]ubmissions are converted into filings by the court's staff after a quality control review," and although filers "may submit initial documents to the court electronically . . . it is the court that actually opens the case and assigns it a case number")).  Courts also have an interest in and obligation to prevent the dissemination of private and confidential information.  (ECF 66 at 69; ECF 98-2 at ¶ 44); *see Hade*, 631 F. Supp. 3d at 363-64 (E.D. Va. 2022) (citing *Ostergren v. Cuccinelli*, 615 F.3d 263, 275 (4th Cir. 2010) (citing *The*

*Florida Star v. B.J.F.*, 491 U.S. 524 (1989)) (post-*Schaefer*, explaining states have an interest in policing sensitive information and protecting citizens' privacy).   Despite CNS's contrary assertions, ECF 99 at 30,[13] without pre-access clerk review, to the extent documents are mistakenly submitted containing confidential and/or private information, Defendants will disseminate such information to the public, at least for some period of time, through one of the forced solutions, *i.e.*, the press review tool or auto-accept.  (ECF 98-1 at 21-25; ECF 98-2, at ¶ 44-46).  Finally, despite CNS trying to turn this part of the analysis into a "numbers game," ECF 99 at 23, it should not be permitted to do so.  *See Ward v. Rock Against Racism*, 491 U.S. 781, 800 (1989) ("So long as the means chosen are not substantially broader than necessary to achieve the government's interest . . . the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative.").

Further, delaying access has been accepted as a constitutionally sound method for balancing an individual's constitutional rights with the media's right to access to court proceedings.  *See e.g., United States v. Cianci*, 175 F. Supp. 2d 194, 205 (D. R.I. 2001) (citation omitted) ("Both the Supreme Court and the First Circuit have recognized that delaying the release of documents is one method of striking an appropriate balance between a defendant's right to a fair trial and the media's right of access."); *In re Globe Newspaper Co.*, 729 F.2d 47, 57 (1st Cir. 1984) ("we think that the harm in delayed access is not as great as that in denied access.").

And finally, and importantly, CNS misses, ECF 99 at 20-21,[14] the critical point that, of course, the type of "speech" that is alleged to be restricted and/or harmed, as well as the context

---

[13] Even CNS must backtrack on its assertion by stating that the "alternatives would enable Defendants to continue withholding the few e-filed civil complaints *most likely to* contain confidential information . . . ."  (ECF 99 at 31 (emphasis added).)

[14] Somehow, in a fact-based area of the analysis that focuses on the type of "speech" alleged to be harmed, CNS oddly questions the relevance of the distinguishment between speech

within which the "speech" is "restricted," are vital considerations in this analysis.  *See Fusaro*, 930

F.3d at 256 ("given the spectrum of First Amendment protections applicable to *different kinds of*

*speech in varying contexts*, [the court must ask] what level of scrutiny governs [the plaintiff's]

claims?") (emphasis added).[15]   Defendants' pre-access-clerk-review policies present no actual

constitutional problem *for CNS*, *see* ECF 98-1 at 29-32, who finally concedes that it cannot

challenge the policies based on the abstract rights of others, ECF 99 at 32-33.  It is undisputed that

CNS faces no legal or criminal consequences related to them, that they do not dictate what

categories of judicial records CNS may publish, that they do not restrict the types of speech CNS

may express, and that they do not prevent CNS from obtaining the post-clerk-review access to

judicial records that courts have traditionally provided, especially in Maryland.  (ECF 98-1 at 29-

32.)  And on the issue of timeliness, Defendants' policies and practices do not prevent CNS from

publishing its content within a timeliness standard that is consistent with its publishing habits, and

do not prevent CNS from obtaining reasonably contemporaneous access to judicial records.  (*Id*.)

IX.    **GRANTING THE RELIEF REQUESTED WILL FORCE THIS COURT TO MANDATE A CHANGE TO THE STATE COURTS' OPERATION OF ITS ELECTRONIC SYSTEMS.**

Although CNS claims that it does not ask the Court to order any solution, ECF 99 at 28,

granting CNS's requested relief will force a specific change to court operations.  *See Planet*, 947

---

[15] Again, CNS misconstrues the First Amendment as an unqualified entitlement to certain documents (like FOIA), rather than protection against a problem.  (*See* ECF 98-1 at 29-32); *Fusaro*, 930 F.3d at 249 ("no general First Amendment right to access a government record").

restrictions and access to court documents.  CNS also misleadingly suggests here that because the Fourth Circuit quoted *Reynolds*, 779 F.3d at 229, in *Schaefer*, 2 F.4th at 329, that *Reynolds* supports its contentions here.  In actuality, the *Reynolds* quote in *Schaefer*: (1) was made only within the context of evaluating the evidence related to the clerks' delays in that case, and (2) is merely a general evidentiary statement that an "argument unsupported by the evidence will not suffice to carry the government's burden," which is completely unrelated to the substantive point CNS is trying to make here.  2 F.4th at 329 (quoting *Reynolds*, 779 F.3d at 229).

F.3d at 596 ("The First Amendment does not require courts, public entities with limited resources, to set aside their judicial operational needs to satisfy the immediate demands of the press."). On a functional level, eliminating pre-access clerk review of case-initiating documents will leave Maryland courts with implementing either: (a) an auto-accept configuration, or (b) a press review tool. (ECF 98-2 at ⁋ 38.) Despite CNS's contrary assertions, ECF 99 at 31-32, implementing the press review tool will cause Maryland's courts to change how File and Serve operates. Exhibit 10, Preston Depo. at 193-208; Exhibit 11, Derrick Dep. at 200-04. Most notably, a press review tool will force Maryland to revert to a system in which filers are entrusted with the power to control security settings for documents, reversing important rulemaking. (ECF Nos. 98-55 – 98-60.)

## CONCLUSION[16]

Defendants' cross-motion for summary judgment should be granted.

Respectfully submitted,

ANTHONY G. BROWN
Attorney General of Maryland

/s/ Kevin M. Cox
_____
KEVIN M. COX (29012)
KATHRYN HUMMEL (21991)
Office of Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
kcox@oag.state.md.us
Attorneys for Defendants

March 26, 2024

---

[16] CNS attaches an "evidentiary objections" exhibit. (ECF 99-10.) Clearly, CNS is concerned about those facts. Defendants would be remiss if they did not at least acknowledge this. However, a substantive response is unnecessary. *See e.g., Burch v. Regents of U. of California*, 433 F. Supp. 2d 1110, 1118 (E.D. Cal. 2006) ("It appears to have become the 'standard of practice' on summary judgment motions for attorneys to comb through" opposing materials "in search of any statement, phrase, or document which might in any way run afoul of the Federal Rules of Evidence, and to file objections on all conceivable grounds. In some of the larger law firms, newer attorneys are assigned to the case simply for that purpose." Attorneys routinely raise unnecessary objections. "Instead of objecting, parties should simply argue that the facts are not material.").

**United States District Court for the District of Maryland**
Civil Case No. 1:22-cv-00548
Defendants' Cross-Motion for Summary Judgment

**REPLY EXHIBIT LIST**

| Exhibit | Description |
|---------|-------------|
| | |
| 1 | Docket and Compl., *CNS v. Hade, et al.*<br>U.S. District Court for the Eastern District of Virginia, Case No. 3:21-cv-00460-HEH |
| 2 | Exerpts from Hearing Transcript, Nov. 28, 2022 (ECF No. 59) |
| 3 | Joint Stipulations of Fact, *CNS v. Hade, et al.*<br>U.S. District Court for the Eastern District of Virginia, Case No. 3:21-cv-00460-HEH |
| 4 | Prince William Circuit Court Clerk's Office, Attorney eFiling Information,<br>Available at: https://www.pwcva.gov/department/circuit-court/attorney-efiling<br>(last visited Mar. 26, 2024) |
| 5 | CNS Brief, *CNS v. Hade, et al.*<br>United States Court of Appeals for the Fourth Circuit, Case No. 22-2110 |
| 6 | USDC of Maryland CM/ECF Notice |
| 7 | Reply Declaration of Dr. Jamie Walter |
| 8 | Defendants' Expert Designation |
| 9 | CNS's Expert Designation |
| 10 | Exerpts from Lisa Preston Deposition |
| 11 | Exerpts from Terry Derrick (Tyler Technologies) Deposition |